**Jennie B. Krasner**
**Daniel J. Maher (*pending pro hac vice*)**
**Duane K. Thompson (*pending pro hac vice*)**
**Marc E. Johnson (*pending pro hac vice*)**
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, NE**
**Washington, DC  20549**
**Telephone:  (202) 551-7159**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **FRANCISCO ABELLAN VILLENA, GUILLERMO CIUPIAK, JAMES B, PANTHER, JR., and FAIYAZ DEAN** <br><br> **Defendants.** | **Civil Action No. 18-cv-4307** <br><br> **Jury Trial Demanded** |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or the "SEC") alleges as follows:

## SUMMARY

1.      Defendants Francisco Abellan Villena ("Abellan"), Guillermo Ciupiak ("Ciupiak"), James B. Panther, Jr. ("Panther"), and Faiyaz Dean ("Dean") engaged in a fraudulent scheme to effect illegal, unregistered sales of and manipulate the market for shares of the micro-cap company Biozoom, Inc. ("Biozoom").  The scheme quickly generated roughly $34

million in illicit proceeds from sales of Biozoom shares to retail investors and others at artificially inflated prices.

2.      Defendants' deceptive conduct created the false appearance that (1) Biozoom shares were legally available for sale to the general public; and (2) the price and trading volume of Biozoom shares were determined by the natural interplay of market supply and demand, rather than artificially generated through manipulative trading.  Defendants' deceptive conduct also concealed Abellan and Ciupiak's controlling interests in the company that became Biozoom.

3.      Each defendant played an integral role in the scheme's success.  Abellan and Ciupiak masterminded and controlled the scheme.  Panther furthered the scheme by arranging the creation of brokerage accounts in the names of nominees, facilitating their trading in Biozoom stock, and organizing a promotional campaign to coincide with the manipulative trading.  Dean, an attorney, furthered the scheme by acquiring stock for Abellan and Ciupiak in a manner designed to conceal both Abellan and Ciupiak's control of the stock and the fact that the stock should not have been immediately available for re-sale to the public, and then by helping Panther with the creation of brokerage accounts in the names of nominees into which the Biozoom shares were deposited and from which they were sold.  In May and June of 2013, Abellan and Ciupiak, with Panther's assistance, controlled sophisticated manipulative trading to artificially inflate the price and trading volume for Biozoom shares by creating the false appearance of active trading in Biozoom stock.

4.      Months before Abellan and Ciupiak artificially created the appearance of demand for Biozoom stock, they had Dean arrange to acquire for them all of the shares of an inactive shell company and to hide Abellan and Ciupiak's control of these shares by placing them in the names of Argentine nationals (the "Argentine Nominees") who had no actual economic interest

2

in, or control of, the shares.  Dean also falsified the transaction documents to hide the fact that the acquired shares could not be freely re-sold.  Having thus obtained all of the shares, Abellan and Ciupiak, with significant involvement from Panther, then effectively merged a subsidiary of the shell company with a German biomedical company, resulting in the creation of Biozoom, Inc.  As a result, all of Abellan and Ciupiak's shares in the shell company became Biozoom shares.  Panther and Dean arranged to have the Biozoom shares deposited in accounts in the names of the Argentine Nominees at U.S. brokerages.  With Panther's assistance, Abellan and Ciupiak then secretly directed the trading in those accounts, as well as in the accounts of other nominees.

5.     With the scheme's groundwork in place, beginning on May 16, 2013, Abellan, Ciupiak, and Panther quickly laddered the price of Biozoom stock upwards.  These defendants got the stock price moving upward through trading – at ever-increasing prices – among the Argentine Nominees and these defendants' network of brokers and traders.  Simultaneously, Abellan and Ciupiak controlled other foreign nominee accounts that they used for manipulative coordinated bidding to keep the share price propped up.  This bid activity created the false appearance of a rising price resulting from significant demand for Biozoom stock, even as Abellan, Ciupiak, and Panther caused millions of shares of Biozoom to be illegally sold into the market.  To further drive up demand – and thus Biozoom's share price – Abellan, Ciupiak, and Panther organized an elaborate online, print, and radio promotional campaign that coincided with the manipulative trading.

6.     Prior to the manipulative trading, Biozoom's stock never publicly traded.  After manipulative trading started on May 16, 2013, at a pegged price of $1.10 per share, the stock price peaked at $4.50 per share on June 19, 2013.  By selling to retail investors at artificially

inflated prices, Abellan, Ciupiak, and Panther generated approximately $34 million in illicit proceeds from sales of shares deposited in the accounts they set up and controlled.

7.      The Commission suspended trading in Biozoom shares on June 25, 2013.  The Commission also obtained an order freezing all of the sales proceeds in an action previously filed in this District.  More than $16 million in assets located in the United States were subsequently released to the Commission and distributed to harmed investors.  Abellan and Ciupiak had already caused the other approximately $17 million of proceeds of the fraud to be wired to offshore accounts they controlled.

8.      By engaging in this fraudulent scheme, Abellan, Ciupiak, Dean, and Panther violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, as well as Section 5 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77(e), and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

9.      By this complaint, the SEC seeks permanent injunctions prohibiting future violations of the federal securities laws, a bar from participating in the offering of any penny stock, disgorgement of ill-gotten gains together with pre-judgment interest, and civil penalties.

## JURISDICTION AND VENUE

10.     The SEC brings this action pursuant to the authority conferred by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Defendants have directly or indirectly made use of the means or instrumentalities of

transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

12.     Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. §78aa, because certain of the offers and sales of securities and certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the District.  As detailed below, numerous of the brokerage accounts used to perpetrate the fraud, including by offering and selling securities, were located at a brokerage in this District.   Money was wired into those accounts, while key communications – including trade orders and efforts to set up the accounts – occurred in this District.  A registered representative at that brokerage, sitting in this District, routed many of the manipulative trades to other brokers for execution.  The brokerage's clearing firm, which cleared the certificates for trading, and which received funds from Defendants, was also located in this District.  Finally, other wires to and from entities controlled by Abellan and Ciupiak were routed through banks in this District.

## DEFENDANTS

13.     Guillermo Ciupiak, age 35, is an Argentine national last known to have resided in Barcelona, Spain.  He is the beneficial owner of Royal Capital Ventures Ltd. ("Royal Capital"). As described below, Royal Capital provided nearly all the funds used to carry out the scheme.

14.     Francisco Abellan Villena, age 47, is last known to have resided in Barcelona, Spain.  The SEC previously obtained judgment against Abellan for coordinating another market manipulation scheme in *SEC v. Francisco Abellan, et al.*, No. 3:08-cv-05502 (W.D. Wash, Aug. 13, 2008).  Abellan also exerted substantial control over Royal Capital.

15.     James B. Panther, Jr., age 45, is a resident of Carlsbad, California.  He is both a U.S. and Ecuadorian citizen.  Panther sometimes identified himself as Jaime (or James) Suqui.

16.      Faiyaz Dean, age 40, is a Canadian citizen residing in Vancouver, British Columbia, Canada.  He is licensed to practice law in British Columbia, Canada and Washington State.

## RELATED ENTITIES AND INDIVIDUALS

17.     Biozoom was incorporated in Nevada in June 2007 as Entertainment Art, Inc. ("EERT") and quoted on the Over-the-Counter Bulletin Board ("OTCBB").  Its common stock was registered with the Commission pursuant to Exchange Act Section 12(g) on May 22, 2009.  In 2013, EERT became Biozoom through an asset purchase transaction and name change.  The Commission suspended trading in BIZM stock on June 25, 2013.  Biozoom deregistered its common stock under Section 12(g) via a Form 15 filed with the Commission on October 22, 2015.

18.     Biozoom's stock was a "penny stock" as defined by the Exchange Act.  At all times relevant to this Complaint, Biozoom's stock traded at less than $5.00 per share.  During the same time period, Biozoom's stock did not meet any of the exceptions to penny stock classification pursuant to Section 3(a)(51) and Rule 3a51-1 of the Exchange Act.

19.     Mark Karow, age 55, is a resident of Great Neck, New York.  Karow was, from July 2011 until June 2014, a registered representative in Legend Securities, Inc.'s office in New York, New York.  In May 2018, Karow, without admitting or denying factual allegations, settled the Commission's claims against him for his role in the events alleged in this Complaint.

20.     Legend Securities, Inc., ("Legend") has been registered with the Commission as a broker-dealer with its principal place of business in New York, New York since November 1998.

In May 2018, Legend, without admitting or denying factual allegations, settled the Commission's claims against it for its role in the events alleged in this Complaint.

21.     Timothy Scarpino, age 35, is a resident of Scottsdale, Arizona.  Scarpino was, from 2009 until 2013, a registered representative at a broker-dealer located in Scottsdale, Arizona.  In May 2018, Scarpino, without admitting or denying factual allegations, settled the Commission's claims against him for his role in the events alleged in this Complaint.

## BACKGROUND

22.     Under Section 5 of the Securities Act, it is unlawful for any person, directly or indirectly, to offer or sell securities using the U.S. mails or interstate commerce, unless (1) the offer or sale is registered with the SEC pursuant to a valid registration statement that applies to that specific offering of stock; or (2) the offer or sale is exempt from the registration requirements of Section 5.  Section 5 applies to both direct and indirect sellers.  An indirect seller is a person who was a necessary participant and substantial factor in the unregistered sales.

## STATEMENT OF FACTS

**A.     Background of EERT's Shares**

23.     Biozoom's predecessor entity, EERT, was incorporated in June 2007, ostensibly to market a line of leather bags.

24.     As of 2009, EERT had two categories of shares outstanding: (1) 1.2 million restricted control shares held by EERT's three founders (the "control block"); and (2) 610,000 shares EERT had sold to 34 investors ("private placement investors") in private placement transactions ("private placement shares").  EERT registered the resale of the private placement shares in a filing with the SEC that became effective on July 29, 2008.  No sales were made pursuant to this registration.

25.     In May 2009, Medford Financial, Inc. ("Medford") purchased all outstanding EERT shares in a private transaction.  As a result, the previously-filed registration statement was no longer effective, and the private placement shares became control shares, subject to restrictions on their public re-sale.  No new registration statement was ever filed with the Commission regarding those shares' potential re-sale.

26.     To conceal from the public and regulators that the private placement shares had been converted to control shares subject to significant restrictions on their public re-sale, Medford did not disclose its purchase of the shares or seek to transfer them into its name.  The private placement shares therefore remained in the names of the 34 private placement investors.

27.     EERT's public filings furthered this deception, falsely stating that Medford acquired only the 1.2 million control block shares.

28.     EERT's stock underwent a 33:1 forward split in July 2009, making the total shares outstanding 59.73 million.  All of these shares were control shares owned by Medford.

29.     By late 2010, two shell brokers affiliated with Medford began to advertise EERT for sale.  They distributed a term sheet to individuals including Dean, which indicated that "99%" of EERT's shares were available for purchase.  Dean therefore knew or was reckless in not knowing that EERT's control shares and private placement shares were under common control.  EERT's public filings and related documentation, however, incorrectly continued to reflect that there remained two distinct blocks of stock:  39.6 million control block shares, and 20.13 million private placement shares.  EERT had no business activity throughout this period.

**B.      Abellan and Ciupiak Acquired Biozoom's Predecessor Entity, EERT, and Dean Hid Their Involvement**

30.     In or around December 2010, Ciupiak contacted Dean, looking for a "specialist to take companies public."  Dean responded, "Yes that is exactly what we do here and we can

definitely assist." Over the next eighteen months, Dean identified public shell companies to Ciupiak for potential acquisitions unrelated to Biozoom.

31.    On or about July 18, 2012, Dean contacted the shell brokers affiliated with Medford and asked if they knew of any public shell companies available for purchase. Dean did not identify his client, Ciupiak, as the person who wanted to purchase the shell. The shell brokers told Dean that EERT was available.

32.    On July 23, 2012, Dean sent the shell brokers a proposed Letter of Intent pursuant to which Dean's client would acquire *all* of EERT's shares – including the 20.13 million private placement shares – for $430,000. One of the brokers responded, "We can't have both free and restricted in 1 agreement, this will be viewed as a combined purchase and the free will become restricted. We will assemble two separate agreements and send back. This is the best way to consummate the deal." The shell brokers knew that Dean and his client wanted to conceal that the private placement shares were control shares subject to significant restrictions on their public re-sale, and Dean knew that documentation of the purchase of *all* shares by his client would reveal the shares' control status.

33.    To continue to hide the control status of the shares, Dean and the shell brokers revised the final Letter of Intent to falsely indicate that Dean's client would purchase only the 39.6-million-share control block, even though the purchase actually included both the control block *and* the private placement shares for the price of $430,000, the same amount Dean had offered to purchase all of the shares.

34.    Ciupiak and his associate, Abellan, did not want their involvement in the purchase of EERT known, so they created a nominee entity – Le Mond Capital ("Le Mond"), a British Virgin Islands entity – as a vehicle for their purchase. They installed a Canadian national

residing in Buenos Aires, Argentina as the nominal director of Le Mond.  In an email sent on September 6, 2012, Dean told the shell brokers that Le Mond would be the purchaser.

35.     In October 2012, Le Mond completed the transaction to purchase *all* of the shares of EERT.  Royal Capital, a Seychelles entity owned and controlled by Abellan and Ciupiak, provided the $430,000 purchase price via an escrow agent hired by Dean.

36.     As part of the transaction, Dean negotiated with the shell brokers to obtain $105,000 of the $430,000 purchase funds as a "finder's fee."  The finder's fee was paid to an entity controlled by Dean's wife.

37.     EERT's SEC filings continued to conceal the transfer of the private placement shares.  The October 25, 2012 Form 8-K filed with the SEC stated that Le Mond purchased only the 39.6-million-share control block and omitted any reference to the 20.13 million private placement shares.  Because of the deceptive manner in which Dean documented the purchase, the share certificates for the private placement shares were not cancelled and reissued in Le Mond's name, and thus were not designated as control shares, as they should have been.

38.     Through Dean's deceptive conduct, by October 2012, Abellan and Ciupiak controlled all of EERT's outstanding stock, including the 20.13 million private placement shares that still falsely appeared to belong to the 34 private placement investors, and thus falsely appeared eligible for public resale by the private placement investors pursuant to a registration exemption.

**C.     Dean Arranged for the Transfer of EERT Shares to Argentine Nominees**

39.     By no later than fall 2012, Dean started communicating with Panther in connection with the scheme.  When communicating with Dean, Panther often used an email address containing the name "Suqui," such as james.suqui@strategies.com.ec.  As discussed below, "Suqui" was a pseudonym Panther used throughout the scheme.

40.     Abellan and Ciupiak concealed their control of the scheme by operating through nominees.  Beginning in November 2012, Dean arranged to have the private placement shares – which were nominally owned by Le Mond and actually controlled by Abellan and Ciupiak – transferred into the names of the ten Argentine Nominees.  To accomplish this, Dean provided EERT's transfer agent with fraudulent stock purchase agreements.  In most cases, these agreements purported to show that the Argentine Nominees purchased the private placement shares directly from the private placement investors, even though Dean knew that Abellan and Ciupiak, using Le Mond, had acquired the shares from Medford several months earlier.

41.     Dean knew or was reckless in not knowing that these purchase agreements were shams.  He had previously arranged the sale of the private placement shares from Medford to Le Mond, so he knew or was reckless in not knowing that, at the time of the transfer to the Argentine Nominees, the private placement investors did not own those same shares and thus could not sell them to anyone.

42.     Because the purchase agreements falsely reflected that the Argentine Nominees were purchasing shares directly from the private placement investors, Dean was able to use the agreements to facilitate the transfer agent's issuance of new share certificates without restrictive legends in the names of the Argentine Nominees.  Dean's deceptive conduct was successful, and from November 2012 through May 2013, the transfer agent issued certificates without restrictive legends for the 20.13 million private placement shares in the names of the ten Argentine Nominees and provided the certificates to escrow agents chosen by Dean.

43.     The escrow agents received the certificates from the transfer agent and the purchase funds from foreign bank accounts in the Argentine Nominees' names, which, as discussed below, actually were controlled and funded by Abellan and Ciupiak.

44.     As Dean instructed, the escrow agents sent the certificates to Dean's office and wired $118,000 of the supposed purchase funds to Dean, even though Dean ostensibly represented the buyers of the shares.  Dean did not have the funds transferred to the private placement investors – the purported sellers of the shares – because he knew that there was no actual sale between the private placement investors to the Argentine Nominees and that the shares were, in fact, owned by Le Mond, the entity controlled by Abellan and Ciupiak.  Dean's subterfuge facilitated the transfer of the shares to the Argentine Nominees who were also controlled by Abellan and Ciupiak.

**D.     Abellan, Ciupiak, and Panther Searched for an Operating Company, and Panther Used Deception to Facilitate EERT's Transition to Biozoom**

45.     By late 2012, Panther, Abellan, and Ciupiak had begun searching for a company with a product to promote.

46.     An associate of Abellan identified the Opsolution companies (collectively, "Opsolution"), a collection of three entities based in Germany, that was developing a mobile scanner that would provide biometric readings from a non-invasive skin scan.  The founders and officers of Opsolution were seeking investors to support commercial development of the company's product.

47.     In late 2012 or early 2013, Panther and Dean spoke with Opsolution's officers. Panther introduced himself to them as "James" and later communicated with them using the alias "James Suqui" and the email address james.suqui@strategies.com.ec.

48.     Panther told the Opsolution officers that he represented a group of potential investors who were interested in Opsolution's technology.  Panther offered to help Opsolution navigate entry into the U.S. stock market, which he claimed would help the company raise funds.

49.     Panther met with the Opsolution officers in Zurich, Switzerland on January 17, 2013.  Panther said the group he represented could invest $2 million in Opsolution, but the deal and due diligence would need to be completed quickly, to which the Opsolution officers agreed.  Panther placed a call to Abellan's Barcelona phone number on the day of the meeting with the Opsolution officers and traveled the next day to Barcelona, where Abellan and Ciupiak resided.

50.     Panther requested that Opsolution prepare a business plan.  The Opsolution officers provided the confidential business plan, including detailed financial projections, to only Panther and Dean.  As described below, without the Opsolution officers' knowledge or approval, this information later was used in promotional materials touting Biozoom stock financed by Abellan and Ciupiak and arranged by them, along with Panther.

51.     On February 28, 2013, EERT filed a Form 8-K with the SEC announcing a share transaction and asset purchase of Opsolution.  In effect, Opsolution merged into an EERT subsidiary called Biozoom Technologies, and became Biozoom, Inc. effective April 1, 2013.  All outstanding EERT shares were converted into shares of Biozoom, which was quoted under the ticker symbol "BIZM."  The number of BIZM shares available for trading, known as its "float," remained the same as EERT's.

52.     Le Mond transferred 39 million control shares to the Opsolution officers; Le Mond's nominal owner retained 600,000 shares.  As disclosed control shares, these shares were not available for public resale absent registration or an applicable exemption.  After the transaction, Abellan and Ciupiak continued to control the 20.13 million private placement shares in the Argentine Nominees' names.

53.     In connection with the transaction, Opsolution/Biozoom received payments totaling approximately $1.2 million into its U.S. corporate bank account, with $600,000 coming

from a Panamanian entity over which Ciupiak had a general power of attorney and that sent

funds to and received funds from Royal Capital.

**E.     Abellan and Ciupiak Controlled Argentine Nominee Bank, Brokerage, and Other Accounts to Further the Scheme**

54.     Abellan and Ciupiak controlled brokerage and bank accounts in the names of the

Argentine Nominees.  After Dean arranged to transfer Abellan and Ciupiak's 20.13 million

private placement shares into the names of ten Argentine Nominees, Abellan and Ciupiak – with

assistance from Panther and others – opened and controlled brokerage accounts in the names of

those same Argentine Nominees.  Panther and Dean then arranged to deposit the share

certificates into the brokerage accounts, so that Abellan and Ciupiak could liquidate their shares.

Abellan and Ciupiak funded the Argentine Nominees' brokerage accounts using corresponding

bank accounts in the names of the Argentine Nominees (which Abellan and Ciupiak also

controlled) located in several different foreign countries.

55.     Starting in or around November 2012, Abellan and Ciupiak deposited substantial

funds – tens of thousands of Euros – from Royal Capital into the Argentine Nominees' bank

accounts.

56.     After the first bank wrote that it would need supporting documents or an

explanation as to the source of the funds, Ciupiak directed a lawyer in Switzerland to create a

sham trust agreement between Royal Capital, the lawyer's entity as Trustee, and one of the

Argentine Nominees ("Nominee 1") as beneficiary, and to use that trust agreement as the

standard to fund all the Argentine Nominees' bank accounts.  Ciupiak further instructed the

Swiss lawyer that Nominee 1 needed to appear to be a signatory so it would look like the

nominee had engaged the trustee.  On or about January 7, 2013, Ciupiak sent a trust agreement to

14

the lawyer, supposedly signed by Nominee 1.  Abellan and Ciupiak used similar sham trust

agreements in connection with funding bank accounts in each of the Argentine Nominees'

names.

57.     In addition to sham trust agreements, Abellan and Ciupiak also used sham loan

agreements between Royal Capital and each of the ten Argentine Nominees to falsely document

the funding transactions.  For example, with respect to a second Argentine nominee ("Nominee

2") whose accounts Ciupiak and Abellan also controlled, Ciupiak told the Swiss lawyer on

January 28, 2013, that "[w]e are trying to deposit 50,000 EUR at [Nominee 2's] bank account

through a loan agreement coming from Royal [Capital].  I'll need you to draft a trust agreement .

. . for this transaction.  I've also attached the loan agreement between Royal and [Nominee 2]."

58.     Ciupiak informed the Swiss lawyer that the funds for the nominee accounts were

set to arrive in the lawyer's "trustee" entity bank account.  Ciupiak then reminded the lawyer to

inform "us" when he was "sending the wires" to the Argentine Nominees' bank accounts.  Royal

Capital – Abellan and Ciupiak's Seychelles entity – wired funds to the Swiss lawyer's entity.

The Swiss lawyer, in turn, wired those funds onward to foreign bank accounts – including

accounts in Belize, Cyprus, Panama, St. Vincent and the Grenadines, and Switzerland, but *not*

Argentina – in the names of the Argentine Nominees.  These wires referred to the sham loan and

trust agreements.  For example, on January 30, 2013, Royal Capital wired €51,500 to the

lawyer's entity, and the wire receipt stated this payment was for "Loan and Trust Agreement."

Two days later, the Swiss lawyer transferred €50,000 from his entity's bank account to a Cyprus

bank account in Nominee 2's name, again with reference to "Loan and Trust Agreement."

59.     In this manner, Abellan and Ciupiak funded the nominee bank accounts while

concealing their control and funding of the accounts by hiding behind the Argentine Nominees

and Royal Capital.  Later communications underscore the extent to which they controlled the Argentine Nominees' bank activity.  For example, on April 24, 2013, Abellan told the Swiss lawyer that the "transactions" for two nominees would not "happen at the moment.  We will keep you updated on any changes."  Abellan and Ciupiak used the Argentine Nominees' bank accounts to fund brokerage accounts they controlled in the names of Argentine Nominees and to effect the Argentine Nominees' sham share purchases arranged by Dean, discussed above.

60.     To further conceal that they controlled bank and brokerage accounts in the names of the Argentine Nominees, Abellan, Ciupiak, and Panther controlled and monitored email and instant message accounts in the names of the Argentine Nominees and used those accounts to communicate with the banks and brokers.  For example, on November 16, 2012, a bank employee sent an email to the email address of Nominee 1.  Less than an hour later, Ciupiak forwarded this email to the Swiss lawyer.  There was no intervening "forward" from Nominee 1's email address to Ciupiak's email address, which indicates that Ciupiak actually received emails intended for Nominee 1, including those regarding the bank account in Nominee 1's name.  Moreover, Internet Protocol ("IP") records confirm that Abellan and Ciupiak controlled the instant messages that were sent in the names of the Argentine Nominees to brokers in connection with trading.

61.     Abellan and Ciupiak took additional steps to conceal their control of these instant message accounts by making extensive use of anonymous proxy servers.  Anonymous proxy servers are servers that act as intermediaries between end users, and thus obfuscate the location and identity of the actual user.  Virtually all of the messages sent from the Argentine Nominees' instant message accounts – which, as discussed below, placed all of the sell orders to liquidate Abellan and Ciupiak's BIZM shares – were sent through anonymous proxy servers.

16

**F.      Panther and Dean Directed and Facilitated the Opening of the Argentine Nominees' Brokerage Accounts and Deposits of Private Placement EERT Shares**

62.      From November 2012 through May 2013, Panther, with Dean's assistance, directed and facilitated the opening of accounts at U.S. brokerage firms in the names of the Argentine Nominees who nominally owned the private placement shares.  As described above, those accounts and the shares they contained were controlled by Abellan and Ciupiak.

63.      In November 2012, Panther attempted to open a brokerage account in the name of Nominee 2 at a broker-dealer in Florida (the "Florida Brokerage").  Phone records show several calls between a registered representative at the Florida Brokerage ("Florida Rep") and Panther's number and at least one call between the Florida Rep and Abellan's Barcelona phone number in late September.

64.      During that time, Panther was in regular contact with Abellan.  Panther was in Barcelona – where Abellan was located – from November 11 to November 21, 2012.  Between November 23, 2012 and December 1, 2012, shortly after Panther returned to California, phone records show at least ten lengthy calls between Panther's phone number and Abellan's Barcelona phone number.

65.      On November 21, 2012 – the last day of Panther's November stay in Barcelona – the Florida Brokerage received, via email, completed account opening documents for the account in the name of Nominee 2, which stated that Nominee 2 intended to deposit a certificate for 165,000 EERT shares he purportedly purchased from a private placement purchaser, Investor A.

66.      The Florida Brokerage's clearing firm would not clear Nominee 2's share certificate unless he provided the original subscription agreement reflecting Investor A's purchase of the shares from EERT.  However, none of the Defendants had that agreement.

17

67.     On December 3, 2012, Panther wrote to Dean: "Need to find out if the cert was sent to the broker.  There is an issue with clearing firm.  If it was sent need the tracking number asap to pass to orcle [sic]."  "Oracle" was a name Abellan sometimes used.  For example, in an email, Abellan stated that his instant messaging handle was "oracle."

68.     Because Nominee 2 could not provide the original subscription agreement, the clearing firm, located in Manhattan, New York, refused to clear the share certificate for trading. Florida Rep then referred the account to Karow, a registered representative at Legend, a broker-dealer also located in Manhattan, where Karow had his office.

69.     From January to May 2013, Karow opened five accounts in the names of some of the Argentine Nominees; shares of EERT were deposited into four of those accounts.

70.     In connection with each deposit, the Argentine Nominees provided (1) a stock purchase agreement reflecting that they purportedly purchased the private placement shares from the original private placement investors, and (2) an opinion letter that stated the shares were not required to bear a restrictive legend and could be sold without registration.

71.     Panther and Dean arranged for the issuance of these opinion letters by an Illinois-based attorney.  Panther and Dean provided the Illinois-based attorney with documents and information.  For example, Dean sent the Illinois-based attorney a document that Dean obtained from Panther that bore the purported signature of one of the Argentine Nominees.

72.     When Nominee 2 first attempted to deposit an EERT share certificate in his account at Legend, Karow raised questions concerning Nominee 2's purchase of the EERT shares.

73.     In response, Panther called Karow.  Panther's phone records indicate that on February 27, 2013, Panther had spoken with Abellan and then immediately called Karow.

Although he was not an attorney, Panther falsely claimed to be a lawyer calling on behalf of his "client," Nominee 2.  In fact, Panther was acting on behalf of Abellan and Ciupiak.  Karow told Panther that Nominee 2 needed to supply documentation that Nominee 2 had purchased the shares in a bona fide transaction.  Panther offered to provide Karow with documentation in an attempt to address Karow's request.

74.     Panther knew, or was reckless in not knowing, that Nominee 2 had not purchased the shares in a bona fide transaction.  After the call with Karow, Panther called Dean.  Dean then directed the escrow agent he had retained for the sham transaction between Nominee 2 and Investor A to send a letter to Karow.  The escrow agent sent Karow a letter that stated that the funds to purchase the shares were "disbursed" in March 2013.

75.     However, the purported purchase funds from Nominee 2 were never sent to Investor A because Investor A had already sold the shares to Medford several years earlier.  To the contrary, as described above in ¶¶ 43-44, on Dean's instructions, the escrow agent sent the purported purchase funds to Dean, who purportedly represented Nominee 2, the *purchaser* of the shares.

76.     On March 12, 2013, Nominee 2's EERT shares were cleared for trading.  Over the ensuing weeks, the shares deposited in the accounts of additional Argentine Nominees at Legend were likewise cleared for trading.

77.     In order for the Argentine Nominees to trade in these accounts, the accounts needed to be funded to cover clearing and other fees.  There were significant issues with funding the account in the name of another of the Argentine Nominees ("Nominee 3"), requiring interventions by Panther, Dean, Abellan, and Ciupiak.

78.     Panther's father was an attorney with his own law firm.  On April 26, 2013, Royal Capital, the entity controlled by Abellan and Ciupiak, wired nearly $375,000 to an attorney trust account in the name of Panther's father's law firm; Panther had access to that account.  Abellan generated a fraudulent billing invoice purportedly from the law firm to Royal Capital for nearly $375,000 to falsely justify the transfer.

79.     On May 5, 2013, Dean called Karow stating that Nominee 3 was having difficulty funding her account arising from Cyprus banking issues.

80.     In early May 2013, Panther's father's law firm sent Karow a cashier's check to fund Nominee 3's account.  Although the check listed Nominee 3 as the payer, it was in fact drawn on Panther's father's law firm trust account using funds from the Royal Capital wire.  The clearing firm declined to accept the cashier's check.

81.     Eventually, the accounts opened by Karow in the names of Nominee 3 and other Argentine Nominees into which certificates were deposited were successfully funded, all with money that ultimately came from Royal Capital through the Swiss lawyer and the Argentine Nominees' foreign bank accounts that Abellan and Ciupiak controlled.

**G.     Panther Attempted to Facilitate Deposits at the California Brokerage and When Rejected, Arranged for Deposits at the Arizona Brokerage**

82.     In early May 2013, immediately after returning from two months in Barcelona, Panther met with the president of a broker-dealer located in El Segundo, California (the "California Brokerage") about referring individuals to open accounts at the California Brokerage. Throughout the meeting and all of his subsequent communications with the California Brokerage, Panther identified himself using the pseudonym "Jaime Suqui."

83.     Panther explained that his referrals would deposit shares of Biozoom, a company with which he was working.

20

84.     On May 2, 2013, a Ciupiak/Abellan associate in Barcelona ("Barcelona Associate") sent to the California Brokerage a list of six of the Argentine Nominees who intended to open accounts at the California Brokerage.  The completed account opening documents subsequently submitted for those Argentine Nominees listed "Jaime P. Suqui" as the source of the referral.

85.     When the Argentine Nominees attempted to deposit share certificates in their accounts, the California Brokerage's clearing firm refused to clear the certificates without the original subscription agreements between the private placement investors and EERT.

86.     Unable to provide those agreements, further reinforcing that he knew or was reckless in not knowing that the Argentine Nominees did not acquire the shares in a bona fide transaction with the private placement investors, Panther instead explored opening accounts at a broker-dealer in Arizona (the "Arizona Brokerage") where the share certificates could be transferred.

87.     Panther sought and received several accommodations from the Arizona Brokerage for the Argentine Nominees.  Panther demanded that the Arizona Brokerage arrange for the direct routing of orders to the Florida Brokerage and the California Brokerage without the involvement of any other broker-dealers or market participants.  Panther also required that the Arizona Brokerage permit the Argentine Nominees to place orders by instant message.

88.     From May 10 to May 16, 2013, the Arizona Brokerage received account opening applications for four of the Argentine Nominees.  The initial paperwork listed "James Panther" as the referring party.  Panther asked the Arizona Brokerage to remove this reference to his name, and it was.

89.     On May 15, 2013, Panther met with the Arizona Brokerage's owner and Timothy Scarpino, one of its registered representatives, in California.  At the meeting, Panther said that the Argentine Nominees planned to deposit share certificates of Biozoom into their respective accounts for trading.  Panther explained that he was working with Biozoom to raise its share price and that the Argentine Nominees could bring a good amount of business to the Arizona Brokerage.  Panther reiterated that his referrals must be allowed to place orders via instant message and route trades directly to the Florida Brokerage and the California Brokerage.  The Arizona Brokerage owner agreed to Panther's requests.

90.     The next day – May 16, 2013 – the California Brokerage transferred to the Arizona Brokerage the EERT share certificates that the California Brokerage's clearing firm had rejected. Dean submitted to the Arizona Brokerage documentation it required for the deposit of the Argentine Nominees' share certificates, including the fraudulent stock purchase agreements discussed in ¶¶ 40-41 above.  The documentation provided by Dean indicated that the Argentine Nominees would collectively deposit a total of 8.92 million shares.  The share certificates were deposited and cleared for trading at the Arizona Brokerage.

**H.     Abellan, Ciupiak, and Panther Controlled and Monitored the Nominee Brokerage Accounts**

91.     By early May 2013, Abellan, Ciupiak, Panther, and Dean had facilitated the opening of, and deposit of 15.675 million  BIZM shares (more than 77% of the private placement shares) into, brokerage accounts at Legend and the Arizona Brokerage in the names of eight of the Argentine Nominees.

92.     Abellan and Ciupiak controlled these accounts in the names of the Argentine Nominees.  This control is confirmed by IP records.  Emails sent by Abellan and Ciupiak were

often sent from the same IP addresses that sent instant messages that directed trading in at least seven of the eight accounts.

93.     Panther's communications confirmed that he also had the ability to monitor the accounts' trading.  Panther communicated with the Arizona Brokerage frequently throughout the trading described below.  During the four weeks from May 29 through June 24, 2013, Panther spoke to Scarpino multiple times on every trading day but one, often starting before the market opened.  Panther discussed BIZM in general and, on at least some occasions, specifically asked how his referrals were doing.  During this period, Panther almost always called Scarpino from Abellan's phone number in Barcelona.

94.     Panther was aware of the trading when it occurred and monitored and participated in it in real time.  In particular, Panther had real time visibility into the instant messaging accounts the Argentine Nominees used to place orders to trade.  On one occasion, for example, Scarpino briefly stepped away from the trading desk; after he had been away for a short time, Panther called Scarpino and asked why he had not responded to instant messages from one of the Argentine Nominees.

95.     Abellan and Ciupiak also funded the Argentine Nominees' accounts.  As described above in ¶¶ 58-59, Abellan and Ciupiak sent funds from Royal Capital through an intermediary – the Swiss lawyer's "trustee" entity –to foreign bank accounts in the names of the Argentine Nominees.  Those bank accounts then sent that money onward to the U.S. to fund brokerage accounts at Legend.

**I.     Other Nominee Accounts Abellan, Ciupiak, and Panther Used to Manipulate Biozoom Stock**

96.     Abellan and Ciupiak also controlled and funded – through Royal Capital – other nominee accounts opened at the California Brokerage, the Arizona Brokerage, and an online

broker-dealer (the "Online Brokerage").  EERT/BIZM shares were not deposited in these nominee accounts, but Abellan and Ciupiak used the accounts to manipulate the market for Biozoom stock.  As with Scarpino, Panther communicated with the California Brokerage regarding BIZM frequently throughout the trading, often starting before the market opened, and on several occasions called the California Brokerage president from Abellan's phone number in Barcelona.  One such account was in the name of AFI Allgemeine Finanz und Investment AG ("AFI"), a purported Swiss investment firm that Abellan and Ciupiak controlled.

97.    Abellan and Ciupiak instructed the Swiss lawyer to create AFI.  To obscure their control of AFI, Abellan and Ciupiak directed the Swiss lawyer to install a nominee as AFI's ostensible director.  In an October 18, 2012 email, the lawyer wrote Abellan and Ciupiak that he had identified a director candidate who "is willing to do the job at 10 000 a year, no questions asked, no auditing required."

98.    To make AFI appear to be a legitimate entity in order to open brokerage accounts in its name, Abellan directed the establishment of a web domain and email accounts in AFI's name in a manner designed to conceal Abellan's role.  On February 17, 2013, Abellan wrote to the Swiss lawyer that AFI's website was "[n]ot intended for comercial [sic] use," and the next day stated that it would also be good to have a working telephone number listed on the website for "[w]hen we are active in the public markets."

99.    Abellan and Ciupiak controlled AFI's email, which was used to communicate with brokers at firms where AFI had accounts.  For example, a May 21, 2013 email from a broker to AFI's nominee director went directly to Ciupiak's email account.  A May 22, 2013 email from a broker to AFI's nominee director went directly to Abellan's email account.

100.    Abellan and Ciupiak also controlled AFI's bank accounts and concealed their control by using at least one pseudonym.  For example, in a May 17, 2013 email, Abellan instructed the Swiss lawyer to set up a bank account in AFI's name, but cautioned that the bank "knows me by Mark" and asked him not to mention "my real name."  "Mark" was a pseudonym Abellan used throughout the scheme.

101.    Three brokerage accounts were opened in AFI's name.  Panther referred the AFI account that was opened at the Arizona brokerage.  The two other accounts were opened at the California Brokerage and Online Brokerage.

102.    In addition to AFI's accounts, Abellan and Ciupiak also controlled and funded other nominee brokerage accounts which they used to manipulate the market for Biozoom stock.  One account was opened in the name of another Argentine citizen ("Purchaser Nominee 1") at the California Brokerage in May 2013.  Purchaser Nominee 1's Foreign Account Due Diligence Questionnaire, a form that the broker-dealer required from potential foreign clients, stated that "Suqui" had referred her to the California Brokerage.  Later, this account was used for trading in BIZM stock.  An account in the name of Purchaser Nominee 1 was also opened at the Arizona Brokerage in early June 2013.

103.    An account in the name of another Argentine citizen ("Purchaser Nominee 2") was opened at the California Brokerage in May 2013.  In 2012, Purchaser Nominee 2 received hundreds of thousands of dollars from Abellan and Ciupiak's entity, Royal Capital.  A purported Loan Agreement between Royal Capital and Purchaser Nominee 2 was executed to make the large transfer of funds appear legitimate.  IP records, as well as records that identify specific computers and cell phones, indicate that Abellan entered orders in a brokerage account in Purchaser Nominee 2's name at Online Brokerage.

**J.      Abellan, Ciupiak, and Panther Illegally Sold Millions of BIZM Shares**

104.    From May 16, 2013 through June 19, 2013, Abellan and Ciupiak, with the assistance of Panther and other associates, liquidated over 14 million Biozoom shares through the accounts Abellan and Ciupiak controlled in the names of the Argentine Nominees at Legend and the Arizona Brokerage.  Their sales yielded approximately $34 million in illegal proceeds.

105.    During this time, Abellan, Ciupiak, Panther, and their associates also engaged in manipulative trading intended to artificially inflate the price of Biozoom stock.  They controlled accounts that strategically placed bids and executed orders to enable and support the massive liquidation of the Argentine Nominees' BIZM shares into the market.

106.    In the fall of 2012, Abellan and the Florida Rep established a market price for EERT stock, which had never publicly traded.  Phone records show that on September 28, 2012, several weeks before Abellan and Ciupiak's acquisition of EERT was finalized, Abellan and the Florida Rep participated in a 15-minute call.  Less than two months later, the Florida Rep and Abellan engaged in the first public trades of EERT stock in the company's history.  On November 21, 2012 – the same day the Florida Rep received Nominee 2's EERT share deposit – Florida Rep sold short 300 shares at $1.01 per share and then covered his short position eight minutes later at $1.02 per share.  His counterparty on the opposite side of both trades was an Online Brokerage account in the name of Purchaser Nominee 2; IP and related records show that in fact Abellan operated this account.  Travel records also show that Panther was in Barcelona – where Abellan lived – on that day.

107.    Neither EERT nor BIZM stock publicly traded again until May 2013.  Beginning in May 2013, the Argentine Nominees' accounts at Legend began engaging in concerted trading.

These accounts were controlled by Abellan and Ciupiak and sold shares directly to the Florida Rep.

108.    The first order after November 2012 was placed by a trader from Spokane, Washington (the "Spokane Trader") and friend of the Florida Rep.  The Spokane Trader provided "bid support" – buy orders entered for the purpose of establishing or maintaining the appearance of a market for Biozoom stock.  On May 15, 2013, the Spokane Trader placed an order to buy 2,500 shares of BIZM at $1.00 per share.  In conjunction with the previous November's trades, this helped set a price floor for BIZM of roughly $1.00 per share.

109.    The next day, on May 16, 2013, the Argentine Nominees' accounts – controlled by Abellan and Ciupiak, with Panther's assistance – began their liquidation of BIZM shares, initially trading only with the Florida Rep.  That day, Nominee 1's account at Legend sold 10,000 shares of BIZM to the Florida Rep at $1.10 per share, in the first public transaction to occur under the ticker symbol "BIZM."

110.    That trade was effected as follows: At 3:40 p.m. on May 16, 2013, Karow at Legend received an instant message from Nominee 1, instructing Karow to "sell 10,000 shares Biozoom limit price 1.10 [Good 'Til Canceled]."  By specifying a limit price of $1.10, Nominee 1 ensured that the shares would not be sold for less than that price, thus creating an effective price floor.  One minute later, the Florida Rep called Karow.  The timing of this call suggests that the Florida Rep knew Nominee 1 had placed his order with Karow.  At 3:43 p.m., Karow sent the order to the Florida Brokerage for execution.  The Florida Rep immediately filled the order by buying 10,000 shares at $1.10 per share, taking the shares into the Florida Brokerage's inventory of securities.

111.     Over the next three trading days, the Argentine Nominees' accounts at Legend sold a total of 40,000 Biozoom shares to the Florida Brokerage.  The price of Biozoom stock increased each day by $.05 per share.  And each day, bid support from the Spokane Trader established a price floor a few cents below the execution prices.  This chart illustrates the Biozoom trading and bid support during its first four trading days:

| DATE | Argentine Nominee seller at Legend | # BIZM shares sold from Legend Accounts to Florida Brokerage Accounts | SALE PRICE | BID SUPPORT PRICE (outstanding buy orders placed by the Spokane Trader) |
|---|---|---|---|---|
| May 16 | Nominee 1 | 10,000 | $1.10 | $1.00 |
| May 17 | Nominee 1 | 10,000 | $1.15 | $1.11 |
| May 20 | Nominee 2 | 15,000 | $1.20 | $1.17 |
| May 21 | Nominee 2 | 15,000 | $1.25 | $1.20 |

112.     Starting on May 23, 2013, the Florida Rep began to sell to the Spokane Trader some of the shares the Florida Rep had acquired from the Argentine Nominees at Legend.

113.     On May 23, 2013, Nominee 2 instructed Karow to sell 25,000 Biozoom shares at no less than $1.30 per share.  Karow immediately routed the order to the Florida Rep for execution.  Roughly one minute later, the Spokane Trader entered an order to purchase 25,000 Biozoom shares at $1.31 per share.  Almost simultaneously with the Spokane Trader's order, the Florida Rep sold 25,000 BIZM shares from his inventory to another brokerage firm located in

New Jersey (the "New Jersey Brokerage"), at $1.31 per share, and the New Jersey Brokerage promptly sold those same shares to the Spokane Trader.  The Florida Rep then executed against Nominee 2's sell order at $1.30.  The Florida Rep thereby made $0.01/share, while ensuring that the Spokane Trader was able to begin accumulating shares.  The continued use of limit orders on both the buy and sell sides ensured that Abellan and Ciupiak could keep BIZM's share price within a desired range.

114.    The next day's trading followed the same pattern – Karow routed a 25,000-share sell order to the Florida Rep for execution at $1.32 per share; the Spokane Trader entered a bid a penny higher at virtually the same time; and the Florida Rep helped the Spokane Trader buy 24,000 of the 25,000 shares.

115.    By market close on May 24, 2013, Nominee 1 and Nominee 2's Legend accounts had sold a total of 100,000 Biozoom shares – with the Florida Rep and the Spokane Trader buying 99,000 of them.  Over the seven trading days after the inception of BIZM trading, the price had risen more than 30%, from roughly $1.02/share (based on the November 2012 trades described in ¶ 106, above) to $1.33/share.

**K.    The Argentine Nominees' Accounts Liquidated BIZM Holdings at Artificially-Inflated Prices**

116.    Starting May 28, 2013, the Argentine Nominees' accounts at the Arizona Brokerage joined those at Legend in liquidating their Biozoom holdings.

117.    Accounts at the Arizona Brokerage and Legend placed orders in a similar pattern: they sent Scarpino and Karow (respectively) instant messages directing pre-market sell orders at prices slightly above the previous day's closing price, raised those offer prices at the market open, and liquidated heavy volumes of shares throughout the day.

118.    Each time one of the Argentine Nominees' accounts at either the Arizona Brokerage or Legend finished liquidating all or virtually all of its deposited Biozoom shares, another one of the Argentine Nominees' account at the same firm began to liquidate its position. This highly coordinated trading indicates common control of all of the Argentine Nominees' accounts.

119.    There was one key difference between the trading behavior of the Argentine Nominees' accounts at the two firms.  At Legend, Karow routed all of the Argentine Nominees' orders from May 16 through June 7, 2013 to the Florida Brokerage, which enabled the Florida Rep to control the flow of Biozoom shares into the market.  By contrast, the Argentine Nominees' accounts at the Arizona Brokerage provided Scarpino with detailed instructions via instant message to route multiple sell orders of varying sizes and limit prices to a variety of market-makers, thus creating the appearance of a broad supply of BIZM stock flowing through multiple market centers.

120.    While the Argentine Nominees' accounts were liquidating their shares in the coordinated manner described above, additional accounts controlled by Abellan and Ciupiak also engaged in consistent and coordinated bid activity designed to prop up Biozoom's stock price. At the California Brokerage, accounts in the names of Purchaser Nominee 1 and Purchaser Nominee 2 provided price support by entering pre-market bids just below the previous day's closing price, then raising those bids in parallel with market prices over the course of each trading day.

121.    Both Purchaser Nominee 1 and 2's accounts also regularly entered bids at or near the prevailing market price shortly before the end of the trading day after not having entered a new bid, or updated an existing bid, for at least one hour.  Like their other buy orders, Purchaser

Nominee 1 and 2's end-of-day bids sometimes resulted in executed trades in relatively low volumes, thus confirming a high price level without expending significant sums. For example, on June 3, 2013, Purchaser Nominee 2 started the day with pre-market buy orders for a total of 300,000 shares at prices below the previous day's close and updated the orders periodically throughout the day, always staying slightly below the market. The last update to these orders was at 2:54 p.m. and resulted in orders to buy 300,000 shares of BIZM at $1.52 and $1.53 per share while the market was at $1.55/share. At 3:56 p.m. – four minutes before the market close – Purchaser Nominee 2 entered a new order to buy 5,000 shares of BIZM at $1.54 per share; this order executed.

122.    Purchaser Nominee 1 and Purchaser Nominee 2 frequently directed their registered representative at the California Brokerage to "show size" on large buy orders; in other words, to display to the market the total number of shares for which they were bidding, rather than displaying merely a portion of the order. For example, on June 4, 2013, Purchaser Nominee 1 placed an order to buy 150,000 shares of BIZM at $1.57 per share through the California Brokerage and an additional 150,000 shares at $1.58 per share at another market center; at the time, the stock was trading at around $1.59 per share. Purchaser Nominee 1 directed the registered rep to display full size on her orders. By showing interest in 300,000 shares at prices just below the market, Abellan and Ciupiak created the appearance of significant demand for BIZM stock, which was intended to have the effect of maintaining – or possibly even increasing – existing price levels.

123.    Abellan and Ciupiak used Purchaser Nominee 1 and 2's accounts in this way to prop up the price of BIZM stock and create the illusion of a legitimate, robust public market for

BIZM stock into which they could sell their BIZM shares out of the Argentine Nominees' accounts.

**L.**  **As Biozoom Promotions Saturated the Market, the Scheme Participants Inflated the Price of Biozoom Stock While Securing Substantial Profits**

124.  Throughout 2013, Abellan, Ciupiak, and Panther planned and executed an extensive campaign to promote Biozoom's stock.  They timed the promotional campaign to coincide with their planned sales of BIZM shares from the Argentine Nominees' accounts at Legend and the Arizona Brokerage.

125.  During the Opsolution asset purchase, Panther assumed control of Biozoom's public relations, ostensibly at the behest of the "group of investors" he represented.  In early 2013, Panther hired several people to promote Biozoom, including through the development of a corporate website.  Royal Capital paid at least one of these employees.  Moreover, Panther installed an associate of his as Biozoom's Corporate Secretary, with control over Biozoom's SEC filings and its U.S. bank account.

126.  Panther planned a campaign of corporate press releases to coincide with the liquidation of the shares held in the Argentine Nominees' accounts.  In a March 2013 "Strategy Letter," Panther instructed the Opsolution officers to create a "blueprint" of Biozoom's press release "campaign" "covering at the very minimum, ten to fifteen future releases in advance," and comprising "approximately two releases per week beginning in the middle of April and continuing through mid-June and then again in September onward."  Panther's "Strategy Letter" also included a detailed list of potential press release topics and a "PR Schedule" focused on issuing press releases in May and June 2013.

127.  Beginning on May 21, 2013, Biozoom's Corporate Secretary issued two press releases every week on behalf of Biozoom, as directed by Panther.  Those releases concerned

events that had occurred months beforehand.  By issuing them routinely, Panther inserted Biozoom into the newsfeeds of potential investors.

128.   In addition to corporate press releases, Abellan and Panther also orchestrated an external campaign to promote Biozoom stock and entice investors to purchase stock at inflated prices.  On May 16, 2013, a publication touting Biozoom, *The Stock Report*, appeared online. *The Stock Report* contained the same confidential financial projections that the Opsolution officers had provided to Panther and Dean during the due diligence process.  *The Stock Report* indicated that Biozoom's stock price as of its May 16, 2013 issue date was $1.10 per share, the price that would be established that very same day in a trade between Nominee 1's Legend account and the Florida Rep.  The online publication purported to be produced by Global Investors Research, LLP and a related entity called Global Financial Insight, both of which were controlled by Abellan and Ciupiak.

129.   A second publication touting Biozoom, also called *Global Financial Insight*, was later distributed to millions of people in hard copy.  Abellan and Ciupiak funded the mailer's printing and distribution through their entity, Royal Capital.

130.   Again using the pseudonym "Mark," Abellan hired a print broker in Arizona (the "Arizona Printer") to manage the printing and distribution of approximately 7.5 million copies of *Global Financial Insight*.  Abellan communicated with the Arizona Printer via phone and a secure email platform.

131.   Abellan carefully dictated the distribution schedule for the mailers to coordinate with the anticipated liquidation of BIZM certificates from the Argentine Nominees' accounts at Legend and the Arizona Brokerage.  On May 14, 2013, Abellan wrote in an email to Arizona Printer, "We are still not clear on when we will drop the mailers.  We are experiencing some

delays at brokers." Abellan wrote this during the time when Panther was facilitating the transfer of the Argentine Nominees' share certificates to the Arizona Brokerage after they had failed to be cleared for trading at the California Brokerage.

132. After the Argentine Nominees' shares had been cleared for trading, Abellan wrote to the Arizona Printer on May 30, 2013, "We need 750k pieces inbox daily starting Monday [June] 10 (the soonest time frame possible). Any delays would affect our results dramatically as we believe that during the end of June and the month of July, trading is going to be slow." Abellan attached a calendar with his preferred timeframe. It showed 750,000 mailers arriving at mailboxes each weekday from June 10 through June 26, 2013. This schedule – and its trading-related rationale – aligned with the corporate press release timeline Panther had described in his March 2013 "Strategy Letter" to the Opsolution officers.

133. Starting June 6, 2013, more than 7 million copies of *Global Financial Insight* were sent to brokers, investors, and other recipients. In a later communication from Abellan to the Arizona Printer after trading in BIZM had started, Abellan said the mailers were "working fantastic."

134. The cost to print and mail the mailers was more than $4.7 million. On at least one occasion, Abellan requested that the Arizona Printer arrange for the cost to be divided and invoiced to three separate entities: Big Bang Studio, Ltd., Foresight Media Inc., and Global Investors Research LLP, which was the purported distributor of *Global Financial Insight*. All were entities connected to either Abellan or Ciupiak. Despite the attempt to conceal the payment source, all of the payments for the mailers came, directly or indirectly, from Royal Capital.

135. For example, one payment came from Royal Capital through two Argentine individuals Panther referred to Dean, who then wired Dean $550,000. Dean then – pursuant to a

"Subscription Agreement" with Global Investors Research – wired all of those funds onward as payment for the mailer.

136.    Another payment of roughly $375,000 came from Royal Capital directly.

137.    Panther also communicated with the Arizona Printer regarding *Global Financial Insight*.  On at least one occasion, Abellan passed his phone to Panther so Panther could speak directly with the Arizona Printer.

138.    Abellan and Ciupiak, using intermediaries to conceal their roles, also funded a significant radio and print campaign advertising *The Stock Report* and *Global Financial Insight*. Although ostensibly intended to promote those publications, the advertising campaign actually focused on touting Biozoom.  Royal Capital, through Global Investors Research, funded a significant radio advertising campaign in support of these publications.  During the week of June 10-14, 2013, iHeart Radio broadcast at least forty 30-second ads for *The Stock Report* on nationally syndicated shows, including the Rush Limbaugh Show.

139.    Abellan and Ciupiak also funded and coordinated a campaign of full-page advertisements for *Global Financial Insight* and Biozoom in print publications including *USA Today*'s June 18 edition, the June 23 Sunday Business Section of *The New York Times*, and a two-page spread in a *Forbes* issue planned to hit newsstands on June 28.  In late May and early June, Royal Capital, through Foresight Media, sent hundreds of thousands of dollars to a Toronto, Canada entity ("Toronto Ad Broker") controlled by a friend of Panther's.  The Toronto Ad Broker then paid a U.S. media broker to place the ads.

140.    Entities controlled by Abellan and Ciupiak also arranged for a campaign of web advertisements on major platforms including Yahoo! and Google.  For example, on April 5, 2013, Yahoo! employees received an email sent from a domain belonging to Foresight Media

regarding the *Global Financial Insight* and Biozoom promotional campaign.  Later communications about the campaign came from a domain associated with another Abellan and Ciupiak entity, Big Bang Studio.  A payment of more than $180,000 was made to Yahoo Inc. from the account of Big Bang Studio on April 29, 2013.

**M.     Trading Volume Continued to Grow as the Promotional Campaign Increased in Intensity**

141.     Starting on Monday, June 10, 2013, the Biozoom promotional campaign reached new intensity.  By this date, the *Global Financial Insight* mailer funded and/or coordinated by Abellan, Ciupiak and Panther had already reached millions of recipients.  The radio and major print advertisements that Abellan and Ciupiak funded, discussed above, began that week as well.

142.     During this period Biozoom trading volume spiked dramatically.  Volume went from approximately 3.5 million shares traded on Friday, June 7, 2013 (the highest daily volume to that point, by almost 800,000 shares), to 11.7 million shares just two trading days later on June 11, 2013.  During the eleven trading days from June 10-24, 2013, just over 77 million shares changed hands.  Because, as discussed above in ¶ 25, no registration statement was in effect for the shares the Argentine Nominees liquidated, those sales constituted an illegal unregistered distribution.  Meanwhile, in this two-week period the share price almost doubled.  It climbed from $1.77 at the market close on June 7, 2013 to close at $3.45 on June 24, an increase of 95%. The price peaked on June 19 at $4.50/share.

143.     To further stimulate market demand and keep up the share price amid the deluge of liquidations from the Argentine Nominees' accounts, Purchaser Nominee 1, Purchaser Nominee 2, the Spokane Trader, and his associates – some of them using multiple accounts –

bought and sold hundreds of thousands of shares each day; Spokane trader alone averaged more than 100,000 shares bought and sold daily over the trading period.  This trading created the appearance of a deep, highly active market.  AFI – the nominee entity controlled by Abellan and Ciupiak – also entered the market, buying and selling more than $2,000,000 of BIZM stock in a retail account at the Online Brokerage, while at the same time providing price support via its accounts at the California Brokerage and the Arizona Brokerage.

144.    As the Argentine Nominees' accounts finished liquidating their deposited BIZM shares, certain of them switched to the buy-side to provide price support for ongoing share liquidations.  For example, one of the Argentine Nominees' accounts at the Arizona Brokerage ("Nominee 4"), after it completed the liquidation of its deposited BIZM shares, switched sides and joined AFI and Purchaser Nominees 1 and 2 in providing bid support.  On June 13, after having sold more than 1.59 million Biozoom shares over the preceding four trading days, Nominee 4 entered numerous buy orders at limit prices below the market and directed them to different market makers.

145.    Other of the Argentine Nominees' accounts used their sales proceeds to engage in additional manipulative trading.  For example, after Nominee 2's account at Legend liquidated most of its shares, the account wired $1 million in proceeds to a newly-created account in Nominee 1's name at the Arizona Brokerage.  That account then provided bid support for ongoing share liquidations by actively day trading BIZM stock.

146.    This bid support was motivated, at least in part, by a concern that short sellers were trying to drive down Biozoom's share price – a concern expressed numerous times by Panther and in instant messages sent from accounts associated with Abellan and Ciupiak's nominees.   For example, Panther expressed his concern about short sellers entering the BIZM

market during phone calls with Scarpino.  On June 20, 2013, instant messages sent from an AFI account controlled by Abellan and Ciupiak to a registered representative at the California Brokerage repeatedly expressed concerns about short-sellers.  And a June 21, 2013 instant message sent from an AFI account to the same registered representative at 3:24 p.m. expressed interest in keeping Biozoom's share price high through the market close, writing "I'll buy you a beer if this holds above 3 today."

**N.     Abellan and Ciupiak Obtained Illegal Sale Proceeds**

147.    As the Argentine Nominees' accounts controlled by Abellan and Ciupiak completed their share liquidations, a number of them wired their proceeds offshore and eventually to Abellan and Ciupiak.  For example, on June 18, $600,000 was wired from Nominee 3's Legend account to the bank account in Cyprus through which Abellan and Ciupiak had initially funded Nominee 3's Legend account.  Nominee 3's Cyprus bank account then wired $500,000 onward to Royal Capital.  Similarly, in transfers on June 20 and June 24, another of the Argentine Nominees sent wires totaling approximately $6.2 million to a bank account in Cyprus, then transferred virtually all of the money onward to Royal Capital.

**O.     After the Commission Suspended Trading in Biozoom, Abellan and Panther Sought to Conceal Their Involvement in the Scheme**

148.    On June 25, 2013, the SEC suspended trading in BIZM stock.  The same day, someone using a Foresight Media email address – the  same domain used by Abellan and associated with one of the entities he and Ciupiak used to fund the promotional campaign – emailed Yahoo! to "confirm that the [sic] all the campaigns are on pause right now."  The email's author also stated that he was "trying to delete two credit cards from the account . . . attached to the campaign."

149.     After the SEC suspended trading and issued a subpoena to Biozoom, Panther met with the Opsolution officers in Germany.  Panther asked them to sign a letter agreement on his father's law firm letterhead addressed to EERT and back-dated to March 15, 2013.  The letter falsely represented that EERT had retained Panther's father's law firm and stated, "We have discussed and you have agreed that we may choose to hire or retain, and to pay, third party vendors hired for your matter ('Third Party Service Providers') which shall include but not be limited to my son James Panther, Jr. to perform due diligence and advisory services."

150.     By this time, the Opsolution officers had learned that the person they knew as "James Suqui" was in fact James Panther.   The letter agreement offered by Panther was purportedly signed by Panther's father and was designed to use attorney-client privilege to protect Panther's communications with EERT/Biozoom from disclosure; Panther urged them to sign the agreement, stating that he would be "protected" if they did so.  Opsolution's officers, who had never heard of the law firm, refused to execute the fraudulent agreement.

**P.     Abellan's Reaction to the Freezing of the Nominee Accounts Confirmed Abellan's Control**

151.     After the SEC suspended trading in BIZM, a federal court granted the SEC's request for a restraining order and asset freeze, which had the effect of preventing additional funds in the Argentine Nominees' brokerage accounts from being transferred to Abellan and Ciupiak.  Several foreign authorities also froze certain bank accounts abroad that received BIZM sales proceeds, including Royal Capital accounts connected to Abellan and Ciupiak.

152.     After the asset freeze, Abellan had difficulty completing payments to the Arizona Printer for the mailers.  As of early July, the Arizona Printer was still owed $100,000 for his work related to *Global Financial Insight*.  When he inquired about the unpaid funds, Abellan told him to "please call James . . . at the regular phone line you were given."  That day, the

Arizona Printer called Abellan's Barcelona phone number.  At the time, Panther was in Barcelona.  Later, the Arizona Printer wrote to Abellan, "I spoke with James.  He said he was going to take care of the $100,000 wire that was owed.  It's been 3 weeks now.  We need to get that paid right away."  Abellan replied, "We need a few days to move funds from a different place because the escrow attorney got a subpoena and it was not appropriate to send money to you from there."

153.    Later that summer, Abellan told the Swiss lawyer that he "had no cards to pay for life expenses.  There has been a temporal freeze of our main bank account where we had all cards linked."  Abellan asked the Swiss lawyer for "debit cards" including "some cards li[n]ked to AFI."

**Q.    Defendants Participated in the Fraudulent Scheme with Scienter**

154.    Defendants' deceptive conduct had the effect of creating a false appearance of material fact that (1) Biozoom shares were legally available for sale to the general public; and (2) the price and trading volume of Biozoom shares were determined by the natural interplay of market supply and demand, rather than artificially generated through manipulative trading. Defendants' deceptive conduct also concealed Abellan and Ciupiak's control of all of the Biozoom private placement shares and their responsibility for the multi-media promotional campaign touting Biozoom in coordination with the manipulative trading.

155.    As one of the scheme's architects, Abellan engaged in deceptive conduct in furtherance of the scheme.  Specifically, he knowingly or recklessly:

- With Ciupiak, created and funded nominee accounts in the names of Argentine Nominees to conceal their control of the account activity, including manipulative trading (¶¶ 40, 54-61, 77-78, 81, 91-92, 95, 123 above);

- Also with Ciupiak, created and used sham "loan agreements" and "trust agreements" to fund the Argentine Nominees' accounts (¶¶ 56-59);

- Created, funded, and controlled AFI while concealing his role by installing a nominee as the entity's director (¶¶ 96-103);

- Organized and funded diverse promotions intended to lure investors into purchasing BIZM shares at inflated prices (¶¶ 124, 128-141);

- Received and sent emails and instant messages while purporting to be certain Argentine Nominees, while sometimes using anonymous proxy servers to conceal his control (¶¶ 60, 61, 92, 99, 146);

- Used a pseudonym when dealing with third parties that facilitated the opening of the AFI accounts and the aggressive promotional scheme (¶¶ 100, 130); and

- With Ciupiak, funded the purchase of Opsolution (¶ 53).

156.   As a scheme architect, Ciupiak engaged in deceptive conduct in furtherance of the scheme.  Specifically, he knowingly or recklessly:

- Orchestrated and funded the purchase of the free-trading EERT shares while concealing his role (¶¶ 30-38);

- With Abellan, created and funded accounts in the names of the Argentine Nominees to conceal their control of the account activity, including manipulative trading (¶¶ 40, 54-61, 77-78, 81, 91-92, 95, 123);

- With Abellan, created and used sham "loan agreements" and "trust agreements" to fund the Argentine Nominees' accounts (¶¶56-59);

- With Abellan, received and sent emails and instant messages while purporting to be the Argentine Nominees, while sometimes using anonymous proxy servers to conceal their control (¶¶ 60, 61, 92, 99); and

- With Abellan, funded the promotional scheme and the purchase of Opsolution (¶¶ 53, 129, 134-136, 138-140).

157.    Panther similarly engaged in a variety of deceptive conduct.  Specifically, he knowingly or recklessly:

- Arranged the opening of accounts at different brokerages, ostensibly on behalf of the Argentine Nominees, but in fact so that Abellan and Ciupiak could engage in manipulative trading practices using these accounts (¶¶ 62-90);

- Falsely portrayed himself as a lawyer to Karow and misrepresented who his purported client was (¶¶ 73, 74);

- Portrayed himself as the representative of interested investors to the Opsolution officers and requested a business plan, when in fact he only wanted a company – and its information – to promote (¶¶ 47-50);

- Used a pseudonym in communications with the Opsolution officers and certain brokers (¶¶ 47, 82, 84, 102);

- Directed – and hired staff to perform – promotional and public relation activity for Biozoom in coordination with Abellan and Ciupiak's manipulative trading (¶¶ 124-127, 137); and

- Sought to conceal his misconduct by asking the Opsolution officers to sign a back-dated agreement with his father's law firm in an attempt to protect Panther's communications from disclosure (¶¶ 149-150).

158.    Dean also knowingly or recklessly engaged in deceptive conduct in furtherance of the scheme.  Specifically, he knowingly or recklessly structured the purchase of EERT to conceal Abellan and Ciupiak's acquisition of 20 million EERT shares and to ensure that those shares did not bear a restrictive legend.  (¶¶ 30-38.)  Dean then employed transfer agents, escrow agents, brokers and attorneys to facilitate the use of those shares by the Argentine Nominees' accounts.  (¶¶ 39-44, 54, 67-71, 74-79, 90.)  He also facilitated the funding of a portion of the Biozoom promotional effort.  (¶ 135.)  In connection with this knowingly deceptive conduct, Dean diverted substantial funds to his own use. (¶ 36.)

**R.    Defendants Sold BIZM Shares Without an Effective Registration Statement**

159.    Abellan and Ciupiak, through the Argentine Nominees' accounts, directly sold more than 14 million BIZM shares in public over-the-counter transactions without an effective registration statement.

160.    Panther and Dean were indirect sellers with respect to Abellan and Ciupiak's illegal unregistered distribution of BIZM shares, as actions taken by Dean and Panther were indispensable to Abellan and Ciupiak's sales.

161.    Panther provided false documents and information to brokers regarding the BIZM share deposits, managed the opening of the Argentine Nominees' accounts at the Arizona Brokerage, and arranged for the accounts to be able to trade via instant message.  All of these actions enabled Abellan and Ciupiak to illegally sell their shares to the public.

162.    Dean also facilitated the unregistered distribution.  Specifically, he orchestrated sham transactions; hired multiple escrow agents to document these sham transactions; provided fabricated documents and false information to brokers, lawyers, and the transfer agent; and

facilitated the deposits of those share certificates at Legend and Arizona Brokerage.  These actions were essential to Abellan and Ciupiak's sales.

## COUNT ONE

### Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) Thereunder
### (Against All Defendants)

163.    The Commission realleges and reincorporates paragraphs 1 through 158 as if fully set forth herein.

164.    Defendants Abellan, Ciupiak, Panther and Dean, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:

(a)    employed devices, schemes, or artifices to defraud; and

(c)    engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit.

165.    By reason of the actions alleged herein, Defendants Abellan, Ciupiak, Panther and Dean each violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5] and unless restrained and enjoined will do so again in the future.

## COUNT TWO

### Unregistered Securities Offerings in Violation of Section 5 of the Securities Act
### (Against All Defendants)

166.    The Commission realleges and reincorporates paragraphs 1 through 158 as if fully set forth herein.

167.    Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to

sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

168.   No registration statement was filed or in effect with respect to any of the offerings or sales alleged herein, nor did any exemption from the registration requirements exist with respect to the securities and transactions describe in this Complaint.

169.   By engaging in the conduct described above, Defendants have violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e, ), and unless restrained and enjoined will do so again in the future.

## COUNT THREE

### Violation of Section 17(a)(1) and (3) of the Securities Act
**(Against All Defendants)**

170.   The Commission realleges and reincorporates paragraphs 1 through 158 as if fully set forth herein.

171.   Defendants directly and indirectly, singly and in concert, by the use of the means and instruments of transportation or communication in interstate commerce, and in connection with the offer or sale of securities: (a) with scienter, employed devices, schemes or artifices to defraud; or (b) engaged in one or more transactions, acts, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers.

172.   By engaging in the conduct described above, Defendants violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and unless restrained and enjoined will do so again in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter Final Judgments:

A.     Finding that Defendants violated the provisions of the federal securities laws as alleged herein;

B.     Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

C.     Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

D.     Permanently enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 5 of the Securities Act [15 U.S.C. § 77e];

E.     Barring Defendants from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)];

F.     Ordering Defendants to jointly and severally disgorge, with prejudgment interest, all ill-gotten gains received by any person or entity as a result of the conduct alleged in this Complaint;

G.     Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

H.     Granting such other and further relief as the Court deems just, equitable, or

necessary.


Date:   May 15, 2018                        /S/ Jennie Krasner
                                            Jennie B. Krasner
                                            Daniel J, Maher (*pending pro hac vice*)
                                            Duane K. Thompson (*pending pro hac vice*)
                                            Marc E. Johnson (*pending pro hac vice*)
                                            Securities and Exchange Commission
                                            100 F Street, NE
                                            Washington, D.C. 20549
                                            Tel: (202) 551-7159
                                            Fax: (202) 772-9292
                                            Email: thompsond@sec.gov

Of Counsel:

Antonia Chion
Deborah A. Tarasevich