

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
100 F St., N.E.
Washington, DC 20549-5041

**DIVISION OF**
**ENFORCEMENT**

Daniel Maher
Direct dial: (202) 551-4737
MaherD@sec.gov

April 30, 2019

**VIA ECF**

The Honorable P. Kevin Castel
United States District Judge
The Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, 10007-1312

    Re:    <u>SEC v. Abellan, et al.,</u> No. 18-cv-04309

Dear Judge Castel:

    In accordance with the Court's April 9, 2019 Order (Dkt. No. 53), Plaintiff Securities and Exchange Commission ("Commission") and defendant James B. Panther ("Panther") submit this joint letter. For the reasons described below, defendants Francisco Abellen Villena ("Abellan"), Faiyez Dean and Guillermo Ciupiak did not participate in the preparation of this letter.

### 1. Plaintiff's Description of the Facts and Claims

    The Complaint alleges that defendants violated the anti-fraud and securities registration provisions of the federal securities laws by engaging in a fraudulent scheme to manipulate the market for shares of a microcap company named Biozoom, Inc. The scheme generated approximately $34 million in illicit proceeds from sales of Biozoom shares to retail investors and others at artificially inflated prices in May and June of 2013. Defendant Abellan[1] orchestrated the scheme and conducted the trading. Defendants Ciupiak, Panther and Dean each knowingly and/or recklessly played essential roles in the scheme's execution. Defendants' deceptive conduct created the false appearance that (1) Biozoom shares were legally available for sale to the general public; and (2) the price and trading volume of Biozoom shares were determined by the natural interplay of market supply and demand, rather than artificially generated through manipulative trading. Defendants' deceptive conduct also concealed Abellan and Ciupiak's controlling interests in the company that became Biozoom.

---

[1] Abellan is a recidivist. The SEC was previously granted judgment against Abellan in *SEC v. Abellan*, 674 F. Supp 2d 1213 (W.D. Wash. 2009), based on allegations that he operated a manipulative trading scheme.

### A. Background of Biozoom and its Predecessor EERT's Shares

Biozoom's predecessor was a corporate shell named Entertainment Art, Inc. ("EERT"). In May 2009, an entity named Medford Financial, Inc. ("Medford") purchased all outstanding shares of EERT, including a control block of 1.2 million shares ("control block shares") and 610,000 shares previously sold in private placement transactions to 34 investors and registered for public resale ("private placement shares"). Medford's purchase had the effect of converting the private placement shares into control shares, making the previously-filed registration statement no longer effective. Medford did not transfer the private placement shares into its name. Moreover, EERT did not file a new registration for the private placement shares, nor did it disclose Medford's purchase of *all* EERT shares. Rather, EERT's public filings falsely stated that Medford acquired only the 1.2 million control block shares. The 600,000 private placement shares thus remained in the names of the initial private placement investors.

In October of 2012, an entity controlled by Abellan and Ciupiak purchased all of the EERT shares from Medford. Dean acted as the middleman for this transaction. Although the defendants knew they had purchased all EERT shares, EERT's public filings falsely claimed that they had purchased only the control shares.

Dean and Panther, at the direction of Abellan and Ciupiak, then sought to accomplish three tasks essential to the scheme: opening nominee accounts through which Abellan could secretly conduct the trading; transferring the private placement shares to those accounts; and facilitating the funding of nominee accounts while concealing the funds' true source. Panther also demanded and received special trading accommodations from certain brokers, including the use of instant messaging to place orders and the routing of trades to certain pre-selected brokers. At the same time, Abellan and Ciupiak worked to create sham documentation that would purport to explain the transfer of stock and substantial funds into certain of the nominee accounts, while concealing the accounts' true owners.

On February 28, 2013, EERT announced that it had purchased Opsolution, which was then merged into an EERT subsidiary called Biozoom Technologies, becoming Biozoom, Inc. All outstanding EERT shares were converted into Biozoom shares. As a result of an earlier EERT stock split, there were now approximately 39 million BIZM control shares and 20 million BIZM purported private placement shares. By May of 2013, defendants succeeded in depositing more than three quarters of the 20 million control shares – stock that should have been restricted – in nominee accounts.

### B. *The Trading and the Promotional Campaign*

From May 16, 2013 to June 19, 2013, Abellan, with substantial assistance from Ciupiak and Panther, liquidated over 14 million Biozoom shares through the nominee accounts. These sales yielded approximately $34 million in illegal proceeds. As detailed in the complaint, Abellan, Ciupiak and Panther and a small cohort of traders engaged in a systematic effort to inflate the price of Biozoom stock. In addition to coordinated trading, Abellan, Ciupiak and Panther also used wash trades and other manipulative trading devices. Abellan orchestrated the purchases and sales from a terminal at the mansion in Barcelona he shared with Ciupiak and, often, Panther. As trading progressed, Panther often called a key broker from a number for the

Barcelona mansion, while also monitoring the instant messages Abellan used to make certain trades.

The manipulative trading created the illusion of a legitimate, robust public market for BIZM stock. As Biozoom's price steadily climbed, Abellan, with assistance from Panther and Ciupiak, began to liquidate BIZM stock in certain of the nominee accounts. While carefully staggering these liquidations, Abellan, with assistance from Ciupiak and Panther, used other nominee accounts and a corporate front to keep the price artificially inflated.

The defendants also executed a robust campaign to promote BIZM. When the defendants acquired Opsolution, Panther assumed control of public relations for the newly-merged BIZM. Using funds provided by companies Abellan and Ciupiak controlled, Panther planned and executed a campaign of corporate press releases to coincide with Abellan's liquidation of BIZM shares. BIZM began to issue press releases on May 21, 2013, while confidential data that Panther acquired from Opsolution's founders was used in an online publication called *The Stock Report*. That publication first appeared online on May 16, 2013, followed shortly by another hard copy mailer sent to millions of recipients. Abellan was directly involved in communications with printers, often with the assistance of Panther. And, on at least one occasion, Abellan used Dean to wire funds to pay for the mailer. The mailer, combined with additional radio and major media print advertisements, caused a substantial spike in price and trading volume.

Abellan and Ciupiak transferred the illicit proceeds from the liquidation of the private placement shares to offshore accounts. Shortly after the SEC halted trading on June 25, 2013, Panther sought to fabricate an attorney-client privilege between his father's law firm and Opsolution's founders. Specifically, Panther asked the founders to sign a letter back-dated to March 15, 2013 purporting to hire Panther's father's law firm.

2. **Mr. Panther's Description of the Facts and Claims**

Entertainment Art, Inc. employed Mr. Panther as a consultant pursuant to an Advisory Services Agreement effective January 20, 2013. Under this agreement, Mr. Panther agreed to assist the company by providing due diligence and other public company related services in connection with the acquisition of OpSolution GmbH and its affiliates, which later became Biozoom, Inc. Mr. Panther was not aware of any actions by others to engage in a fraudulent scheme to manipulate the market for shares of Biozoom. Mr. Panther has denied the allegations in the SEC complaint.

3. **The Parties Agree That the Action Will Be Tried to a Jury**

4. **Status of the Action**

The Department of Justice ("DOJ") intervened in this matter and requested a three-month stay of discovery, which was granted. It is the Commission's understanding that counsel for the DOJ has filed, or will soon be filing, a status report under seal.

   a. The Parties

- The clerk has entered a clerk's default against defendant Dean, who has not filed an answer. (Dkt. No. 32)

- Ciupiak has consented to judgment on liability and injunctive relief, with financial remedies to be determined upon motion of the SEC. (Dkt. No. 45).

- The SEC has not yet served Abellan.

- Panther has filed an answer and is currently the only defendant contesting this action.

b. Discovery

Discovery has been stayed until May 17, 2019. Prior to staying the case, Judge Sweet did not set a specific discovery schedule. While the SEC and Panther have exchanged written discovery requests, and the SEC has produced documents and is prepared to produce more, there have been no depositions. Should this case proceed, the SEC anticipates that it will depose Panther as well as a number of third-party witnesses. Mr. Panther will also need to depose several third-party witnesses.

c. Motions

There are no pending motions at this time.

5. **Steps Necessary To Bring the Action to Trial**

To bring this case to trial, the SEC will have to serve Abellan and complete fact and expert discovery with Abellan and Panther. The SEC may also file a dispositive motion and pre-trial motions *in limine*. The outcome of the criminal investigation may also impact the timing and substance of a trial.

6. **Status of Settlement Discussions**

The parties have not had meaningful settlement discussions. At this time, it appears that the SEC and Panther have completely different views of the case. Nevertheless, the Commission and Mr. Panther are willing to attempt to negotiate a settlement of this matter.

Respectfully submitted,

/s/
Daniel J. Maher
Duane K Thompson
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
202-551-4737
202-772-9244 (facsimile)
MaherD@sec.gov

      Counsel for Plaintiff


      _____/s/_____
      Russell D. Duncan
      Shulman Rogers P.A.
      12505 Park Potomac Ave., 6th Floor
      Potomac, MD 20854
      301-945-9247
      RDuncan@shulmanrogers.com
      Counsel for Defendant James Panther, Jr.

## **CERTIFICATE OF SERVICE**

I certify that on April 30, 2019, I caused the foregoing to be filed on ECF and to be sent by email to the following:

Russell D. Duncan, Esq.
Shulman Rogers, P.A.
12505 Park Potomac Avenue, 6th Floor
Potomac, MD 20854
301-945-9247
rduncan@shulmanrogers.com
*Counsel for Defendant James Panther*

Michael R. McPhail, Esq.
Faegre Baker Daniels LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO 80203
303-607-3692
Michael.Macphail@FaegreBD.com
*Counsel for Defendant Guillermo Ciupiak*


Michael Bachner
Bachner & Associates, PC
39 Broadway-Suite 1610
New York, NY 10006
212-344-7778
mb@bhlawfirm.com
*Counsel for Defendant Faiyaz Dean*


                                              /s/ Daniel J. Maher
                                              Co-Counsel for the SEC