UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FRANCISCO ABELLAN VILLENA,<br><br>GUILLERMO CIUPIAK, JAMES B.<br><br>PANTHER, JR., and FAIYAZ DEAN<br><br>Defendants. | No. 18-cv-4309 (PKC) |

**PLAINTIFF'S MEMORANDUMIN SUPPORT OF ITS MOTION FOR A DEFAULT JUDGMENT AGAINST DEFENDANT FAIYAZ DEAN**

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this memorandum in support of its motion enter final judgment against Defendant Faiyaz Dean ("Dean") pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure and Local Rule 55(b)(2). On November 18, 2018, the Clerk certified a default against Dean pursuant to Fed R. Civ. P. 55(b)(1). (Doc. 32). For the reasons set forth below, the Court should now order injunctive relief, impose a financial penalty and enter final judgment.

**PROCEDURAL BACKGROUND**

The SEC brought this case on May 15, 2018, alleging that Defendants engaged in a sophisticated scheme to profit by manipulating the price of Biozoom stock. (Doc. 4, Complaint). The case was initially assigned to Judge Sweet. The case was reassigned to this Court on April 8, 2019. On May 1st, the Court stayed all discovery in this case (Doc. 58) at the request of the U.S. Department of Justice, which has brought a parallel criminal proceeding against defendants Abellan, Dean and Panther.

In this matter, only Panther has filed an answer (Doc. 20) and is actively litigating. Ciupiak has settled as to liability and injunctive relief. (Doc. 45). The SEC continues to search for Abellan so that it can serve him. As for Dean, the SEC effected service on him by two means, including personal service in Canada (Doc. 17 and 17-1). Although Dean's counsel during the SEC's investigation has not been authorized to enter an appearance in this matter, the SEC has also conferred with him about its intention to seek the instant default judgment.

## FACTS ALLEGED IN THE COMPLAINT

In its Complaint, the SEC alleged that Dean was a participant in a fraudulent scheme to manipulate the market for shares of Biozoom, Inc. ("Biozoom") in violation of Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]. (Doc. 4 at ¶¶ 1, 8). Dean also helped effect the illegal sale of unregistered Biozoom stock in violation of Section 5 of the Securities Act [15 U.S.C. § 77(e)]. (*Id*.).

Broadly, Defendants profited by creating the false appearances that (1) Biozoom shares were legally available for sale to the general public; and (2) the price and trading volume of Biozoom shares were determined by the natural interplay of market supply and demand, instead of artificially created by manipulative trading. (Doc. 4 at ¶ 2).

More specifically, months before the manipulative trading in 2013, Abellan and Ciupiak had Dean arrange to acquire for them the shares of a shell company and to hide Abellan's and Ciupiak's control of these shares. (*Id*. at ¶ 4). Those shell company shares consisted of two blocks: a control block and a block originally sold to 34 private placement investors and registered for re-sale pursuant to a Form S-1 (the "private placement shares"). (*Id*. at ¶¶ 23-26). In 2009, Medford, a company affiliated with two shell brokers, had purchased both blocks, which made the private placement shares control shares, thus restricting their re-sale. (*Id*. at ¶¶ 25-26). However, Medford concealed its purchase of the private placement shares, falsely leaving them in the name of the

original private placement recipients. (*Id*. at ¶ 26). By doing so, a subsequent purchaser could claim to have bought them directly from the original recipients, allowing them to be re-sold without restriction. (*Id*. at ¶¶ 32, 37-38).

With Dean's help, that is exactly what Defendants did. Dean and the shell brokers created sham paperwork to conceal that Defendants – through a newly-created company ("LeMond") that hid their identity – had purchased *all* of the shell's shares, including the private placement shares. (*Id.* at ¶¶ 32-38). Again, this would eventually allow Defendants, including Dean, to create and use additional sham paperwork purporting to show that varied investors had purchased the shares directly from the original recipients. (*Id*. at ¶¶ 40-44). But those purchasers were, in fact, "nominees" having no economic interest in, or control of, the shares or the brokerage accounts in their name. (*Id*.).

Dean and Panther then used this sham paperwork to transfer stock certificates without restrictive legends from the names of the private placement shareholders to the names of the nominees. (*Id*.). It also allowed Dean and his co-Defendants to fraudulently open brokerage accounts in the names of the nominees. (*Id*. at ¶¶ 62-81).

Having obtained all of the shares, Defendants effectively merged a subsidiary of the shell company with a German biomedical company, resulting in the creation of Biozoom, Inc. (*Id*. at ¶¶ 4, 46-53). As a result, the shell company shares became Biozoom shares. (*Id*. at ¶ 4, 51). Having fraudulently obtained stock certificates in the names of the nominees without restrictive legends, Panther and Dean arranged to have the certificates deposited in nominee accounts Defendants controlled at several different brokerages, in accounts that Panther and Dean helped open. (*Id*. at ¶¶ 54, 62-79, 90). With Panther's assistance, Abellan and Ciupiak then secretly

3

directed the trading in those accounts, as well as other accounts created to hide their control. (*Id*. at ¶¶ 4, 104-123, 141-46).

With the scheme's groundwork in place, beginning on May 16, 2013, Abellan, Ciupiak, and Panther quickly laddered the price of Biozoom stock upwards. (*Id*.). These defendants got the stock price moving upward through trading – at ever-increasing prices – among the nominee accounts and Defendants' network of brokers and traders. (*Id*.). Simultaneously, Abellan and Ciupiak controlled other nominee accounts that they used for manipulative coordinated bidding to keep the share price propped up. (*Id*.). This bid activity created the false appearance of a rising price resulting from significant demand for Biozoom stock, even as Abellan, Ciupiak, and Panther caused millions of shares of Biozoom to be illegally sold into the market. (*Id*.). To further drive up demand – and thus Biozoom's share price – Abellan, Ciupiak, and Panther organized an elaborate online, print, and radio promotional campaign that coincided with the manipulative trading. (*Id*. at ¶¶ 5, 124-140).

Prior to the manipulative trading, Biozoom's stock never publicly traded. (*Id*. at ¶ 6). After manipulative trading started on May 16, 2013, at a pegged price of $1.10 per share, the stock price peaked at $4.50 per share on June 19, 2013. (*Id*.). By selling to retail investors at artificially inflated prices, Abellan, Ciupiak, and Panther generated approximately $34 million in illicit proceeds from sales of shares deposited in the accounts they set up and controlled. (*Id*.).

Dean, an attorney, played an essential role in this fraud. Specifically:

- Dean identified a public shell company to purchase on behalf of Abellan and Ciupiak, while taking steps to conceal their identifies, (*id*. at ¶¶ 31-34);

- Dean conspired with shell brokers to acquire all of the shell company's stock while concealing the fact that Abellan and Ciupiak had also acquired the private

placement shares, including by creating sham purchase documentation, (*id.* at ¶¶ 32-33);

- Dean provided a transfer agent with fraudulent stock purchase agreements purporting to show that the private placement shares had been purchased directly from their original recipients, even though Dean knew he had arranged for Abellan and Ciupiak to secretly purchase the private placement shares through the shell brokers, (*id.* at ¶¶ 40-41);

- Dean had the transfer agent issue certificates without restrictive legends in the names of ten nominees whom he knew had not actually purchased any shares, (*id.* at ¶ 42);

- Dean orchestrated a plan to have escrow agents he selected send the supposed purchase funds for the shell company shares not to the private placement investors but to *Dean* – who ostensibly represented the buyers – while knowing that the shares had not been purchased in a *bona fide* transaction, (*id.* at ¶¶ 44, 75);

- Dean facilitated the placement of the private placement shares in brokerage accounts held in the names of nominees but controlled by co-Defendants (*id.* at ¶¶ 40-44, 54, 90-91);

- Dean solicited an attorney opinion letter based on sham documentation, (*id.* at ¶ 71);

- Dean intervened to aid his co-Defendants in transferring share certificates to a more accommodating brokerage, in part by again providing the sham stock purchase agreements, (*id.* at ¶ 90);

5

- Dean acted as an intermediary to allow his co-Defendants to finance a promotional effort intended to coincide with the stock trading, (*id*. at ¶ 135); and,

- Dean took nearly $120,000 for his efforts, (*id*. at ¶ 36).

In sum, Dean knowingly laid the foundation for this fraud. He found the shell company, concealed the true nature of the shell company's stock, and then, once it had become Biozoom stock, ensured that the Defendants – through nominee accounts – could trade what should have been restricted shares.

## ARGUMENT

### I. The Court Should Accept the SEC's Allegations Against Dean as True

Where a defendant has defaulted, "a court is required to accept all of the . . . factual allegations as true and draw all reasonable inferences in [plaintiff's] favor." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (citation omitted); *SEC v. Cole*, 661 Fed. Appx. 52, 53-54 (2d Cir. 2016) (a default "require[s] the court to accept as true the Complaint's factual allegations") (citing *Finkel*). However, a court "is also required to determine whether the . . . allegations establish [defendant's] liability as a matter of law." *Finkel*, 577 F.3d at 84 (citation omitted). As set forth below, the allegations establish Dean's liability.

### II. Dean Violated Sections 10(b) of the Exchange Act and 17(a) of the Securities Act

To prove that Dean violated Section 10(b) and Rule 10b-5, the SEC must show he "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (citation omitted). Dean violated Rule 10b-5(a) or (c) if he "(1) engaged in a manipulative or deceptive act, (2) in furtherance of an alleged scheme to defraud, and (3) acted with scienter." *SEC v.*

*Penn*, 225 F. Supp. 3d 225, 235 (S.D.N.Y. 2016) (citations omitted). "Essentially the same elements are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security, though no showing of scienter is required" under subsections (a)(2) or (a)(3). *Monarch Funding*, 192 F.3d at 308.[1]

Here, Dean committed numerous deceptive acts in violation of Rule 10b-5(a) and (c).[2] *SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, *22 (S.D.N.Y. March 27, 2018) (Those provisions create "scheme liability for those who, with scienter, engage in deceitful conduct.") (citations and quotation omitted). Among other misconduct, he conspired with the shell brokers to conceal defendants' acquisition of the private placement shares; created and/or employed sham paperwork to deceive transfer agents and brokerages; solicited unrestricted stock certificates and an opinion letter on false pretenses; orchestrated the use of escrow agents to hide the fact that the private placement shares were purchased from the shell brokers, not the original recipients; and engaged in a variety of efforts to hide that defendants had ultimate control over, and were the beneficiaries of, the trading in Biozoom stock. *See, e.g., SEC v. Alternative Green Techs., Inc.,* No 11-cv-9056, 2012 WL 4763094, *5 (S.D.N.Y. Sept. 24, 2012) (steps taken to

---

[1] "The SEC must also show that defendants engaged in or made use of the instrumentalities of interstate commerce." *SEC v. CKB168, Ltd.,* 210 F. Supp. 3d 421, 441 n.24 (E.D.N.Y. 2016) (citing 17 C.F.R. § 240.10b-5). The interstate requirement is met here by Defendants' regular use of email, phone, bank wires, instant message, and trading platforms to perpetrate this fraud. (Doc. 4 at, *e.g.*, ¶¶ 32, 37, 39, 44, 59, 60, 65, 73, 74, 95, 106, 110, 119). *See, e.g., CKB168,* 421 at 441 n.24 (holding that email and wire transfers meet the requirement); *SEC v. Bass*, No. 1:10-cv-00606, 2011 WL 4344001, *2 (N.D.N.Y. Sept. 14, 2011) (ordering default judgment on Section 5 claim where defendants employed "telephone, mail, [and] wires").

[2] That conduct was in connection with the purchase, sale and offer of a security. Defendants enticed investors to purchase publicly traded Biozoom stock while concealing that stock's true control and manipulating its price. *SEC v. Wey*, 246 F. Supp. 3d 894, 913-14 (S.D.N.Y. 2017) (the "in connection with" requirement for 10(b) is construed broadly, such that "it is enough that the fraud alleged coincide with a securities transaction") (citations and quotations omitted); *SEC v. Ahmed*, 308 F. Supp. 3d 628, 658 (D. Conn. 2018) ("Section 17(a)'s requirement . . . is similarly expansive.").

"obtain the inaccurate legal opinion and secure the issuance of the purportedly unrestricted stock," including the use of sham paperwork, support a scheme liability claim); *Penn*, 225 F. Supp. 3d at 236 ("By disguising the ultimate recipient of the funds through sham transactions, [defendant] engaged in an inherently deceptive act.").

This conduct was plainly "in furtherance of an alleged scheme to defraud." The Complaint depicts a sophisticated scheme to control all of the purportedly unrestricted shares and manipulate the price and trading in Biozoom stock, netting nearly $35 million in illicit profits. (Doc 4 at, *e.g.*, ¶¶ 124-146); *SEC v. Lek*, 276 F. Supp. 3d 49, 59 (S.D.N.Y. 2017) (reviewing Second Circuit authority on "market manipulation," which is "market activity aimed at deceiving investors as to how other market participants have valued a security") (citations and quotation omitted). Dean's efforts set the foundation for that fraud. Through his acts, he deceived numerous individuals and entities – transfer agents, brokers, attorneys, and, most important, the investing public – to achieve Defendants' illicit goal.

Finally, Dean acted knowingly. *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1467 (2d Cir. 1996) ("[K]nowing misconduct" establishes scienter under the "securities fraud statutes"). He knew from the outset that Abellan and Ciupiak acquired the private placement shares from the shell brokers, not the original recipients. He also knew that the shares should have been restricted. Yet Dean sought to establish that the opposite was true – that the nominees acquired the shares in legitimate transactions, and that the shares should therefore be sold without restrictions. He therefore had the requisite scienter.[3]

---

[3] In addition, as a lawyer who claimed to specialize in taking companies public (Doc. 4 at ¶ 30), Dean knew numerous other facts that make his misconduct knowing or extremely reckless. *SEC v. Obus*, 693 F. 3d 276, 286 (2d Cir. 2012) (Reckless conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care" also satisfies the scienter requirement). He knew that Abellan and Ciupiak wanted to conceal their identities and

For these reasons, the SEC respectfully asks that the Court enter final judgment against Dean on its Section 10(b) and Section 17(a) claims.

### III. Dean Violated Section 5 of the Securities Act

"Section 5 of the Securities Act makes it unlawful, directly or indirectly, to publicly offer or sell unregistered stock . . . unless the offering is covered by an exemption." *SEC v. Frohling*, 851 F.3d 132, 135 (2d Cir. 2016). To establish a violation, the SEC must show "(1) lack of a required registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation and communication and the mails in connection with the offer or sale." *Id*. at 136 (citations and quotations omitted). "A person not directly engaged in transferring title of the security can be held liable under § 5 if he or she engaged in steps necessary to the distribution of unregistered security issues." *Id*. (citation and quotation omitted).

Here, the Complaint alleges that Defendants never registered Biozoom stock before offering and selling it, and that there was no exemption from registration. (Doc. 4 at ¶ 168). Not only were Defendants not entitled to an exemption, they knowingly engaged in a series of deceptions to offer and sell Biozoom stock without restriction. (*Id*. at ¶¶ 23-44, 51-52, 62-90).

Finally, although Dean did not directly offer the securities, he "engaged in steps necessary to the distribution of unregistered security issues." *Frohling*, 851 F.3d at 136. Dean helped Defendants acquire the stock, concealed its true lineage and control, and facilitated its deposit into the nominee accounts his co-Defendants controlled. He therefore violated Section 5.

---

their ownership of the private placement shares; he knew that it was important that they obtain certificates falsely describing the shares as unrestricted; and he knew that his co-Defendants wanted to deposit the shares in nominee accounts bearing the names of individuals who did not, in fact, buy the shares from the original private placement recipient.

*See, e.g., SEC v. Universal Express, Inc.,* 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007) (holding defendants liable under Section 5 because "[t]here is no doubt that, without their actions, the sale transactions would not have taken place") (citation and quotation omitted).

    IV.    <u>The Court Should Enjoin Dean Against Future Violations of the Sections 10(b), 17(a) and 5 and Should Impose a Penny Stock Bar</u>

Sections 21(d) and (e) of the Exchange Act, 15 U.S.C. § 78u(d-e), authorize district courts to issue injunctive relief in SEC actions. In determining whether to impose injunctions, courts consider:

> (1) The fact that the defendant has been found liable for illegal conduct; (2) the degree of scienter involved; (3) whether the infraction is an isolated occurrence; (4) whether defendant continues to maintain that his past conduct was blameless; and (5) whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*SEC v. Alpine Secur. Corp.,* No. 17-cv-4179, 2019 WL 4393027, *13 (S.D.N.Y. Sept. 12, 2019) (citing *SEC v. Cavanagh*, 155 F. 3d 129, 135 (2d Cir. 1998)). The Court has discretion to impose permanent injunctive relief, which is "particularly appropriate 'where a violation was founded on systemic wrongdoing, rather than an isolated occurrence' and where the defendant's 'persistent refusals to admit any wrongdoing'" make it likely she will commit further misconduct. *Alpine Secur. Corp.,* 2019 WL 4393027 at * 13 (quoting *Frohling*, 851 F.3d at 139).

Here, a permanent injunction is appropriate. First, as set forth above, Dean should be found liable for violating the securities laws. Second, he knowingly executed a series of deceptions about the nature and control of what became Biozoom stock, including the repeated use of sham documentation and transactions. Third, his conduct was not isolated, but was carefully planned and executed, involved numerous deceptions, and unfolded over a period of

10

months.  Fourth, Dean, who has refused to appear in this action, has not accepted any responsibility for his misconduct.  Finally, Dean is a lawyer that touted his expertise in "tak[ing] companies public."  (Doc. 4 at ¶ 30).  His "professional position" and relative youth – Dean is only 41 (*id*. at ¶ 16) – makes him likely to commit further violations of the securities laws.  *See, e.g., SEC v. Bronson*, 246 F. Supp. 3d 956, 974 (S.D.N.Y. 2017) (Imposing permanent injunction where defendant was an attorney familiar with securities laws and because he could continue "working for many years").

For these reasons, the Court should permanently enjoin Dean from violations of Exchange Act Section 10(b) and Securities Act Sections 5 and 17(a).[4]

The Court should also impose a permanent penny stock bar on Dean pursuant to Section Securities Act Section 20(g) [15 U.S.C. § 77t(g)].  The decision on whether to impose a penny stock bar rests on factors similar to those for a permanent injunction:

> (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that the misconduct will recur.

*SEC v. Jean-Pierre*, No. 12-cv-8886, 2015 WL 1054905, *12 (S.D.N.Y. March 9, 2015) (citing *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995)).

As discussed above, Dean's misconduct was egregious.  He knowingly deceived numerous securities industry participants as well as the investing public, including by exploiting

---

[4] Courts have divided over whether injunctions, like penalties and disgorgement, are subject to a five-year statute of limitations.  *Compare, e.g., SEC v. Collyard*, 861 F.3d 760, 764 (8th Cir. 2017) (no limitations period for obey-the-law injunctions like that requested here) with *SEC v. Cohen,* 332 F. Supp. 3d 575, 591-92 (E.D.N.Y. 2018) (five-year limitations period).  For the reasons explained in the Third Circuit's recent opinion in *SEC v. Gentile*, --- F.3d ---, 2019 WL 4686251 (3d Cir. Sept. 26, 2019), the Court should hold that the limitations period that governs penalty and disgorgement does not apply to injunctions like that requested here.

his knowledge as an attorney who specializes in taking companies public to facilitate sham transactions. He had an essential role in the fraud and collected nearly $120,000 for his efforts. He has refused to appear before this Court, much less acknowledge his wrongdoing. That, combined with his professional position, make it likely the conduct will recur. *See, e.g. Bronson*, 246 F. Supp. 3d at 975 (imposing permanent penny stock bar on attorney who refused to acknowledge wrongdoing); *Universal Express*, 475 F. Supp. 2d at 429 (imposing penny stock bar because defendant's professional position and refusal to acknowledge wrongdoing made future violations likely).

For these reasons, the Court should also impose a permanent penny stock bar on Dean.

V. The Court Should Impose a Penalty of $160,000 on Dean

The Securities Act and Exchange Act both "authorize three tiers of monetary penalties for statutory violations." *SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013) (citing 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3)). The Court may impose a third-tier penalty where the violation involved fraud, deceit or manipulation and "the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Razmilovic*, 738 F.3d at 38 (quoting the statutes). The amount of penalty for a third-tier violation shall not exceed the greater of defendant's "gross amount of pecuniary gain" or, for a natural person, $160,000 for each violation. *Id*. (citing the statute); *see also* 17 C.F.R. § 201.1001, Table I (adjusting the maximum penalty for the time period of Dean's violations); *SEC v. Riel*, 282 F. Supp. 3d 499, 528 (S.D.N.Y. 2017) (stating that, pursuant to the C.F.R., $160,000 is the maximum per violation penalty for violations occurring after March 5, 2013).

"Though the maximum penalty is set by statute on the basis of tier, the actual amount of the penalty is left up to the discretion of the trial court." *Riel*, 282 F. Supp. 3d at 528 (citation omitted). In determining a penalty, courts may consider:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses . . . (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Berkey*, 374 F. Supp. 3d at 360 (citations omitted); *see also SEC v. Rajaratnam*, 918 F.3d 36, 45 (2d Cir. 2019) (noting that these factors "are not to be taken as talismanic").

Here, Dean's conduct was egregious, involved a high degree of scienter, directly led to over $34 million in illicit proceeds, and involved a variety of deceptive acts over a period of months. Dean has refused to appear in this case and has not acknowledged wrongdoing. A $160,000 penalty is therefore appropriate.

This penalty should be imposed even though much of Dean's conduct occurred before the limitations period. *Gabelli v. SEC*, 568 U.S. 442, 448 (2013) (penalties are subject to five-year statute of limitations, based on "when a defendant's allegedly fraudulent conduct occurs."). Importantly, the Complaint alleges that on May 16, 2013, Dean submitted sham documentation to a brokerage to facilitate the deposit of share certificates in the nominee accounts. (Doc. 4 at ¶ 90). *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1102-03 (2019) (sending false and misleading statements contained in documents violates Rule 10b-5(a) and (c)). Like his other misconduct, Dean acted knowingly on May 16, 2013 to further an egregious fraud. Because that violation occurred within the limitations period, because the statutory penalty may be imposed on a "per

violation" basis, and because the Court should consider Dean's earlier conduct in weighing the severity of his May 16th misconduct, the Court should impose a $160,000 penalty.[5]

Legal authority supports this request. Each deceptive act – such as Dean's timely conduct – can support a statutory penalty. *See, e.g., SEC v. Pentagon Capital Mgmt., PLC*, 725 F. 3d 279, 288 n.7 (2d Cir. 2013) (approving the district court's calculation of the penalty based on the statutory maximum for *each* late trade); *SEC v. GTF Enterprises, Inc.*, No. 2015 WL 728159, *4 (S.D.N.Y. Feb. 19, 2015) (reviewing the various ways courts define "violation" for purposes of the calculating the penalty, which can include "the number of fraudulent transactions") (citations omitted). Further, courts presented with allegations that straddle the limitations period will impose penalties for the timely conduct. *See, e.g., GTF Enterprises*, 2015 WL 728159, at *5; *SEC v. Hansen*, No. 13-cv-1403, 2017 WL 1232716, *6-7 (S.D.N.Y. March 31, 2017); *SEC v. Straub*, No. 11-cv-9645, 2016 WL 5793398, *20 (S.D.N.Y. Sept. 30, 2016); *compare with Cohen*, 332 F. Supp. 3d at 591-92 (imposing no penalty after finding all conduct occurred outside limitations period). Further, in determining the *severity* of the penalty for Dean's May 16 violation, the Court should consider all of Dean's conduct. *See Birkelbach v. SEC*, 751 F.3d 472, 482 (7th Cir. 2014) (holding that it was appropriate for the SEC to consider "events outside the [limitations] period in crafting its sanction").

Here, on May 16, 2013 – within the limitations period, but following nearly a year of deceptive conduct – Dean knowingly submitted sham paperwork, including stock certificates he deceptively obtained, to allow defendants ultimately to trade millions of Biozoom shares. The Court should therefore impose a $160,000 for Dean's May 16 violation.

---

[5] Because Dean collected his illicit proceeds in 2012, the SEC does not seek disgorgement. *Kokesh v. SEC*, 137 S. Ct. 1635 (2017).

## CONCLUSION

Forth the reasons set forth above, the SEC respectfully requests that the Court enter final judgment against Dean and impose injunctive relief and a financial penalty.


Date:   November 25, 2019                  ___/s/ Daniel Maher
                                                                  Daniel Maher (*admitted pro hac vice*)
                                                                  Duane Thompson (*admitted pro hac vice*)
                                                                  Jennie Krasner
                                                                  Marc E. Johnson
                                                                 Securities and Exchange Commission
                                                                  100 F Street, NE
                                                                  Washington, D.C. 20549
                                                                  Tel: (202) 551-4737 (Maher)
                                                                  Email: maherd@sec.gov