UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>   v.<br><br>FRANCISCO ABELLAN VILLENA,<br><br>GUILLERMO CIUPIAK, JAMES B. PANTHER, JR., and FAIYAZ ABELLAN<br><br>     Defendants. | No. 18-cv-4309 (PKC) |

**PLAINTIFF'S MEMORANDUMIN IN SUPPORT
OF ITS MOTION FOR A DEFAULT JUDGMENT
<u>AGAINST DEFENDANT FRANCISCO ABELLAN VILLENA</u>**

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this memorandum in support of its motion to enter final judgment against Defendant Francisco Abellan Villena ("Abellan") pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure and Local Rule 55(b)(2).  On February 20, 2020, the Clerk certified a default against Abellan pursuant to Fed R. Civ. P. 55(b)(1).  (Doc. #86).  For the reasons set forth below, the Court should now order injunctive relief, impose a financial penalty and enter final judgment.

# TABLE OF CONTENTS

**PROCEDURAL BACKGROUND**……………………...………………………..1

**ABELLAN IS A RECIDIVIST**…………………………………………...…………1

**FACTS ALLEGED IN THE COMPLAINT**……………………………………...1

**ARGUMENT**……………………………………………………………………..5

    The Court Should Accept The SEC'S Allegations Against Abellan As True………..…..5

    Abellan Violated Sections 10(b) of the Exchange Act and 17(a) of the Securities Act…....5

    Abellan Violated Section 5 of the Securities Act…………………………………..8

    The Court Should Enjoin Abellan Against Future Violations and Should Impose a Penny Stock Bar……………………………………………………………………9

    The SEC Does Not Seek Disgorgement Against Abellan…………………………..11

    The Court Should Impose a Penalty of $33,336,801 on Abellan……………………12

**CONCLUSION**……………………...…………………………………………..15

## PROCEDURAL BACKGROUND

The SEC brought this case on May 15, 2018, alleging that Defendants engaged in a sophisticated scheme to profit by engaging in an unlawful distribution and manipulating the price of Biozoom stock. (Doc. #4, Complaint). The case was initially assigned to Judge Sweet. The case was reassigned to this Court on April 8, 2019. On May 1, 2019, the Court stayed all discovery in this case (Doc. #58) at the request of the U.S. Department of Justice, which has brought a parallel criminal proceeding against defendants Abellan, Dean, and Panther.

In this matter, only Panther has filed an Answer (Doc. #20) and is actively litigating. Ciupiak has settled as to liability and injunctive relief. (Doc. #45). The Court has entered a default judgment against Dean. (Doc. #71). The SEC made substantial efforts to locate and serve Abellan in Spain, including retaining Spanish counsel. (Doc. #82). On November 29, 2019, an agent retained by the SEC's Spanish counsel personally served Abellan at a prison in Ibiza, Spain. (*Id*.).

## ABELLAN IS A RECIDIVIST

Abellan is a recidivist that has previously been found liable for nearly identical misconduct. *SEC v. Abellan*, 674 F. Supp. 2d 1213, 1219 (W.D. Wash. 2009). The court in that matter ordered disgorgement of $15,403,703 and a penalty of $480,000. *Id*. at 1221-22. Abellan did not actually pay any disgorgement or penalty. Declaration of SEC Attorney Jennie B. Krasner in Support of the SEC's Motion for Final Judgment against Francisco Abellan Villena ("Krasner Declaration") ¶ 15.

## FACTS ALLEGED IN THE COMPLAINT

In its Complaint, the SEC alleged that Abellan was an architect of a fraudulent scheme to manipulate the market for shares of Biozoom, Inc. ("Biozoom") in violation of Section 10(b) of

1

the Exchange Act [15 U.S.C. 78j(b)] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]. (Doc. #4 at ¶¶ 1, 8). Abellan and his co-Defendants also effected the illegal unregistered sale of Biozoom stock in violation of Section 5 of the Securities Act [15 U.S.C. § 77(e)]. (*Id.*).

Broadly, Defendants profited by creating the false appearance that (1) Biozoom shares were legally available for sale to the general public; and (2) the price and trading volume of Biozoom shares were determined by the natural interplay of market supply and demand, instead of artificially created by manipulative trading. (Doc. #4 at ¶ 2).

Abellan orchestrated this fraud. Before the manipulative trading in 2013, Abellan and Ciupiak had Defendant Faiyaz Dean ("Dean") arrange to acquire for them the shares of a shell company and to hide Abellan's control of these shares. (*Id.* at ¶ 4). Those shell company shares consisted of two blocks: a restricted control block and a block originally sold to 34 private placement investors and registered for re-sale pursuant to a Form S-1 (the "private placement shares"). (*Id.* at ¶¶ 23-26). In 2009, Medford Financial ("Medford"), a company affiliated with two shell brokers, had purchased both blocks, which made the private placement shares control shares, thus restricting their re-sale. (*Id.* at ¶¶ 25-26). However, Medford concealed its purchase of the private placement shares, falsely leaving them in the names of the original private placement recipients. (*Id.* at ¶ 26). By doing so, a subsequent purchaser could claim to have bought them directly from the original recipients, enabling them to be re-sold without restriction. (*Id.* at ¶¶ 32, 37-38).

That is exactly what Defendants did. Dean and the shell brokers created sham paperwork to conceal that Defendants – through a newly-created company, called LeMond, that hid Abellan's control and identity – had purchased *all* of the shell's shares, including the private placement

shares. (*Id.* at ¶¶ 32-38). Again, this would eventually allow Defendants to create and use additional sham paperwork purporting to show that varied investors had purchased the shares directly from the original recipients. (*Id*. at ¶¶ 40-44). But those purchasers were, in fact, "nominees" having no direct economic interest in, or control of, the shares or the brokerage accounts in their respective names. (*Id*.).

Dean and Panther then used this sham paperwork to transfer stock certificates without restrictive legends from the names of the private placement shareholders to the names of the nominees. (*Id*.). It also allowed Defendants to fraudulently open brokerage accounts in the names of the nominees. (*Id*. at ¶¶ 62-81).

Having obtained all of the shares, Defendants effectively merged a subsidiary of the shell company with a German biomedical company, resulting in the creation of Biozoom, Inc. (*Id*. at ¶¶ 4, 46-53). As a result, the shell company shares became Biozoom shares. (*Id*. at ¶ 4, 51). Having fraudulently obtained stock certificates in the names of the nominees without restrictive legends, Abellan and Panther arranged to have the certificates deposited in nominee accounts Defendants controlled at several different brokerages. (*Id*. at ¶¶ 54, 62-79, 90). With Panther's assistance, Abellan and Ciupiak then secretly directed the trading in those accounts, as well as other accounts created to hide their control. (*Id*. at ¶¶ 4, 104-123, 141-46).

With the scheme's groundwork in place, beginning on May 16, 2013, Abellan, Ciupiak and Panther quickly laddered the price of Biozoom stock upwards. (*Id*.). These defendants got the stock price moving upward through trading – at ever-increasing prices – among the nominee accounts and Defendants' network of brokers and traders. (*Id*.). Simultaneously, Abellan and Ciupiak controlled other nominee accounts that they used for manipulative coordinated bidding to keep the share price propped up. (*Id*.). This bid activity created the false appearance of a rising

price resulting from significant demand for Biozoom stock, even as Abellan, Ciupiak, and Panther caused millions of shares of Biozoom to be illegally sold into the market. (*Id*.). To further drive up demand – and thus Biozoom's share price – Abellan, Ciupiak, and Panther organized an elaborate online, print, and radio promotional campaign that coincided with the manipulative trading. (*Id*. at ¶¶ 5, 124-140).

Prior to the manipulative trading, Biozoom's stock never publicly traded. (*Id*. at ¶ 6). Trading started on May 16, 2013, at a pegged price of $1.10 per share, and the stock price peaked at $4.50 per share on June 19, 2013. (*Id*.). By selling to retail investors at artificially inflated prices, Abellan, Ciupiak, and Panther generated more than $33 million in illicit proceeds from sales of shares deposited in the accounts they set up and controlled. (*Id*.). Substantial proceeds were wired to accounts Abellan controlled. (*Id.* at ¶ 147).

Abellan was this fraud's primary architect and trader. Specifically, Abellan:

- Directed Dean to acquire all of the shares of an inactive shell company and to hide Abellan's control of these shares by using a nominee entity to pay for them and by placing shares in accounts in the names of nominees. Abellan also directed Dean to conceal the fact that the shares could not be freely re-sold (*Id*. ¶¶ 3, 4, 34-35, 38, 40-44);

- Directed Panther and others to locate and acquire a company to promote (*Id*. ¶¶ 45-53);

- Arranged to have funds and shares deposited in brokerage accounts to be used in the unlawful trading while concealing both his role in providing those funds as well as the fact that he controlled the accounts (*Id*. ¶¶ 54-81);

- Used proxy servers and other technology to conceal his control of the nominee accounts (*Id*. ¶¶ 60-61);

- Created additional sham entities to help him manipulate the price of Biozoom stock while concealing his control of the entities (*Id*. ¶¶ 96-103);

- In email communications, falsely purported to be the nominees or the named control persons of the entities he created (*Id*. ¶ 60);

4

- Engaged in sophisticated and coordinated trading to artificially inflate the price of Biozoom stock (*Id*. ¶¶ 104-123, 141-46);

- Solicited and funded a promotional campaign to correspond with the trading (Id. ¶¶ 124-146); and

- Sold Biozoom stock at inflated prices to obtain more than $33 million in profits, much of which he had wired to accounts he controlled. (*Id*. at ¶¶ 6, 147).

In sum, Abellan, a recidivist and unrepentant market manipulator, directed and executed a sophisticated fraud, depriving investors of over $33 million.

## ARGUMENT

I.   The Court Should Accept the SEC's Allegations Against Abellan as True

Where a defendant has defaulted, "a court is required to accept all of the . . . factual allegations as true and draw all reasonable inferences in [plaintiff's] favor." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (citation omitted); *SEC v. Cole*, 661 Fed. Appx. 52, 53-54 (2d Cir. 2016) (a default "require[s] the court to accept as true the Complaint's factual allegations") (citing *Finkel*).  However, a court "is also required to determine whether the . . . allegations establish [defendant's] liability as a matter of law." *Finkel*, 577 F.3d at 84 (citation omitted).  As set forth below, the allegations establish Abellan's liability.

II.   Abellan Violated Sections 10(b) of the Exchange Act and 17(a) of the Securities Act

To establish that Abellan violated Section 10(b) and Rule 10b-5, the SEC must show he "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (citation omitted).  Abellan violated Rule 10b-5(a) or (c) if he "(1) engaged in a manipulative or deceptive act, (2) in furtherance of an alleged scheme to defraud, and (3) acted with scienter." *SEC v. Penn*, 225 F. Supp. 3d 225, 235 (S.D.N.Y. 2016) (citations omitted).  "Essentially the same

5

elements are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security, though no showing of scienter is required" under subsections (a)(2) or (a)(3). *Monarch Funding*, 192 F.3d at 308.[1]

Here, Abellan committed numerous deceptive acts in violation of Rule 10b-5(a) and (c).[2] *SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, *22 (S.D.N.Y. March 27, 2018) (Those provisions create "scheme liability for those who, with scienter, engage in deceitful conduct.") (citations and quotation omitted). Foremost, Abellan artificially inflated the price of Biozoom stock, then sold shares he secretly controlled. *See, e.g., SEC v. Fiore*, 416 F. Supp. 3d 306, 321-24 (S.D.N.Y. 2019) (allegations "are sufficient to establish scheme liability" where defendant used paid stock promotion, "multiple forms of market manipulation" and "deceptive trading practices" that "encourag[ed] the public to buy Plandai and then allow[ed] Fiore to sell his shares at a profit") (citing, among other cases, *SEC v. Abellan*, 674 F. Supp. 2d 1213, 1219 (W.D. Wash. 2009)); *SEC v. Lek,* 276 F. Supp. 3d 49, 59 (S.D.N.Y. 2017) ("The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell

---

[1] "The SEC must also show that defendants engaged in or made use of the instrumentalities of interstate commerce." *SEC v. CKB168, Ltd.,* 210 F. Supp. 3d 421, 441 n.24 (E.D.N.Y. 2016) (citing 17 C.F.R. § 240.10b-5). The interstate requirement is met here by Defendants', including Abellan's, regular use of email, phone, bank wires, instant message, and trading platforms to perpetrate this fraud. (Doc. 4 at, *e.g.*, ¶¶ 32, 37, 39, 44, 59, 60, 65, 73, 74, 95, 106, 110, 119). *See, e.g., CKB168*, 421 at 441 n.24 (holding that email and wire transfers meet the requirement); *SEC v. Bass*, No. 1:10-cv-00606, 2011 WL 4344001, *2 (N.D.N.Y. Sept. 14, 2011) (ordering default judgment on Section 5 claim where defendants employed "telephone, mail, [and] wires").

[2] That conduct was in connection with the purchase, sale and offer of a security. Defendants enticed investors to purchase publicly traded Biozoom stock while concealing that stock's true control and manipulating its price. *SEC v. Wey*, 246 F. Supp. 3d 894, 913-14 (S.D.N.Y. 2017) (the "in connection with" requirement for 10(b) is construed broadly, such that "it is enough that the fraud alleged coincide with a securities transaction") (citations and quotations omitted); *SEC v. Ahmed*, 308 F. Supp. 3d 628, 658 (D. Conn. 2018) ("Section 17(a)'s requirement . . . is similarly expansive.").

securities are determined by the natural interplay of supply and demand, not rigged by manipulators.") (quoting *Wilson v. Merrill Lynch & Co., Inc.,* 671 F.3d 120, 130 (2d Cir. 2011)).

In addition, he took elaborate steps to conceal his involvement, including the use of nominee accounts, sham entities, fake email addresses, and proxy servers. *See, e.g., VanCook v. SEC*, 653 F. 3d 130, 138-40 (2d Cir. 2011) ("architect" of elaborate efforts to conceal late-trading scheme violated 10b-5(a) and (c), among other provisions). His use of willing co-Defendants to prepare and execute the fraud further obscured his role. *Penn*, 225 F. Supp. 3d at 236 ("By disguising the ultimate recipient of the funds through sham transactions, [defendant] engaged in an inherently deceptive act.").

This conduct was plainly "in furtherance of an alleged scheme to defraud." The Complaint depicts a sophisticated scheme to control all of the purportedly unrestricted shares and manipulate the price and trading in Biozoom stock, netting more than $33 million in illicit profits. (Doc. #4 at, *e.g.,* ¶¶ 124-146); *Fiore*, 416 F. Supp. 3d 306 at 321-24 (complaint depicting pump-and-dump scheme sufficient to allege violations of Sections 10(b) and 17(a)); *Lek*, 276 F. Supp. 3d at 59-60 (reviewing Second Circuit authority on "market manipulation."). Defendants, at Abellan's direction, deceived numerous individuals and entities – transfer agents, brokers, attorneys, and, most important, the investing public – to achieve their illicit goal.

Finally, Abellan acted knowingly. *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1467 (2d Cir. 1996) ("[K]nowing misconduct" establishes scienter under the "securities fraud statutes"). Abellan carefully prepared and then executed a sophisticated scheme to manipulate, and profit from, trading in Biozoom stock. Every aspect of this scheme – from the acquisition of shares, to the opening of nominee and other accounts, to the use of attorneys, transfer agents, and trustees, through the manipulative trading itself – reflects knowing and intentional conduct. That

he has previously been found liable for a nearly identical fraud, *Abellan*, 674 F. Supp. 2d 1213, only reinforces that conclusion. *SEC v. Boock*, No. 09-cv-8261, 2012 WL 3133638, *6 (S.D.N.Y. Aug. 2, 2012) ("The evidence leaves no doubt that Boock's violations of the securities laws were knowing and intentional, a conclusion that is reinforced by the fact that he is a recidivist.").

For these reasons, the SEC respectfully asks that the Court enter final judgment against Abellan on its Section 10(b) and Section 17(a) claims.

### III. Abellan Violated Section 5 of the Securities Act

"Section 5 of the Securities Act makes it unlawful, directly or indirectly, to publicly offer or sell unregistered stock . . . unless the offering is covered by an exemption." *SEC v. Frohling*, 851 F.3d 132, 135 (2d Cir. 2016). To establish a violation, the SEC must show "(1) lack of a required registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation and communication and the mails in connection with the offer or sale." *Id*. at 136 (citations and quotations omitted). "A person not directly engaged in transferring title of the security can be held liable under § 5 if he or she engaged in steps necessary to the distribution of unregistered security issues." *Id*. (citation and quotation omitted).

Here, the Complaint alleges that Defendants never registered Biozoom stock before offering and selling it, and that there was no exemption from registration. (Doc. #4 at ¶ 168). Not only were Defendants not entitled to an exemption, they knowingly engaged in a series of deceptions to offer and sell Biozoom stock without restriction. (*Id*. at ¶¶ 23-44, 51-52, 62-90).

Finally, through intermediaries he controlled, Abellan offered the stock for sale to the investing public. Even if he did not directly offer the securities, he "engaged in steps necessary

8

to the distribution of unregistered security issues." *Frohling*, 851 F.3d at 136.  Abellan instructed Dean to acquire the stock and to conceal its true lineage and control, had a company he controlled fund the purchase of the stock, and directed that it be cleared for trading and deposited into nominee accounts he controlled.  Through those accounts, he then offered the stock for sale.  Abellan therefore violated Section 5.  *See, e.g., SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007) (holding defendants liable under Section 5 because "[t]here is no doubt that, without their actions, the sale transactions would not have taken place") (citation and quotation omitted).

> IV. The Court Should Enjoin Abellan Against Future Violations of the Sections 10(b), 17(a) and 5 and Should Impose a Penny Stock Bar

Sections 21(d) and (e) of the Exchange Act, 15 U.S.C. § 78u(d-e), authorize district courts to issue injunctive relief in SEC actions.  In determining whether to impose injunctions, courts consider:

> (1) The fact that the defendant has been found liable for illegal conduct; (2) the degree of scienter involved; (3) whether the infraction is an isolated occurrence; (4) whether defendant continues to maintain that his past conduct was blameless; and (5) whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*SEC v. Alpine Secur. Corp.*, No. 17-cv-4179, 2019 WL 4393027, *13 (S.D.N.Y. Sept. 12, 2019) (citing *SEC v. Cavanagh*, 155 F. 3d 129, 135 (2d Cir. 1998)).  The Court has discretion to impose permanent injunctive relief, which is "particularly appropriate 'where a violation was founded on systemic wrongdoing, rather than an isolated occurrence' and where the defendant's 'persistent refusals to admit any wrongdoing'" make it likely she will commit further misconduct. *Alpine Secur. Corp.*, 2019 WL 4393027 at * 13 (quoting *Frohling*, 851 F.3d at 139).

9

Here, a permanent injunction is appropriate. First, as set forth above, Abellan should be found liable for violating the securities laws. Second, he knowingly orchestrated a pernicious fraud. Third, his conduct was not isolated, but was carefully planned and executed, involved numerous deceptions, and unfolded over a period of months. Fourth, Abellan has not accepted any responsibility for his misconduct. Finally, Abellan is a recidivist. His wealth, sophistication, and past conduct all make him likely to commit further violations of the securities laws. *SEC v. Curshen,* No. 2014 WL 12791876, *9 (S.D.N.Y. March 21, 2014) (Entering permanent injunction against recidivist and reasoning that "Curshen's repeated violations of the securities laws weigh heavily in favor of imposing a permanent injunction here.").

For these reasons, the Court should permanently enjoin Abellan from violations of Exchange Act Section 10(b) and Securities Act Sections 5 and 17(a).

The Court should also impose a permanent penny stock bar on Abellan pursuant to Section Securities Act Section 20(g) [15 U.S.C. § 77t(g)]. The stock at issue here was a penny stock. (Doc. 4, ¶ 18). The decision on whether to impose a penny stock bar rests on factors similar to those for a permanent injunction:

> (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that the misconduct will recur.

*SEC v. Jean-Pierre*, No. 12-cv-8886, 2015 WL 1054905, *12 (S.D.N.Y. March 9, 2015) (citing *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995)).

As discussed above, Abellan's misconduct was egregious. He knowingly deceived numerous securities industry participants as well as the investing public. He planned and executed a fraud that harvested over $33 million from duped investors. That, combined with his past securities violations, make it likely the conduct will recur. *See, e.g. SEC v. Becker,* No. 09-

10

cv-5707, 2010 WL 2710613, *1-2 (S.D.N.Y. July 8, 2010) (imposing penny stock bar in part because defendants "are clearly repeat offenders").

For these reasons, the Court should also impose a permanent penny stock bar on Abellan.

V.       The SEC Does Not Seek Disgorgement Against Abellan

As described in the Complaint (Doc. #4 at ¶ 7), the Commission brought a 2013 action against the nominees for violations of Section 5 of the Securities Act. *SEC v. Tavella, et al.*, No. 1:13-cv-04609 (S.D.N.Y. 2013). *Tavella* was an emergency action for a temporary restraining order and asset freeze, brought within weeks of the unlawful trading. (*Id*. at Doc. #1, ¶ 1). The Commission sued the nominees as the ostensible owners of the accounts used to manipulate and profit from the trading in Biozoom stock. Abellan was not a party to that case.

In January 2015, the Commission obtained a default judgment against the nominees. (*Id*. at Doc. #69). In that judgment, the court ordered the nominees to disgorge the $33,336,801[3] obtained through the unlawful distribution of Biozoom stock. A court has therefore already ordered the nominees to disgorge the illicit proceeds that we would normally seek from Abellan.

Different defendants cannot separately be liable for the same illicit proceeds. While defendants may be jointly and severally liable for disgorgement, courts cannot order them to disgorge a sum that exceeds a fraud's "unlawful profits, plus interest on those amounts." *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1476 (2d Cir. 1996); *see also SEC v. AbsoluteFuture.com*, 393 F.3d 94, 96 (2d Cir. 2004) ("[W]hen the profits of multiple defendants

---

[3] The figure of $33,336,801 is based on Judge Buchwald's calculations in *Tavella*, which deviate slightly from the SEC's calculations. *Tavella, et al*., No. 1:13-cv-04609, Doc. #68 at 13-14 (submitted herewith as Exhibit E to the Krasner Declaration) (explaining the reason for the difference); see also *Tavella* Doc. #8-1 and Doc. #46, Declarations of SEC Staff Attorney (setting forth the basis for the SEC figures) (submitted herewith as Exhibits B and C to the Krasner Declaration).

are to be disgorged, the total disgorgement amount cannot exceed the combined profits of the defendants."). In other words, courts may not engage in "impermissible double-counting." *SEC v. Tourre*, 4 F. Supp. 3d 579, 590 (S.D.N.Y. 2014) (discussing *First Jersey* and *AbsoluteFuture*).

Here, the rule against "double-counting" prohibits the Commission from seeking an order requiring Abellan separately to pay sums the *Tavella* court has already ordered the nominees to disgorge. Instead, as set forth below, the Commission seeks a substantial penalty.

VI.   The Court Should Impose a Penalty of $33,336,801 on Abellan

The Securities Act and Exchange Act both "authorize three tiers of monetary penalties for statutory violations." *SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013) (citing 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3)). The Court may impose a third-tier penalty where the violation involved fraud, deceit or manipulation and "the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Razmilovic*, 738 F.3d at 38 (quoting the statutes). The amount of penalty for a third-tier violation shall not exceed the greater of defendant's "gross amount of pecuniary gain" or, for a natural person, $160,000 for each violation. *Id.* (citing the statute); *see also* 17 C.F.R. § 201.1001, Table I (adjusting the maximum penalty for the time period of Abellan's violations); *SEC v. Riel*, 282 F. Supp. 3d 499, 528 (S.D.N.Y. 2017) (stating that, pursuant to the C.F.R., $160,000 is the maximum per violation penalty for violations occurring after March 5, 2013).

"Though the maximum penalty is set by statute on the basis of tier, the actual amount of the penalty is left up to the discretion of the trial court." *Riel*, 282 F. Supp. 3d at 528 (citation omitted). To determine an appropriate penalty, courts consider:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses . . . to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether

the penalty should be reduced due to the defendant's current and future financial condition.

*SEC v. Rajaratnam*, 918 F.3d 36, 44 (2d Cir. 2019) (noting that these factors are not "an exhaustive list . . . and are not to be taken as talismanic"); *see also Razmilovic*, 738 F.3d at 38 (not an abuse of discretion to consider defendant's lack of remorse and efforts to flee the country); *SEC v. Alpine Securities Corp.,* 413 F. Supp. 3d 235, 245 (S.D.N.Y. 2019) (courts may also consider "a defendant's lack of cooperation with authorities" and the "brazenness, scope and duration of illegal conduct") (citations and quotation omitted).

As described above, Abellan was the primary architect and beneficiary of the fraudulent scheme. His conduct was egregious and recurrent, and his cunning, sophistication and greed reflect a high degree of scienter. He is also a recidivist. *See, e.g., Boock*, 2012 WL 3133638, at *6 ("The evidence leaves no doubt that Boock's violations of the securities laws were knowing and intentional, a conclusion that is reinforced by the fact that he is a recidivist."); *SEC v. Madsen*, No. 17-cv-8300, 2018 WL 5023945, *4 (S.D.N.Y. Oct. 17, 2018) (defendant's "status as a securities-fraud recidivist" supported conclusion that misconduct was recurrent) (citation omitted). Further, Abellan's violations caused substantial losses to investors.

Abellan's current and future financial condition support a substantial penalty. Millions of dollars from this fraud remain unaccounted for.[4] Abellan perpetrated it while living in a Barcelona mansion he eventually sold to the pop star Shakira and soccer star Gerard Pique for €5 million. Krasner Decl. ¶ 16. Given his sophistication and recidivism, Abellan is likely to try to augment his wealth by again engaging in securities fraud. Indeed, the $480,000 penalty imposed in the SEC's 2009 enforcement action against Abellan had no deterrent effect. Within a few

---

[4] As a result of the *Tavella* action and judgment, the SEC froze and then obtained approximately $17 million of the illicit proceeds from this fraud before Abellan could transfer them overseas. Krasner Decl. ¶ 14; Doc. #4 at ¶ 151.

years, Abellan orchestrated another fraud that deprived investors of over $33 million. A much more substantial penalty is appropriate here.

Further, although as a result of the asset freeze and the *Tavella* judgment Abellan did not personally acquire all $33,336,801[5], a penalty equal to that amount is appropriate. In the Second Circuit, the "gross amount of pecuniary gain" for purposes of a penalty is equal to the "disgorgeable gain." *Razmilovic*, 738 F.3d at 38. Disgorgement, in turn, equals the "profits causally connected to the violation," not merely "the financial benefit that accrues to [the defendant] personally." *SEC v. Contorinis*, 743 F.3d 296, 305 (2d Cir. 2014) (citations and quotation omitted). Here, the profit causally connected to the violation – and thus the pecuniary gain for purposes of calculating a penalty – is more than $33 million. *See SEC v. de Maison*, 785 Fed. Appx. 3, 7 n.2 (2d Cir. 2019) (rejecting argument that disgorgement and penalty should be limited to "only the amounts by which [the defendant] personally profited").

In addition, courts often impose penalties equal to or greater than the defendant's pecuniary gain – often on less egregious facts. *See, e.g., SEC v. North Star Finance, LLC*, 2019 WL 3860321, *10 (D. Nev. Aug. 15, 2019) (imposing penalties equal to pecuniary gain even where, unlike here, certain defendants had "taken a measure of responsibility for their actions"); *SEC v. Aly*, 2018 WL 4853031, *5 (S.D.N.Y. Oct. 5, 2018) (imposing penalty equal to pecuniary gain in market manipulation case where no indication defendant was a recidivist).

A substantial penalty is especially appropriate here because courts evaluate the total financial recovery when deciding on a penalty. Typically, that means courts reduce a penalty where there is substantial disgorgement. *See SEC v. Universal Express, Inc.,* 646 F. Supp. 2d

---

[5] As noted in footnote 3, because this calculation of the illicit proceeds has been established as part of Judge Buchwald's order in *Tavella*, attached as Exhibit D to the Krasner Declaration, the SEC uses it here.

552, 568 (S.D.N.Y. 2009) (Reasoning that the amount of penalty depends in part on "the extent to which other aspects of the relief and/or judgment . . . will have the desired punitive effect" and noting defendant's $13 million disgorgement obligation). But, by the same logic, the absence of disgorgement here warrants a large penalty, especially against this wealthy, recidivist Defendant. In *SEC v. Razmilovic*, 822 F. Supp. 2d 234, 281-82 (E.D.N.Y. 2012), the court, citing *Universal Express*, ordered the CEO defendant to pay $62 million in total financial penalties for a $41 million fraud. The court, recognizing the severity of the misconduct, reduced the penalty to $21 million *only expressly because* the defendant was "liable for disgorgement in an amount over forty-one million dollars." *Id*.

For these reasons, the Court should impose a penalty equal to Abellan's pecuniary gain of $33,336,801.

## **CONCLUSION**

Forth the reasons set forth above, the SEC respectfully requests that the Court enter final judgment against Abellan and impose injunctive relief and a financial penalty.

Date:   March 25, 2020                        ___/s/ Daniel Maher
                                              Daniel Maher (*admitted pro hac vice*)
                                              Duane Thompson (*admitted pro hac vice*)
                                              Jennie B. Krasner
                                              Securities and Exchange Commission
                                              100 F Street, NE
                                              Washington, D.C. 20549
                                              Tel: (202) 551-4737 (Maher)
                                              Email: maherd@sec.gov