UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                      **Plaintiff,**

    v.

FRANCISCO ABELLAN VILLENA,
GUILLERMO CIUPIAK, JAMES B.
PANTHER, JR., and
FAIYAZ DEAN

                      **Defendants.**

Civil Action No. 18-cv-4309 (PKC)

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT
<u>JAMES B. PANTHER, JR.</u>**

## Table of Contents

TABLE OF AUTHORITIES ........................................................................................... i

PRELIMINARY STATEMENT ................................................................................... 0

THE UNDISPUTED FACTS ....................................................................................... 1

    I.      Panther Joined a Market Manipulation Scheme ................................................. 1

    II.    The Defendants Set Up the Fraud by Acquiring Companies and
          Opening Sham Brokerage Accounts ................................................................... 2

    III.   Defendants Manipulated the Price of Biozoom Stock and Then
          Sold the Shares They Controlled for Enormous Profits ................................... 4

ARGUMENT ................................................................................................................ 6

    I.      The Court Should Estop Panther from Relitigating the Same
          Facts He Admitted to in His Guilty Plea .......................................................... 7

          A.     The Issues in the SEC and DOJ Proceedings Are Identical ................... 7

          B.     The Remaining Requirements for Collateral Estoppel Have
                 Also Been Met ........................................................................................ 9

    II.    Panther's Admissions Establish That He Violated Section 10(b)
          of the Exchange Act and Sections 5 and 17(a) of the Securities Act ............ 10

          A.     Panther Committed Securities Fraud ................................................... 10

          B.     Panther Facilitated the Sale of Unregistered Stock .............................. 12

    III.   The Court Should Enjoin Panther Against Future Violations of
          Sections 5, 10(b), and 17(a) ............................................................................ 13

    IV.   The Court Should Impose a Penny Stock Bar .................................................. 14

    V.    The Court Should Impose a Penalty of $320,000 ........................................... 15

CONCLUSION .......................................................................................................... 17

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*SEC v. Abellan*,
   674 F. Supp. 2d 1213 (W.D. Wash. 2009) .............................................................. 3

*SEC v. Alexander,*
   115 F. Supp. 3d 1071 (N.D. Cal. 2015) ................................................................. 9

*SEC v. Alpine Secur. Corp.,*
   No. 17-cv-4179, 2019 WL 4393027 (S.D.N.Y. Sept. 12, 2019) ............................ 15

*SEC v. Amerindo Inv. Advisors, Inc.,*
   No. 05-cv-5231, 2013 WL 1385013 (S.D.N.Y. March 11, 2013) ....................... 8-9

*SEC v. Apostelos,*
   No. 1:15-cv-00699, 2019 WL 3944755 (S.D. Ohio, Aug. 21, 2019) ....................... 9

*SEC v. CKB168, Ltd.,*
   210 F. Supp. 3d 421 (E.D.N.Y. 2016) ................................................................. 12

*SEC v. Farmer*,
   No. 4:14-cv-2345, 2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ............................ 13

*SEC v. Fiore,*
   416 F. Supp. 3d 306 (S.D.N.Y. 2019) ................................................................. 13

*SEC v. Fowler,*
   6 F. 4th 255 (2d Cir. 2021) .................................................................................. 17

*SEC v. Frohling*,
   851 F. 3d 132 (2d Cir. 2016) ................................................................................ 14

*SEC v. Genovese*,
   553 F. Supp. 3d 24 (S.D.N.Y. 2021) .................................................................... 11

*SEC v. Hansen*,
   No. 13-cv-1403, 2017 WL 1298022 (S.D.N.Y. March 31, 2017) ....................... 8-9

*SEC v. Jean-Pierre*,
   No. 12-cv-8886, 2015 WL 1054905 (S.D.N.Y. March 9, 2015) ..................... 13, 15

*SEC v. LaGuardia*,

No. 19-cv-5895, 2023 WL 4266014 (S.D.N.Y. June 29, 2023) ................................................ 10

*SEC v. Lek Securities Corp.*,
   612 F. Supp. 3d 287 (S.D.N.Y. 2020) ...................................................................................... 17

*SEC v. Mattera*,
   No. 11-cv-8323, 2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013) ...................................7-8, 10-11

*SEC v. McGinn, Smith & Co.*,
   No. 1:10-cv-457, 2015 WL 12780597 (N.D.N.Y. Feb. 17, 2015) ........................................ 8-9

*SEC v. Monarch Funding Corp.*,
   192 F. 3d 295 (2d Cir. 1999) ............................................................................................ 11-12

*SEC v. Penn*,
   225 F. Supp. 3d 225 (S.D.N.Y. 2016). .............................................................................. 11, 13

*SEC v. Pentagon Capital Mgmt. PLC*,
   725 F. 3d 279 (2d Cir. 2013) .................................................................................................... 17

*SEC v. Rajaratnam*,
   918 F.3d 36 (2d Cir. 2019) ....................................................................................................... 16

*SEC v. Razmilovic*,
   738 F.3d 14 (2d Cir. 2013) ....................................................................................................... 16

*SEC v. Reserve Mgmt. Co, Inc.*
   2013 WL 5432334 (S.D.N.Y. Sept. 30, 2013)…………………………………………….17

*SEC v. Riel*,
   282 F. Supp. 3d 499 (S.D.N.Y. 2017) ..................................................................................... 16

*SEC v. Shehyn*,
   No. 04-cv-2003, 2010 WL 3290977 (S.D.N.Y. Aug. 9, 2010) .................................................. 9

*SEC v. Stein*,
   906 F. 3d 823 (9th Cir. 2018) .................................................................................................... 9

*SEC v. Tavella, et al.*,
   No. 1:13-cv-04609 (S.D.N.Y) ................................................................................................... 16

*U.S. v. Abellan, et al.,*
   No. CR-19-00448 (D. Ariz.) ....................................................................................................... 1

**Statutes**
15 U.S.C. § 77t(d) .......................................................................................................................... 16

15 U.S.C. § 78u(d)(3) ........................................................................................................... 16

17 C.F.R. § 201.1001 ........................................................................................................... 16

17 C.F.R. § 240.10b-5........................................................................................................... 12

Plaintiff Securities and Exchange Commission ("SEC") submits this memorandum of law in support of its motion (the "Motion"), pursuant to Federal Rule of Civil Procedure 56, for summary judgment on all its claims against defendant James B. Panther, Jr. ("Panther").  As explained below, the basis for this Motion is the doctrine of collateral estoppel, arising from Panther's guilty plea in a parallel criminal proceeding.  Because there can be no genuine dispute of a material fact, the SEC respectfully asks that the Court grant the Motion.

## PRELIMINARY STATEMENT

The SEC has alleged that Panther was a key participant in a market manipulation scheme orchestrated by Defendant Francisco Abellan Villena ("Abellan").  In short, Defendants Abellan, Panther, and Guillermo Ciupak (collectively, "Defendants,") secretly acquired shares in what would become Biozoom, Inc. ("Biozoom"), artificially inflated the price of Biozoom stock, and then sold the shares they controlled for approximately $34 million in profits.  Moreover, the shares were not legally available for sale to the public.  This conduct violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5, as well as Sections 5 and 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e and 77q(a)(1) and (3).

Panther had an essential role in the scheme.  A U.S. citizen, Panther arranged for the opening of brokerage accounts in the names of nominees that were, in fact, controlled by defendants; facilitated Defendants' trading in those accounts by, among other things, insuring that Defendants could give instructions from email and instant message accounts in the nominees' names; negotiated the purchase of a company with a product Defendants could promote; used an IOLTA account at his father's law firm to transfer proceeds used in furtherance

of the fraud; planned and controlled Biozoom's extensive campaign to promote its stock; and assisted Abellan and co-Defendant Guillermo Ciupiak in trading Biozoom stock.  Finally, after the SEC halted trading in Biozoom, Panther sought to conceal Defendants' misconduct by having key third parties sign a sham, backdated letter agreement falsely claiming that they had retained Panther's father's law firm.

Panther has pled guilty in a parallel criminal proceeding to precisely this conduct.  In April 2019, the Department of Justice ("DOJ") brought charges against Panther, Abellan, and Ciupiak based on the same conduct described in the SEC's Complaint.  *U.S. v. Abellan, et al.,* No. CR-19-00448 (D. Ariz.).  (Indictment, submitted herewith as Exhibit 1 to this Motion).  On May 22, 2023, Panther pled guilty to one count of "conspiracy to commit securities fraud and wire fraud . . . in violation of 18 U.S.C. § 1349."  (Plea Agreement, submitted herewith as Exhibit 2 to the Motion at ¶ 1).  The conspiracy involved deceptive acts that violated 18 U.S.C. §§ 1343 (wire fraud) and 1348 (securities fraud).  (*Id.* at ¶ 9).  As described in greater detail below, the admissions set forth in Panther's Plea Agreement mirror the allegations in the SEC's Complaint.

Because Panther has thus admitted that he engaged in the unlawful conduct described in the Complaint, and because Panther is collaterally estopped from re-litigating those issues in this case, there can be no genuine dispute of material fact.  The Court should therefore grant the SEC's Motion, find Panther liable on all claims, and impose a penalty of $320,000.

## THE UNDISPUTED FACTS

### I.   Panther Joined a Market Manipulation Scheme

Around 2012, Panther was introduced to Abellan, Ciupiak, and co-defendant Faiyaz Dean ("Dean"), and others.  (SEC's Local Rule 56.1 Statement of Undisputed Material Facts, filed

1

herewith, at ¶ 3).  Beginning around November 2012, Panther frequently communicated with Abellan, Dean, and other scheme participants.  (*Id*. at ¶ 6).  Panther knowingly and willfully joined the fraudulent scheme with the intent to engage in acts that would further the scheme. (*Id*.).

Abellan, a sophisticated, recidivist architect of stock promotion manipulation schemes,[1] was the control-person and primary beneficiary of the scheme described in the SEC's Complaint. (*Id*. at ¶ 3).  Abellan and Ciupiak, with the assistance of a Swiss attorney, controlled and/or funded numerous entities, including Royal Capital Ventures ("Royal"), LeMond Capital ("LeMond"), Allegemeine Finanz & Investors Research ("AFI"), Foresight Media ("Foresight"), BigBang Studios, Global Investors Research ("GIR"), and Global Financial Insight ("GFI").  (*Id*. at ¶ 4).  These entities were ultimately used to further the scheme by acquiring additional corporate entities; concealing the true ownership thereof; producing promotional material; funding marketing and other entities; and trading shares.  (*Id*.).  Panther provided trustee agreements created by a law firm operated by his father so that the Swiss attorney could transfer femoney between Abellan-controlled entities.  (*Id*. at ¶ 10).

## II.   The Defendants Set Up the Fraud by Acquiring Companies and Opening Sham Brokerage Accounts

Panther played an essential role in allowing Defendants to trade in nominee brokerage accounts at U.S. firms.  First, Abellan and Ciupiak arranged to have LeMond purchase the going-public vehicle for the fraudulent scheme, known as Entertainment Art, Inc. ("EERT"), and to conceal their association therewith.  (*Id*. at ¶ 5).  Dean structured the transaction to make it appear that EERT had numerous free trading shares when, in fact, the shares were unregistered

---

[1] Abellan has previously been found liable for nearly identical misconduct.  *SEC v. Abellan*, 674 F. Supp. 2d 1213, 1219 (W.D. Wash. 2009).

2

with the SEC and restricted from resale. (*Id*.).

Abellan and Ciupiak also arranged for ten Argentine nationals (the "nominee shareholders") to serve as nominee shareholders of EERT. (*Id.* at ¶ 7). Defendants arranged to impersonate the nominee shareholders. (*Id*.). For example, during March 2013, Dean, who resided in Canada, asked Panther to obtain a signature of one of the nominee shareholders. (*Id*.). Panther complied, and on or about March 29, 2013, sent an attachment to Dean via email containing the JPEG signature of the nominee shareholder, which was then submitted to a U.S. brokerage via email, in an attempt to clear shares for trading. (*Id*.).

Panther facilitated the opening of accounts at United States brokerage firms to be used by Defendants in furtherance of their fraudulent scheme. (*Id.* at ¶ 8). Five accounts were opened in the names of the nominee shareholders at a brokerage firm in New York City, and EERT shares were deposited into four of the accounts. (*Id*.). In connection with the deposit of those shares, Panther and Dean arranged for the issuance of an attorney opinion letter falsely declaring that the shares were not required to bear a restrictive legend and could be sold without registration. (*Id*.).

At Abellan's direction, and with the assistance of Ciupiak and Dean, Panther provided documentation to open accounts in nominee shareholder names at other brokerage firms, including a firm in California (the "California firm") and a firm in Scottsdale, Arizona (the "Arizona firm"). (*Id.* at ¶ 9). When the nominee shareholders were unable to clear shares at the California firm, Panther and Dean arranged for the shares to be referred to and ultimately deposited at the Arizona firm. (*Id*.). To facilitate these deceptive acts and allow the Defendants to impersonate the nominees while trading in the accounts, Panther arranged for the Arizona firm to make policy exceptions to allow trading via instant messaging. (*Id*.).

After the Defendants acquired EERT, the co-Defendants began searching for a company

3

to take public. (*Id.* at ¶ 11). They identified Opsolution, a German company developing a mobile scanner that would provide biometric readings from non-invasive skin scans. The Opsolution executives (the "Executives") were seeking investors to support commercial development of the product. (*Id.*). After Dean failed to persuade the Executives to accept an investment from Abellan-controlled entities, Panther, acting at the direction of his co-Defendants, approached the Executives in or around January 2013. (*Id.* at ¶¶ 11-12). In furtherance of the scheme, Panther met with the Executives and offered to help the Executives gain entry to the U.S. stock market to raise additional funds. (*Id.* at ¶ 12). To that end, Panther negotiated LeMond's $2 million investment into Opsolution. (*Id.*). Panther then requested and received from the Executives Opsolutions's confidential business plan and detailed financial projections – information that Panther and his co-Defendants would later use in promoting Biozoom. (*Id.*). In turn, Panther provided the Executives with a detailed schedule for the issuance of press releases and a list of proposed topics for the releases. (*Id.*). Panther told the Executives that the press releases would help increase the company's stock price. (*Id.*).

### III.   Defendants Manipulated the Price of Biozoom Stock and Then Sold the Shares They Controlled for Enormous Profits

Opsolution was reverse merged into EERT and became Biozoom in or around March 2013. (*Id.* at ¶ 13). Shares of EERT, which were controlled by co-Defendants, effectively became shares of Biozoom. (*Id.*). After the reverse merger, Abellan, Panther and Ciupiak manipulated the price of Biozoom shares through the dissemination of misleading and exaggerated promotional materials designed to give the appearance of a deep liquid market for Biozoom shares, when in the fact the shares were directly or indirectly controlled by Abellan. (*Id.* at ¶ 14). This promotional activity induced victim investors to buy the stock with the eventual goal of the co-Defendants selling the artificially inflated stock at the height of the

4

market for substantial profits.  (*Id.*).

Panther knew that the purpose of the promotional campaigns was to convince victims to buy Biozoom shares, and that the promotional materials contained misleading and exaggerated claims about the Biozoom scanner.  (*Id.* at ¶ 15).  For example, a promotional mailing campaign cost more than $4 million and was conducted without the knowledge or authorization of the Executives.  (*Id.* at ¶ 15).  Panther also knew that the information in the mailers touting the stocks was designed to appear to be independent stock analysis, when in fact the content was created by Abellan and the co-Defendants through GIR, GFI, and Foresight.  (*Id.* at ¶ 15).  Panther assisted his co-Defendants with the promotional campaign, including communicating with a U.S.-based printing company to arrange the wire transfer of funds used to purchase Biozoom mailers, identifying offshore banks that were later used to receive proceeds from the scheme, providing legal document templates for loan and trust agreements used to transfer funds, and creating misleading invoices.  (*Id.* at ¶ 16).  For example, Panther created an invoice for $374,748, which falsely stated that his father's law firm provided legal services, when in fact the money was simply proceeds from the scheme transferred to his father's firm.  (*Id.*).

Prior to May 16, 2013, no shares of Biozoom were traded.  (*Id.* at ¶ 18).  On that day, the "pump" of Biozoom shares began in the form of a coordinated promotional campaign.  (*Id.*). Between May and June 2013, Panther was in Barcelona, Spain, where he assisted Abellan with trading in the nominee shareholder accounts by, among other things, using instant messaging. (*Id.* at ¶ 17).  Panther also monitored trading in Biozoom stock and was in frequent contact with the Arizona brokerage and others regarding the accounts he referred.  (*Id.*).

As the "pump" began, the Defendants began to trade Biozoom stock in the nominee accounts, such that by late June 2013, almost 88 million shares of Biozoom were traded and the

stock price increased from about $1.10 per share to $4 per share.  (*Id.* at 18).  Once the price of Biozoom stock increased in June 2013, Abellan and Ciupiak "dumped" the Biozoom shares held in the name of the nominee shareholders and sent the illicit trading profits – approximately $34 million – to offshore bank accounts they established in the names of nominee shareholders.  (*Id.* at ¶ 19).  The profits from the sale of Biozoom shares resulted from the purchase of shares by members of the investing public.  (*Id.*).  These profits were the results of a scheme in which Panther knowingly participated.  (*Id.* at ¶ 2, 21).

On or about June 25, 2013, the SEC suspended trading in Biozoom and ultimately froze about $16 million in proceeds from the scheme that had not yet been transferred offshore.  (*Id.* at ¶ 20).  After the SEC halted trading in Biozoom, Panther attempted to have the Executives sign a back-dated consulting agreement relating to his work with Biozoom.  (*Id.*).  Panther told the Executives that the agreement would allow him to shield their communications with attorney-client privilege.  He also sought additional compensation.  (*Id.*).

Defendants used bank wires to transfer funds and phone, email, and instant messaging in furtherance of the scheme.  (*Id.* at ¶ 21).  Defendants' profits from the sales of Biozoom stock were the proceeds of an illegal scheme, the ownership of which Defendants sought to conceal or disguise by using nominee and foreign bank accounts.  (*Id.*).

## **ARGUMENT**

"Summary Judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *SEC v. Mattera*, No. 11-cv-8323, 2013 WL 6485949, at *5 (S.D.N.Y. Dec. 9, 2013) (Castel, J.) (citations and quotations omitted in this and all subsequent cites to this opinion below).  To defeat summary judgment, Panther would have to "come forward with specific facts showing

that there is a genuine issue for trial," such that a "reasonable trier of fact could find" in his favor. *Id*.

## I.      **The Court Should Estop Panther from Relitigating the Same Facts He Admitted to in His Guilty Plea**

Because Panther has, in his Plea Agreement, already admitted to the material facts alleged in the SEC's complaint, he cannot carry his burden here. "In a civil case, it is appropriate to estop a party from relitigating issues actually and necessarily decided as part of a prior criminal judgment and conviction, in part because the government bears a higher burden of proof in the criminal than in the civil context." *Id*. at *7. Collateral estoppel is especially proper in cases "involve[ing] claims by the government for civil remedies based on the same transaction that gave rise to the conviction." *Id*. "For estoppel purposes, there is no difference between a conviction obtained [as here] by a plea, or by a guilty verdict." *Id*.

District courts have "broad discretion" to decide whether to enforce collateral estoppel. *Id*. In making that determination, courts apply a four-part test:

> (1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Id*. As explained below, Panther's guilty plea meets each of these four requirements. The Court should therefore enter judgment on the SEC's claims under Section 10(b) of the Exchange Act, and Sections 17(a)(1) and (3) and Section 5 of the Securities Act.

### A.   *The Issues in the SEC and DOJ Proceedings Are Identical*

Panther's criminal conviction and the SEC's claims are identical even though they arise under different statutes. "[F]or collateral estoppel to apply, the civil claims need not arise under the same statutory provisions under which a party was convicted." *SEC v. Amerindo Inv.*

7

*Advisors, Inc.*, No. 05-cv-5231, 2013 WL 1385013, at *3 (S.D.N.Y. March 11, 2013); *see also*

*SEC v. Hansen*, No. 13-cv-1403, 2017 WL 1298022, at *5 (S.D.N.Y. March 31, 2017); *SEC v.*

*McGinn, Smith & Co.*, No. 1:10-cv-457, 2015 WL 12780597, at *8 (N.D.N.Y. Feb. 17, 2015).

Instead, "it is enough if the factual allegations underlying the convictions are sufficient to

establish that the defendant also violated" the civil claims. *Amerindo*, 2013 WL 1385013 at *3

(cleaned up). Accordingly, "to determine whether the issues are identical for collateral estoppel

purposes, courts routinely compare the criminal indictment with the civil complaint." *McGinn,*

*Smith*, 2015 WL 12780597 at *9.[2]

Here, the facts Panther has admitted to in his Plea Agreement – which describe a

conspiracy to commit "securities fraud" – are virtually identical to those alleged in the SEC's

Complaint. Both the Plea Agreement, which is the basis for the undisputed facts set forth above,

and the Complaint describe:

- The same market manipulation scheme, involving the same parties, entities,

  timeline, and profits, with the only difference being that the Complaint provides,

  in some places, more detail (compare, e.g., ECF No. 1, Complaint at ¶¶ 62-81,

  detailing Panther's efforts to open brokerage accounts in nominee names, with a

  more summary version in the Plea Agreement at 7-8);

---

[2] Courts have routinely enforced collateral estoppel against defendants in SEC actions where they
pled guilty to the statutes invoked in Panther's Plea Agreement. *See, e.g., SEC v. Shehyn*, No.
04-cv-2003, 2010 WL 3290977, at *3 (S.D.N.Y. Aug. 9, 2010) (wire fraud); *Hansen*, 2017 WL
1298022 at *5 (mail and wire fraud); *SEC v. Apostelos*, No. 1:15-cv-00699, 2019 WL 3944755,
at **2, 5-6 (S.D. Ohio, Aug. 21, 2019) (guilty plea to 18 U.S.C. § 1349 supported summary
judgment on 10(b) claims because misconduct admitted to in Plea Agreement was identical to
SEC allegations); *SEC v. Alexander,* 115 F. Supp. 3d 1071, 1077, 1080-81 (N.D. Cal. 2015)
(same, based on conviction at trial); *SEC v. Stein,* 906 F. 3d 823, 829-30 (9th Cir. 2018)
(affirming summary judgment on 10(b) claims because, "[h]aving considered the records in the
criminal and civil proceedings," conviction under 18 U.S.C. § 1348 made application of
collateral estoppel appropriate).

- Panther's interactions with, and deception of, Opsolution and the Executives (Complaint at ¶¶ 47-50);

- Panther's deceptive efforts, including the use of a pseudonym, to arrange the opening of accounts at different brokerages, ostensibly on behalf of the nominees, but in fact so that Defendants could use the accounts to engage in manipulative trading practices and amass substantial profits (*Id*. at ¶¶ 62-90). This included Panther obtaining the ability for Defendants to trade by instant message, allowing them to impersonate the nominees (*Id*. at ¶ 87);

- Panther's direction of Defendants' promotional and public relation activity, including his instructions to the Opsolution Executives (*Id*. at ¶¶ 124-130, 137);

- Panther's creation of a sham invoice purporting to reflect legal services provided by his father's law firm to an entity controlled by Abellan and Ciupiak, funds that were eventually used to open an account in a nominee's name (*Id*. at 78, 80);

- Panther's monitoring of the trading in the nominee brokerage accounts, and his knowledge that it was being conducted in a deceptive manner (*Id*. at ¶¶ 93-94);

- Panther's efforts to conceal his misconduct by asking the Executives to sign a back-dated representation agreement (*Id*. at ¶¶ 149-150).

In sum, Panther has admitted in his Plea Agreement to precisely the conduct described in the Complaint. The first collateral estoppel factor is therefore met. *SEC v. LaGuardia*, No. 19-cv-5895, 2023 WL 4266014, at *4 (S.D.N.Y. June 29, 2023) (holding that first requirement for collateral estoppel is met where the complaint and indictment "allege identical conduct").

B. *The Remaining Requirements for Collateral Estoppel Have Also Been Met*

As this Court explained in *Mattera*, a guilty plea in the parallel criminal proceeding

"actually litigated and decided the facts necessary to reach a verdict."  2013 WL 6485949 at *7.

Panther has pled guilty to participating in a conspiracy to commit securities and wire fraud, and

admitted the facts upon which his conviction is based.  Further, Panther – whose criminal

proceeding spanned years and involved multiple defense counsel – had a full and fair opportunity

to litigate the factual and legal issues.  *Id*. (holding that the second prong was met and explaining

that the Court will take judicial notice of the record in the criminal proceeding); *SEC v.

Genovese*, 553 F. Supp. 3d 24, (S.D.N.Y. 2021) (concluding that "although Genovese pleaded

guilty to one count of securities fraud, Genovese had a both a full and fair opportunity to litigate

the underlying factual predicate and legal issues related to his conviction").  Finally, the fourth

collateral estoppel requirement is met because those factual and legal issues were the sole

predicate for his guilty plea.  *Mattera*, 2013 WL 6485949 at *8 (explaining that the Court

"look[ed] to the facts set forth in the Indictment and in the Civil Complaint . . . for the purpose of

evaluating the first and fourth [collateral estoppel] prongs. . . .").

    In sum, because each of the four factors is met here, the Court should estop Panther from

relitigating the facts he admitted to in his Plea Agreement.

## II.   Panther's Admissions Establish That He Violated Section 10(b) of the Exchange Act and Sections 5 and 17(a) of the Securities Act

### A.   *Panther Committed Securities Fraud*

    To establish that Panther violated Section 10(b) and Rule 10b-5, the SEC must show that

he "(1) made a material misrepresentation or a material omission as to which he had a duty to

speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale

of securities."  *SEC v. Monarch Funding Corp.*, 192 F. 3d 295, 308 (2d Cir. 1999).  More

specifically, Panther violated Rule 10b-5(a) and (c) if he "(1) engaged in a manipulative or

deceptive act, (2) in furtherance of an alleged scheme to defraud, and (3) acted with scienter."

10

*SEC v. Penn*, 225 F. Supp. 3d 225, 235 (S.D.N.Y. 2016). "Essentially the same elements are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security, though no showing of scienter is required" under subsection (a)(3). *Monarch Funding*, 192 F. 3d at 308.[3]

As an initial matter, the SEC notes that the Court has previously entered default judgments against Dean and Abellan on the same causes of action. (ECF Nos. 71 and 92). By doing so, the Court made clear that the scheme described in the Complaint – the basis for those default judgments – and in Panther's Plea Agreement violated Exchange Act Section 10(b) and Securities Act Section 17(a).

Here, the undisputed facts establish Panther's culpability for violations of Sections 10(b) and 17(a). As set forth above and in the SEC's Local Civil Rule 56.1 Statement of Undisputed Material Facts, Panther engaged in numerous manipulative or deceptive acts, including: acquiring a nominee signature subsequently used to deceive a brokerage; arranging for the issuance of a false opinion letter; providing sham documentation to brokerages; seeking a policy exception from the brokerage to make it easier for defendants to impersonate the nominees; misleading the Executives about the Defendants' true intent and the purpose of the promotional efforts; by helping create the misimpressions among the public that the price of Biozoom's stock was based on legitimate market forces, and that the stock had been recommended by independent

---

[3] The SEC must also show that Panther engaged in or made use of the instrumentalities of interstate commerce. *SEC v. CKB168, Ltd*., 210 F. Supp. 3d 421, 441 n. 24 (E.D.N.Y. 2016) (citing 17 C.F.R. § 240.10b-5). The interstate requirement is met here, as Panther has admitted that "he and his coconspirators used international and interstate wires in furtherance of the scheme, to include, communicating by telephone, email, and instant messaging to U.S. brokerage houses and entities . . .; and transferring funds to and/or from" at least one U.S. brokerage and promotional agent. (Plea Agreement at 11). Further, consistent with the Plea Agreement, the Complaint alleges that the Defendants made repeated use of email, phone, bank wires, instant message, and trading platforms. (Complaint at, *e.g*., ¶¶ 32, 37, 39, 44, 59, 60, 65, 73, 7, 95, 106, 110, 119).

analysts; and by seeking to conceal Defendants' misconduct.  These actions were indisputably in furtherance of a scheme to defraud the investing public.  And, finally, Panther has admitted that he participated in the scheme while knowing and furthering its true purpose.

Courts have repeatedly held that similar conduct supported summary judgment for the SEC on Rule 10b-5(a) and (c) claims.  As a basic matter, Panther's myriad efforts to deceive the brokerages, including by facilitating trading through direct messages, was deceptive because it concealed the true beneficiary of the trading.[4]  Panther also created a sham invoice to disguise the true nature of over $350,000 in trading proceeds.  *Penn*, 225 F. Supp. 3d at 236 ("By disguising the ultimate recipient of the funds through sham transactions, Penn engaged in an inherently deceptive act."); *see also SEC v. Jean-Pierre*, No. 12-cv-8886, 2015 WL 1054905, at *9 (S.D.N.Y. March 9, 2015) (granting summary judgment based in part on submitting sham paperwork to transfer agents and others to facilitate trading).  Panther's orchestration of the misleading advertising campaign also supports liability. *See, e.g., SEC v. Fiore,* 416 F. Supp. 3d 306, 320-21 (S.D.N.Y. 2019) (granting summary judgment on 10b-5(a) and (c) claims on the basis of "misleading promotional campaign" and other efforts to "convince the public that there was more interest in Plandai stock than in fact existed"); *SEC v. Farmer*, No. 4:14-cv-2345, 2015 WL 5838867, at *14-16 (S.D. Tex. Oct. 7, 2015) (funding and coordinating a misleading advertising campaign and engaging in sham transactions supported summary judgment on 10b-5(a) and (c) claims).

### B.  *Panther Facilitated the Sale of Unregistered Stock*

To establish that Panther violated Section 5, which makes it unlawful to sell unregistered,

---

[4] Panther admitted in his Plea Agreement, at 11, that he engaged in efforts "to conceal or disguise the true ownership or control of the ill-gotten proceeds."

non-exempt securities, the SEC must show "(1) lack of a required registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation and communication and the mails in connection with the offer or sale." *SEC v. Frohling*, 851 F. 3d 132, 136 (2d Cir. 2016). "A person not directly engaged in transferring title of the security can be held liable under § 5 if he or she engaged in steps necessary to the distribution of unregistered security issues." *Id*.

Here, there is no dispute that the securities lacked a required registration statement and were offered and sold to the public in connection with Defendants' use of the means of interstate commerce. Nor is there any dispute that Panther "engaged in steps necessary to the distribution of" Biozoom stock. As the SEC has alleged, and as Panther has admitted in his Plea Agreement, his efforts to open brokerage accounts, negotiate the Opsolution acquisition, and orchestrate a promotional campaign, were specifically intended to facilitate the "offer or sale" of Biozoom stock to the public.

In sum, there is no genuine dispute over any fact, much less a material fact, that would compel the Court to deny the SEC's Motion. Panther has admitted to the relevant conduct and should not be permitted to relitigate those facts here. Accordingly, the Court should find that Panther is liable on all the SEC's claims.

### III. The Court Should Enjoin Panther Against Future Violations of Sections 5, 10(b), and 17(a)

Sections 21(d) and (e) of the Exchange Act, 15 U.S.C. § 78u(d-e), authorize district courts to issue injunctive relief in SEC actions. In determining whether to impose injunctions, courts consider:

> (1) The fact that the defendant has been found liable for illegal conduct; (2) the degree of scienter involved; (3) whether the infraction is an isolated occurrence; (4) whether defendant continues to maintain that his past conduct was blameless; and (5) whether, because of his professional

13

> occupation, the defendant might be in a position where future violations
> could be anticipated.

*SEC v. Alpine Secur. Corp.,* No. 17-cv-4179, 2019 WL 4393027, *13 (S.D.N.Y. Sept. 12, 2019).

The Court has discretion to impose permanent injunctive relief. *Id.* at *13.

Here, a permanent injunction is appropriate.  First, Panther has pled guilty and admitted that he engaged in illegal conduct.  Second, he had admitted that he engaged in that conduct knowingly.  His behavior was not isolated, but instead involved numerous acts taking place over a period of months.

## IV.    The Court Should Impose a Penny Stock Bar

The Court should also impose a permanent penny stock bar on Panther pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)].  The stock at issue here was indisputably a penny stock, because it traded at a market value of less than $5 per share.  (Complaint at ¶ 18; Plea Agreement at 10, describing the price range for the shares).  The decision on whether to impose a penny stock bar rests on factors similar to those for a permanent injunction:

> (1) the egregiousness of the underlying securities law violation; (2) the
> defendant's repeat offender status; (3) the defendant's role or position
> when he engaged in the fraud; (4) the defendant's degree of scienter; (5)
> the defendant's economic stake in the violation; and (6) the likelihood that
> the misconduct will recur.

*Jean-Pierre*, 2015 WL 1054905 at * 12.

As discussed above, Panther's misconduct was egregious.  He knowingly deceived numerous securities industry participants as well as the investing public.  The amoral and dishonest behavior exhibited throughout the fraud – including attempting to exploit his connections to his father's law firm – make a recurrence likely.  For these reasons, the Court should also impose a permanent penny stock bar on Panther.

14

### V.    The Court Should Impose a Penalty of $320,000[5]

The Securities Act and Exchange Act both "authorize three tiers of monetary penalties for statutory violations." *SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013) (citing 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3)). The Court may impose a third-tier penalty where the violation involved fraud, deceit or manipulation and "the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* at 38 (quoting the statutes). The amount of penalty for a third-tier violation shall not exceed the greater of defendant's "gross amount of pecuniary gain" or, for a natural person, $160,000 for each violation. *Id*. (citing the statute); *see also* 17 C.F.R. § 201.1001, Table I (adjusting the maximum penalty for the time period of Panther's violations); *SEC v. Riel*, 282 F. Supp. 3d 499, 528 (S.D.N.Y. 2017) (stating that, pursuant to the C.F.R., $160,000 is the maximum per violation penalty for violations occurring after March 5, 2013).

"Though the maximum penalty is set by statute on the basis of tier, the actual amount of the penalty is left up to the discretion of the trial court." *Riel*, 282 F. Supp. 3d at 528 (citation omitted). To determine an appropriate penalty, courts consider:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses . . . to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's current and future financial condition.

*SEC v. Rajaratnam*, 918 F.3d 36, 44 (2d Cir. 2019) (noting that these factors are not "an exhaustive list . . . and are not to be taken as talismanic"); *see also Razmilovic*, 738 F.3d at 38

---

[5] For the reasons explained in its memorandum in support of its Motion for Default Judgment Against Abellan, ECF No. 87 at 11, the SEC does not seek disgorgement against Panther. In short, a court has already ordered full disgorgement of the proceeds of this fraud, *SEC v. Tavella, et al*., No,. 1:13-cv-04609 (S.D.N.Y), and the SEC cannot seek to re-recover the same funds in this action. As a result, the SEC asks the Court to only impose a penalty.

(not an abuse of discretion to consider defendant's lack of remorse and efforts to flee the country).

These factors favor the imposition of a substantial, third-tier penalty.  As described above, the fraud could not have proceeded without Panther's many knowingly deceptive acts.  His conduct was knowing, egregious, persistent, and essential to the fraud.  Indeed, when one brokerage refused to clear shares for trading, Panther persevered and arranged to have the shares deposited at another brokerage.  (Plea Agreement at 8; Complaint at ¶¶ 82-90).  This conduct caused substantial losses to other persons, nearly $34 million.  Finally, the facts in this case show that Panther is skilled in concealing assets and their true ownership; the Court should thus discount the final factor.

The Court has substantial discretion to determine the amount of Panther's penalty, including what amounts to a discrete violation.  *SEC v. Fowler*, 6 F. 4th 255, 265 (2d Cir. 2021) (stating that "we will not second-guess the District Court's discretionary decision" on what "unit of violation" to use for imposing a "per violation" penalty); *SEC v. Lek Securities Corp.*, 612 F. Supp. 3d 287, 295-96 (S.D.N.Y. 2020) (emphasizing the district court's discretion in setting the penalty amount, including "treat[ing] each fraudulent transaction as a discrete violation").  Here, the SEC proposes a penalty of $320,000 for Panther, equal to one $160,000 statutory penalty each for Panther's violations of the antifraud provisions, Sections 10(b) and 17(a), and the registration provision, Section 5.  *SEC v. Reserve Mgmt. Co., Inc. et al.*, 2013 WL 5432334 at *20 (S.D.N.Y. Sept. 30, 2013) (cataloging various methods of calculating civil penalties, including "based on the number of statutes a defendant violated").  The SEC could seek far more, *see SEC v. Pentagon Capital Mgmt. PLC*, 725 F. 3d 279, 288 n. 13 (2d Cir. 2013), but does not request an unduly "staggering" penalty.  *Lek*, 612 F. Supp. 3d at 299.  Although

16

Panther's misconduct was long-running and harmful, he was not the scheme's primary architect or beneficiary. Combined with his probation in the criminal matter, a penalty of $320,000 should help deter future misconduct. *Id*. at 298.

Accordingly, the SEC respectfully asks that the Court impose a reasonable $320,000 penalty on Panther for his serious and long-running violations of the securities laws.

## CONCLUSION

For the reasons set forth above, the Court should enter summary judgment against Panther on all the SEC's claims, enter a permanent injunction and penny-stock bar, and impose a penalty of $320,000.

Date:   March 20, 2024                          \_\_\_/s/ Daniel Maher
                                                Daniel Maher (*admitted pro hac vice*)
                                                Duane Thompson (*admitted pro hac vice*)
                                                Jennie Krasner
                                                Securities and Exchange Commission
                                                100 F Street, NE
                                                Washington, D.C. 20549
                                                Tel: (202) 551-4737 (Maher)
                                                Email: maherd@sec.gov

## CERTIFICATE OF SERVICE

I certify that on March 20, 2024, I caused the foregoing to be filed on ECF and to be sent by email to the following.

*Counsel for Defendant James Panther in his Criminal Case*

Andrea Tazioli
NCP Lawyers
3200 North Central Avenue
Suite 2550
Phoenix, AZ 85012
Andrea@ncplawyers.com

*Please note that while Ms. Tazioli has agreed to accept papers from the SEC on Panther's*

*behalf, she has not made an appearance in this matter, and does not intend to.*

Guillermo Ciupiak
At his personal email address

/s/ Daniel J. Maher
Co-Counsel for the SEC

18