UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>             Plaintiff,<br><br>    v.<br>FRANCISCO ABELLAN VILLENA, GUILLERMO CIUPIAK, JAMES B. PANTHER, JR., and FAIYAZ DEAN<br><br>             Defendants. | Civil Action No. 18-cv-4309 (PKC) |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT JAMES B. PANTHER, JR.**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this statement of material facts as to which there is no genuine issue to be tried, together with the March 11 Declaration of Jennie B. Krasner and exhibits thereto.

**The Defendant**

1. James B. Panther, Jr. is 50 years old and is a resident of Carlsbad, California.

Support: ECF No. 20 (Panther's Answer to the Complaint) at ¶ 15.

2. Panther, along with his co-Defendants in this matter, was indicted April 23, 2019 by the Department of Justice in the District of Arizona. He would eventually enter into a guilty plea agreement that was filed on May 22, 2023. In that agreement, Panther pleaded guilty to conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 1349. As set forth in the plea agreement, and as described below, Panther admitted that, in coordination with

his co-Defendants, he knowingly and willfully engaged in deceptive and unlawful conduct virtually identical to what is described in the SEC's Complaint. Panther entered his guilty plea at a May 22, 2023 hearing.

Support: Exhibit 2 to the Krasner Declaration, Panther Indictment; Exhibit 1 to the Krasner Declaration, Panther Plea Agreement (hereafter "Panther Plea Agreement") at 1, 6-11.

## The Scheme

3. Around 2012, Panther was introduced to co-Defendants Francisco Abellan Villena ("Abellan"), Guillermo Ciupiak ("Ciupiak"), Faiyaz Dean ("Dean"), and others. Abellan, a sophisticated, recidivist architect of stock promotion manipulation schemes, was the control-person and primary beneficiary of a fraudulent scheme to secretly control, promote, manipulate, and ultimately profit from trading in the stock of an entity that would be called Biozoom, Inc. ("Biozoom"). Abellan operated behind the scenes, putting people in place to advance the scheme.

Support: Panther Plea Agreement at 6-9; *SEC v. Abellan*, 674 F. Supp. 2d 1213 (W.D. Wash. 2009).

4. Abellan and Ciupiak, with the assistance of a Swiss attorney, controlled and/or funded numerous entities, including Royal Capital Ventures ("Royal"), LeMond Capital ("LeMond"), Allegemeine Finanz & Investors Research ("AFI"), Foresight Media ("Foresight"), BigBang Studios, Global Investors Research ("GIR"), and Global Financial Insight ("GFI"). These entities were ultimately used in furtherance of the scheme to acquire additional corporate entities; conceal the true ownership thereof; produce promotional material; fund marketing and other entities; and trade shares.

<u>Support</u>: Panther Plea Agreement at 6-7.

5.      Abellan and Ciupiak arranged to have LeMond purchase the going-public vehicle for the fraudulent scheme, known as Entertainment Art, Inc. ("EERT"), and to conceal their association with the entity. Dean negotiated the transaction such that EERT appeared to have a large number of free trading shares when, in fact, the shares were unregistered with the SEC, restricted, and controlled by an affiliate group of shareholders and traders who were, in turn, controlled by Abellan.

<u>Support</u>: Panther Plea Agreement at 7.

6.      Beginning around November 2012, Panther frequently communicated with Abellan, Dean, and other scheme participants. Panther knowingly and willfully joined the fraudulent scheme with the intent to engage in acts that would further the scheme.

<u>Support</u>: Panther Plea Agreement at 7.

7.      Abellan and Ciupiak arranged for ten Argentine nationals (the "nominee shareholders") to serve as nominee shareholders of EERT. The co-Defendants engaged in acts that allowed them to impersonate the nominee shareholders. For example, during March 2013, Dean, who was located in Canada, asked Panther to obtain a signature of one of the nominee shareholders. Panther complied, and on or about March 29, 2013, sent an attachment to Dean via email containing the JPEG signature of the nominee shareholder, which was then submitted to a U.S. brokerage via email, in an attempt to clear shares for trading.

<u>Support</u>:  Panther Plea Agreement at 7.

8. Panther also facilitated and arranged to introduce his co-Defendants to United States brokerage firms. The co-Defendants opened five accounts in the names of the nominee shareholders at a brokerage firm in New York City (the "New York firm"), and EERT shares were deposited into four of the accounts. In connection with the deposit of those shares, Panther and Dean arranged for the issuance of an attorney opinion letter falsely declaring that the shares were not required to bear a restrictive legend and could be sold without registration.

Support: Panther Plea Agreement at 7.

9. At Abellan's direction, and with the assistance of Ciupiak and Dean, Panther provided documentation to open accounts in the nominee shareholder names at other brokerage firms, including a firm in California (the "California firm") and a firm in Scottsdale, Arizona (the "Arizona firm"). When the nominee shareholders were unable to clear shares at the California firm, Panther and Dean arranged for the shares to be referred to and ultimately deposited at the Arizona firm. To facilitate these deceptive acts, Panther arranged for the Arizona firm to make policy exceptions to allow the nominee shareholders to conduct trades via instant messaging.

Support: Panther Plea Agreement at 8.

10. Panther also provided trustee agreements created by a law firm operated by his father so that the Swiss attorney could transfer money between Abellan-controlled entities.

Support: Panther Plea Agreement at 8.

11. After they acquired EERT, the co-Defendants began searching for a company to

take public.  They identified Opsolution, a German company developing a mobile scanner that would provide biometric readings from non-invasive skin scans.  The Opsolution executives (the "Executives") were seeking investors to support commercial development of the product.  After Dean failed to persuade the Executives to accept an investment from Abellan-controlled entities, Panther negotiated a consulting contract with Opsolution.

      Support: Panther Plea Agreement at 8-9.

12.    In or around January 2013, in furtherance of the scheme, Panther met with Executives and offered, on behalf of his co-Defendants, to help the Executives gain entry into the U.S. stock market to raise additional funds.  To that end, Panther negotiated LeMond's $2 million investment into Opsolution.  Panther then requested and received from the Executives Opsolutions's confidential business plan and detailed financial projections – information that Panther and his co-Defendants would later use in promoting Biozoom.  In turn, Panther provided the Executives with a detailed schedule for the issuance of press releases and a list of proposed topics for the releases.  Panther told the Executives that the press releases would help increase Opsolution's stock price.

      Support: Panther Plea Agreement at 9.

13.    As the result of a reverse merger between Opsolution and EERT, the latter combined entity became Biozoom in or around March 2013.  Shares of EERT effectively became shares of Biozoom, which constituted securities registered under Section 12 of the Securities Exchange Act of 1934 ("Exchange Act") or the securities of an issuer required to file reports under Exchange Act section 15(f).

Support: Panther Plea Agreement at 9.

14. After the reverse merger, Abellan and the co-Defendants manipulated the price of Biozoom shares through the dissemination of misleading and exaggerated promotional materials designed to give the appearance of a deep liquid market for Biozoom shares, when in the fact the shares were directly or indirectly controlled by Abellan. This promotional activity induced victim investors to buy the stock with the eventual goal of the co-Defendants selling the artificially-inflated stock at the height of the market for substantial profits.

Support: Panther Plea Agreement at 9.

15. The promotional mailing campaign cost more than $4 million and was conducted without the knowledge or authorization of the Executives, the ostensible owners of Biozoom. Panther knew and has admitted that the purpose of the promotional campaigns was to convince victims to buy Biozoom shares. Panther further understood and has admitted that the information in the mailers touting the stocks was designed to appear to be independent stock analysis, when in fact the content was created by Abellan and the co-Defendants through GIR, GFI, and Foresight. Panther knew and has admitted that the promotional materials contained misleading and exaggerated claims about the Biozoom scanner.

Support: Panther Plea Agreement at 10.

16. Panther assisted his co-Defendants with the promotional campaign, including communicating with a U.S.-based printing company to arrange the wire transfer of funds used to purchase Biozoom mailers, identifying offshore banks that were later used to deposited proceeds

from the scheme, providing legal document templates for loan and trust agreements used to transfer funds, and creating invoices. For example, Panther created an invoice in amount of $374,748, which falsely stated that his father's law firm provided legal services, when in fact the money was simply proceeds from the scheme.

    Support: Panther Plea Agreement at 10.

17.    Between May and June 2013, Panther was present in Barcelona, Spain, where he assisted Abellan with trading in the nominee shareholder accounts by using instant messaging. While in Barcelona, Panther also monitored trading in Biozoom stock and was in frequent contact with the Arizona brokerage and others regarding the accounts he referred.

    Support: Panther Plea Agreement at 10.

18.    Prior to May 16, 2013, no shares of Biozoom were traded. On that day, the "pump" of Biozoom shares began in the form of a coordinated promotional campaign. At the same time, the Defendants began to trade Biozoom stock, such that by late June 2013, almost 88 million shares of Biozoom were traded and the stock price increased from about $1.10 per share to $4 per share.

    Support: Panther Plea Agreement at 10.

19.    Once the price of Biozoom stock appreciated in June 2013, Abellan and Ciupiak "dumped" the Biozoom shares held in the name of the nominee shareholders and sent the illicit trading profits – approximately $34 million – to offshore bank accounts they established in the names of nominee shareholders. The profits from the sale of Biozoom shares resulted from the

purchase of shares by members of the investing public.

Support: Panther Plea Agreement at 10.

20. On or about June 25, 2013, the SEC suspended trading in Biozoom and ultimately froze about $16 million in proceeds from the scheme. After the SEC halted trading in Biozoom, Panther attempted to have the Executives sign a back-dated consulting agreement relating to his work Biozoom. Panther told the Executives that the agreement would allow him to shield their communications with attorney-client privilege. He also sought additional compensation.

Support: Panther Plea Agreement at 11.

21. As detailed above, Panther has admitted that he and his co-Defendants participated in a scheme to obtain Biozoom shares to manipulate the price through the dissemination of misleading and exaggerated promotional materials. These materials were intended to induce victim investors to purchase Biozoom stock so Panther and his co-Defendants could sell the stock they secretly controlled at a profit. Panther has admitted that he and his co-Defendants used bank wires to transfer funds connected to the scheme, and also used other interstate forms of communication in furtherance of the scheme, including phone, email, and instant messaging to U.S. brokerage houses and entities. Finally, Panther has admitted that the profits form the sale of the Biozoom shares were proceeds of an illegal scheme, and that the transfer of the funds from the brokerages to the foreign bank accounts were financial transactions designed to conceal or disguise the true ownership or control of the ill-gotten proceeds.

Support: Panther Plea Agreement at 11.

Date:   March 20, 2024                             ___/s/ Daniel Maher
                                                              Daniel Maher (*admitted pro hac vice*)
                                                              Duane Thompson (*admitted pro hac vice*)
                                                              Jennie Krasner
                                                              Securities and Exchange Commission
                                                              100 F Street, NE
                                                              Washington, D.C. 20549
                                                              Tel: (202) 551-4737 (Maher)
                                                              Email: maherd@sec.gov