# EXHIBIT 1

FILED _____ LODGED
_____ RECEIVED _____ COPY

APR 2 3 2019

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ M DEPUTY

**SEALED**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-19-00448-PHX-DLR (MHB) |
| Plaintiff, | **I N D I C T M E N T** |
| vs. | VIO: 18 U.S.C. § 1349 |
| | (Conspiracy to Commit Securities Fraud and Wire Fraud) |
| Francisco Villena Abellan, | Count 1 |
| a/k/a "Frank Abellan," "Frank Abel," "Oracle," "Mark," and "Frank Villena" | 18 U.S.C. § 1348 |
| | 18 U.S.C. § 2 |
| James B. Panther, Jr., | (Securities Fraud) |
| a/k/a "James Suqui" and "James Suquilanda," | Count 2 |
| | 18 U.S.C. § 1956(h) |
| and Faiyaz Dean, | (Conspiracy to Commit Money Laundering) |
| | Count 3 |
| Defendants. | 18 U.S.C. § 1957 |
| | 18 U.S.C. § 2 |
| | (Money Laundering) |
| | Counts 4-8 |
| | 18 U.S.C. § 981(a)(1)(C) & 982 |
| | 28 U.S.C. § 2461(c) |
| | (Forfeiture Allegation) |

THE GRAND JURY CHARGES:

At all times material to this Indictment, within the District of Arizona and elsewhere:

**GENERAL ALLEGATIONS**

**The Defendants, Relevant Individuals, & Entities**

**Defendants**

1.     Defendant **FRANCISCO ABELLAN, also known as, "Frank Abellan," "Frank Abel," "Oracle," "Mark," and "Frank Villena" ("ABELLAN")**, was a citizen and resident of Spain and a self-described venture capitalist. **ABELLAN** operated a fraudulent pump and dump scheme involving the company Biozoom, Inc. ("Biozoom"), a Nevada corporation with its principal place of business in Kassel, Germany.

2.     Defendant **JAMES B. PANTHER, JR., also known as, "James Suqui" and "James Suquilanda" ("PANTHER")**, was a dual citizen of the United States and Ecuador and a resident of California. **PANTHER** exercised influence and/or control over corporate entities used in furtherance of the scheme described herein, to include Biozoom.

3.     Defendant **FAIYAZ DEAN ("DEAN")** was a citizen and resident of Canada. **DEAN** was a licensed attorney in the United States who operated a law practice in Washington State.

**Other Relevant Individuals and Entities**

4.     Biozoom purported to be in the business of researching, developing, and licensing technologies related to the mobile remote collection of biomedical data as well as bilateral diagnostic communication. In or around April 2013, Biozoom was formed as a result of a reverse merger of a publiclytraded company, Entertainment Art, Inc. ("Entertainment Art"), a New York-based handbag company that used the trading symbol "EERT," and Opsolution Spectroscopic Systems, Opsolution NanoPhotonics, and Opsolution GmbH (collectively, "Opsolution"), German-based entities specializing in medical technologies. Following the merger, Biozoom's common stock was publicly traded.

5. Coconspirator 1 ("CC1") was a dual citizen of Argentina and Italy and a resident of Argentina. **ABELLAN** and CC1 jointly exercised influence and control over Royal Capital Ventures ("Royal"), a Seychelles-based shell corporation used in furtherance of the scheme. Funds for trading in Biozoom and to establish other corporate entities and bank accounts used in furtherance of the scheme were transferred to and from Royal. CC1 was a former beneficial owner of Royal.

6. Coconspirator 2 ("CC2") was a citizen and resident of Switzerland. CC2 operated or otherwise controlled multiple Swiss entities, to include Orbita GmbH ("Orbita"), and was the beneficial owner of Allegemeine Finanz & Investment ("AFI"), a Swiss-based company established and funded by **ABELLAN** and CC1. **ABELLAN**, CC1, and CC2 set up bank accounts in Switzerland for AFI and brokerage accounts in the United States for the sale and purchase of Biozoom shares. In addition, Orbita served as a financial intermediary to transfer funds between corporate entities used in furtherance of the scheme.

7. Coconspirator 3 ("CC3") was a citizen of the United States and a resident of the State of Washington. CC3 worked as a day trader of stocks. At **ABELLAN**'s direction, CC3 engaged in manipulative trading of Biozoom stock.

8. Nominee Director 1 was a citizen and resident of Switzerland. **ABELLAN** and CC2 installed Nominee Director 1 at AFI and executed correspondence in the name of Nominee Director 1 in furtherance of the scheme.

9. Foresight Media ("Foresight") was a UK-based company where **ABELLAN** exercised influence and control and provided funding. Global Investors Research was also a UK-based company where **ABELLAN** and **PANTHER** exercised influence and control and which operated Global Financial Insight. As described herein, Foresight, Global Investors Research, and

- 3 -

Global Financial Insight were promotional companies that promoted Biozoom stock in major national and international media outlets to inflate the price of Biozoom stock as part of the pump and dump scheme.

10. David Lubin, a conspirator not named as a defendant herein, was a citizen of the United States and a resident of New York. Lubin was an attorney, was licensed to practice law in the State of New York, and acted as a promoter and attorney for public companies.

11. Steven Sanders, a conspirator not named as a defendant herein, was a citizen of the United States and resident of Florida, and acted as a promoter for public companies.

12. Daniel McKelvey, a conspirator not named as a defendant herein, was a citizen of the United States and a resident of California, and acted as a promoter for public companies.

13. LeMond Capital ("LeMond) was a British Virgin Islands shell corporation that purchased Entertainment Art. **ABELLAN**, **PANTHER**, **DEAN**, and CC1 exercised influence and control over LeMond. **ABELLAN**, CC1, and CC2 used LeMond to establish brokerage accounts. LeMond was represented by **DEAN** in the purchase of Entertainment Art.

14. Entity A was a retail and institutional broker-dealer principally engaged in the deposit and liquidation of microcap stocks. Entity A had its principal office in Scottsdale, Arizona and a secondary office in Carlsbad, California. Shares of Biozoom were traded at Entity A.

15. Shares of Biozoom were traded through BS, a market-making firm based in El Segundo, California; LS, a securities brokerage and market making firm based in New York, New York; SS, a full-service securities brokerage and market making firm based in Clearwater, Florida; and ST/SU, an online stock broker specializing in online trading services based in Carmel, New York.

16. Victim A, an investor in Biozoom, was a resident of Surprise, Arizona.

- 4 -

17.     Victim B, an investor in Biozoom, was a resident of Phoenix, Arizona.

18.     Victim C, an investor in Biozoom, was a resident of Sahuarita, Arizona.

19.     Victim D, an investor in Biozoom, was a resident of Nogales, Arizona.

### Definitions and Regulations

20.     The Over-the-Counter ("OTC") securities market was the equity market for securities not listed on a U.S. stock exchange, such as the New York Stock Exchange or the NASDAQ Stock Market.  In general, securities were traded in the OTC market because the company was unable to meet the requirements to be listed on one of the U.S. stock exchanges. OTC securities were traded by broker-dealers who negotiated directly with one another over computer networks and by phone.  Biozoom was traded on the OTC market.

21.     "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which have a low market capitalization.  Biozoom was a microcap stock.  Microcap stocks could be subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks traded on exchanges like the New York Stock Exchange.  Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

22.     Generally, a "pump and dump" scheme involved the artificial manipulation of the price and/or trading volume of a particular stock in order to sell that stock at an artificially inflated price.  As part of a pump and dump scheme, an individual or group of individuals obtained control over a substantial portion of the free trading shares of a company.  Free trading shares were shares of stock that could be traded without restriction.  One of the first steps in executing a pump and dump scheme involved the coconspirators gaining control over all or the vast majority of the free trading shares in a company to control the market for the stock free from outside market influences.

- 5 -

23.     A "nominee" was someone who owned an asset merely on paper, in order to disguise the true owner of the property.  Nominees were used in connection with the formation of shell companies.  Bank and brokerage accounts opened in the name of a shell company with a nominee were often referred to as "nominee accounts."  Such accounts were then used in a pump and dump scheme by allowing the coconspirators to give the appearance of an active market for a stock, when in fact the trades were being conducted among nominees controlled by co-conspirators.  Nominee bank accounts were also often used to conceal the dissipation of the proceeds of the fraud.

24.     A pump and dump scheme also involved parking shares by depositing or transferring them into different accounts, including accounts in the names of nominees, to conceal the ownership, control, and/or manipulative trading of the stock.

25.     A "shell company" was a company which served as a vehicle for business transactions, such as opening bank and brokerage accounts, without itself having any significant assets or operations.

26.     The "pump" involved artificially inflating a company's stock price and/or volume through various means that might include engaging in coordinated trading of the stock—usually by co-conspirators controlling both the buying and selling activity of the stock—to create the appearance of a more active market for that stock.  The pump also involved disseminating false and misleading promotional materials—press releases purportedly from the company or advertisements touting the prospects of a company's stock—to encourage innocent investors to purchase the stock, and therefore increasing sales volume.

27.     After pumping up the stock in the manner described above, the stock was "dumped," meaning large quantities of the shares owned and controlled by the co-conspirators were liquidated by selling to unsuspecting investors.

### Relevant Securities Regulations

28.     The U.S. Securities and Exchange Commission ("SEC") was an agency of the United States responsible for enforcing the securities laws, including the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("Securities Act"), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("Exchange Act").  Regulations promulgated by the SEC defined and implemented the requirements of the statutes.  To register an offer or sale of securities, companies were required to file a Form S-1 registration statement with the SEC.  Once a company's registration was deemed effective, it was required to file periodic and annual reports with the SEC.  These filings were available to the public over the internet via the SEC's electronic filing system known as the Electronic Data, Gathering, Analysis, and Retrieval System ("EDGAR").

29.     Shares of public companies (known as "issuers") not registered via Form S-1 generally could not be sold to the public.  Such shares were generally considered "restricted." However, Rule 144 permitted the sale of restricted securities in certain circumstances.  One of the requirements for relying on Rule 144 was that the seller of the securities was not an "affiliate." An "affiliate" was a person that directly, or indirectly through one or more intermediaries, controlled, or was controlled by, or was under common control with, the issuer.  17 C.F.R. § 230.144(a)(1).  Control meant the power to direct the management and policies of the company in question, whether through the ownership of voting securities, by contract, or otherwise.  17 C.F.R . § 230.405.

30. In a "reverse merger," a private company acquired a majority of the shares of a public company, which was then merged with the purchasing entity. The public company was required to report the terms of a reverse merger in a filing with the SEC.

31. Entertainment Art and Biozoom were issuers that were required to file Form S-1s and periodic reports with the SEC. These issuers were sometimes referred to as "pubcos," "public vehicles" or "shells."

### Overview of the Fraudulent Scheme

32. Lubin, Sanders, McKelvey, and others known and unknown to the Grand Jury, established shell companies, or issuers, and recruited individuals to serve as straw CEOs for these issuers. The conspirators caused shares to be issued in the names of the straw CEOs which would be labeled as control or restricted securities. Sanders, McKelvey, Lubin, and others known and unknown to the Grand Jury, also recruited persons to serve as straw shareholders of these issuers and caused shares to be listed in the names of the straw shareholders or separate shell companies they controlled.

33. Sanders, McKelvey, Lubin, and others known and unknown to the Grand Jury, filed and caused to be filed periodic and annual reports with the SEC that falsely and fraudulently described the business purpose and share structure of the issuers and gave the false appearance that the straw CEO owned and controlled the restricted shares of the company; had reviewed and agreed with the contents of the reports; and had signed and authorized the filings. In reality, Sanders, McKelvey, Lubin, and others known and unknown to the Grand Jury, controlled the companies and the shares listed in the names of the straw CEOs and straw shareholders.

34. Sanders, McKelvey, Lubin, and others known and unknown to the Grand Jury, sought to locate buyers for the issuers, specifically for the purchase and sale of all of the restricted and purportedly unrestricted shares. Sanders, McKelvey, Lubin and others known and unknown

to the Grand Jury, knew that the buyers would seek to use the shares of the issuers for pump and dump stock swindles or other manipulation schemes and, with the knowledge and consent of the buyer, structured the resale of the restricted shares to make it appear that the shares were free trading. One such issuer was Entertainment Art.

35.     **ABELLAN**, **PANTHER**, **DEAN**, CC1, and others known and unknown to the Grand Jury, operated a pump and dump scheme whereby they arranged to take control of Entertainment Art, a publicly traded company, by structuring the purchase of the unregistered, restricted, and purportedly unrestricted shares to make it appear that the shares were all unregistered, registered, and thus, free to trade in the market. **ABELLAN**, **PANTHER**, **DEAN**, and CC1 orchestrated a reverse merger with Entertainment Art to create Biozoom. In this way, **ABELLAN**, **PANTHER**, **DEAN**, CC1, and others known and unknown to the Grand Jury, obtained control over a substantial portion of the purportedly free trading shares of Biozoom and could manipulate the market for the stock.

36.     To retain full control over all available Biozoom shares and conceal their involvement, **ABELLAN**, **PANTHER**, **DEAN**, CC1, and others known and unknown to the Grand Jury, established various nominee companies and entities and caused the creation of fraudulent trust agreements and loans documents to make it appear that the entities and companies controlled Biozoom. They then caused ten Argentine nationals to serve as nominee shareholders of Biozoom stock (hereinafter, the "nominee shareholders").

37.     **ABELLAN**, **PANTHER**, **DEAN**, CC1, and others known and unknown to the Grand Jury funded foreign bank accounts and established trading accounts in the name of the nominee shareholders at United States brokerage houses to trade Biozoom shares. The brokerage accounts allowed **ABELLAN**, **PANTHER**, **DEAN**, CC1, and others known and unknown to the

Grand Jury to control the nominee shareholders' accounts and, when trading commenced, create the appearance of an active market for the stock, when in fact the trades were being conducted by **ABELLAN**, **PANTHER**, **DEAN**, CC1, and others known and unknown to the Grand Jury, in the name of the nominee shareholders.

38.     To cause the "pump" of shares of Biozoom stock—that is, to artificially inflate Biozoom's stock price and trading volume—in or around May 2013, **ABELLAN**, **PANTHER**, **DEAN**, CC1, and others known and unknown to the Grand Jury, i) engaged in manipulative trading of the shares, and ii) conducted a promotional campaign, coordinated with the manipulative trading, touting Biozoom as offering a market-ready device, in order to increase demand and inflate the price of Biozoom stock.  The manipulative trading, conducted in tandem with the aggressive marketing campaign, caused Biozoom's stock price to increase from $1.10 to $4 per share.

39.     After pumping up the stock in the manner described above, the stock was "dumped," meaning large quantities of the shares owned and controlled by **ABELLAN**, **PANTHER**, **DEAN**, CC1, and others known and unknown to the Grand Jury, were liquidated through sales to unsuspecting investors.  Once Biozoom's stock price jumped to $4 per share, the nominee shareholders sold their shares at a profit of approximately $34 million.  **ABELLAN**, **PANTHER**, **DEAN**, CC1, and others known and unknown to the Grand Jury then caused the proceeds of the sale to be transferred to various foreign offshore bank accounts to their benefit.

### Identifying and Creating Entities to Execute the Pump and Dump Scheme

40.     In mid-2012, **ABELLAN** directed CC1, **PANTHER**, and **DEAN** to acquire a public shell with a large number of free trading shares to use in a reverse merger.  Accordingly, **DEAN** identified Entertainment Art and arranged for the purchase of Entertainment Art at the direction of **ABELLAN** and CC1.

41.     Sanders and McKelvey brokered a sale of the restricted and free trading shares of Entertainment Art with **DEAN**, who agreed to purchase Entertainment Art on behalf of LeMond. **DEAN** enlisted attorneys to act as escrow agents for the sale of Entertainment Art to LeMond and caused the transfers of funds for purchase.

42.     **DEAN**, along with McKelvey and Sanders, created separate agreements to make it appear that the shares were to be sold as part of separate transactions, when in fact the shares were sold as one transaction and therefore deemed restricted.  Such agreements fraudulently conveyed that the shares were not restricted and could be immediately sold thereafter to the investing public.

43.     On or about July 23, 2012, **DEAN** sent an email to McKelvey and Sanders submitting a Letter of Intent ("LOI") to purchase Entertainment Art and stating, "[p]lease review the attached draft LOI.  I am still waiting to get the information about the purchasing company. Please review and provide comments and I'll make the revisions.  Thanks." **DEAN**'s draft LOI related to both the free trading and restricted shares.  McKelvey replied on the same date, copying Sanders and informing **DEAN** that the LOI, as drafted, would cause the free trading shares to become restricted: "Faiyez: We can't have both free and restricted in 1 agreement, this will be viewed as a combined purchase and the free will become restricted.  We will assemble two separate agreements and send back.  This is the best way to consummate the deal. Daniel."

44.     From on or about July 31, 2012 through August 23, 2012, **ABELLAN,** CC1, and CC2 created and executed a secure loan agreement for the amount of $437,000 between Royal and LeMond for the purpose of funding LeMond's purchase of Entertainment Art.   On or about September 6, 2012, **ABELLAN**, CC1, **PANTHER** and **DEAN** caused the transfer of approximately $437,000 from a bank account held by Royal at Hellenic Bank in Cyprus to the attorney trust account of a Seattle, Washington-area attorney.  Of this $437,000, **DEAN** caused

- 11 -

the wire transfer of $324,060 to the escrow account of a Florida-based attorney for the purchase of Entertainment Art, keeping the remaining funds for himself.

45.     In or around 2011 and 2012, in connection with the sale of Entertainment Art to LeMond, **ABELLAN**, CC1, and CC2 established and funded nominee companies, to include Royal, LeMond, and AFI, as vehicles for the purchase and subsequent sale of corporate entities and shares to facilitate the pump and dump scheme.

46.     In establishing AFI, **ABELLAN**, CC1, and CC2 took steps to make AFI appear as though it had legitimate operations unrelated to the scheme described herein.  For example, from on or about October 3, 2012 through on or about October 4, 2012, **ABELLAN** and CC2 discussed via email the need to install a nominee director for the "Biozoom job."  In or around November 12, 2012, **ABELLAN**, CC1, and CC2 installed Nominee Director 1 to serve as nominee director of AFI.  Later, on or about February 15, 2013, **ABELLAN** and CC2 caused the creation of a website for AFI.

47.     On or about February 28, 2013, **PANTHER** caused the execution of Asset Purchase Agreements for the sale of assets of Opsolution to LeMond and the filing of SEC documents confirming the sale.  On or about March 20, 2013, **PANTHER** caused the cancellation of the LeMond shares in Entertainment Art and the new issuance of preferred shares in Biozoom, as well as the filing of SEC documents confirming the Entertainment Art transaction.

48.     On or about March 12, 2013, Entertainment Art made a public filing with the SEC announcing a change in business operations from a handbag company to a company involved in the biomedical industry and formed a subsidiary, Biozoom.  On or about April 1, 2013, Entertainment Art officially changed its stock trading symbol to Biozoom, or "BIZM."

**<u>Establishing the Nominee Shareholders to Facilitate the Pump and Dump Scheme</u>**

49. **ABELLAN**, CC1, **PANTHER**, and **DEAN** facilitated the reverse merger of Entertainment Art with Opsolution, a privately held company, for the purpose of obtaining control of the shares in the newly created entity, Biozoom. The shares were then distributed to nominees and sold as part of the pump and dump scheme.

50. **ABELLAN**, CC1, and **PANTHER** caused the ten Argentine nationals to serve as the nominee shareholders of Biozoom shares. From on or about September 27, 2012 through on or about January 29, 2013, **ABELLAN**, CC1, and CC2 created loan agreements between Royal and the nominee shareholders and trust agreements between Royal, Orbita, and the nominee shareholders. On or about February 25, 2013, CC1 sent nine executed loan agreements between the nominee shareholders and AFI to CC2 via email. These loan and trust agreements and resulting wire transfers served to provide funds to the nominee shareholders for the purchase of Biozoom shares and concealed the true source of the funds used by the nominee shareholders to purchase these shares.

51. As a result, beginning in or around October 2012, bank accounts were established and funded for the nominee shareholders as follows:

| Nominee Shareholders | Bank | Location |
| --- | --- | --- |
| CDL | FMBE Bank | Belize |
| DPG | BC Bank | Belize |
| FL | Hellenic Bank Public Company | Cyprus |
| LMH | Hellenic Bank Public Company | Cyprus |
| MPF | Choice Bank | Belize |
| AHF | Alpha Bank | Cyprus |
| MT | Loyal Bank | St. Vincent/Grenadines |
| MAG | Loyal Bank | St. Vincent/Grenadines |
| ARB | FMBE Bank | Cyprus |
| GGB | First Caribbean Bank | British Virgin Islands |

52.     In addition to structuring the Entertainment Art transaction to conceal that the Entertainment Art shares were restricted and therefore could not be immediately sold to the investing public, **DEAN** took steps to structure the nominee shareholders' acquisition of Biozoom shares such that they fraudulently appeared to have purchased their shares from the original shareholders of Entertainment Art.  This information was false, as the original shareholders sold their shares back to Entertainment Art in 2009.

53.     **PANTHER** and **DEAN** established different escrow agents for the nominee shareholders' Entertainment Art share purchases to facilitate the transfer of money from the nominee shareholders to the original shareholders of Entertainment Art, and established an escrow agent for the control block of shares.  For example,

> a. from on or about March 5, 2013 through on or about March 19, 2013, **DEAN** caused a Hawaii-based attorney to act as an escrow agent for the funds used for the purchase of Biozoom shares purportedly from original shareholders by LMH, MPF, MT and MAG, four of the nominee shareholders;
>
> b. from on or about February 18, 2013 through on or about March 12, 2013, **DEAN** caused a second Seattle, Washington-based attorney ("Seattle Attorney") to act as an escrow agent for funds used for the purchase of Biozoom shares purportedly from original shareholders by DPG and FL, two of the nominee shareholders;
>
> c. from on or about March 24, 2013 through on or about April 13, 2013, **DEAN** caused Seattle Attorney to act as an escrow agent for funds used for the purchase of Biozoom shares purportedly from original shareholders by GGB, one of the nominee shareholders; and

     d.   on or about May 16, 2013, **DEAN** caused Seattle Attorney to act as an escrow agent for funds used for the purchase of Biozoom shares purportedly from original S-1 shareholders by FL, one of the nominee shareholders.

## Opening Accounts for the Argentine Nominees and AFI at Trading and Brokerage Firms

54.    On or about May 2, 2013, **PANTHER** caused two nominee shareholders to open individual foreign brokerage accounts for Biozoom trading at Entity A.

55.    In early May 2013, **PANTHER** met with the owner of a California-based market maker BS to discuss Biozoom and presented Biozoom executives to demonstrate the Biozoom device. That same month, **PANTHER** caused six nominee shareholders to open accounts and deposit Biozoom share certificates at BS. Thereafter, between on or about May 3, 2013 through on or about May 8, 2013, BS requested a number of documents from the nominee shareholders to open the accounts and clear the Biozoom shares through BS's clearing firm.

56.    On or about May 14, 2013, BS notified corporate counsel for Biozoom and requested production of the stock subscription documents for four of the nominee shareholders. Biozoom's counsel informed BS that he did not have the original subscriptions and learned that the stock could not be cleared. Biozoom's counsel informed **PANTHER**, who told him, in substance, not to worry, because he had ties to the principal at Entity A.

57.    On or about May 15, 2013, **PANTHER** met with an owner and an employee of Entity A to discuss Biozoom and other matters. **PANTHER** informed the Entity A representatives that he would refer the "foreign clients" to Entity A and discussed discounted commission rates, the use of certain market makers, trade routes, specific deposit requirements, and the use of instant messaging for trading. Thereafter, on or about May 16, 2013, the four nominee shareholders transferred their accounts from BS to Entity A. In exchange for referring the clients to Entity A, **PANTHER** requested and received certain policy exceptions, to include allowing the clients to be

- 15 -

permitted to conduct trades via instant messaging. At that time, Entity A did not permit instant messaging trades but made an exception to permit the clients referred by **PANTHER** to do so, and had a platform set up to facilitate the instant messaging trades.

58. In total, **PANTHER** caused brokerage accounts for a total of six of the nominee shareholders to be opened at Entity A.

59. Once the nominee shareholders transferred their accounts from BS to Entity A, the Biozoom shares had to be cleared before they could be traded. To clear the stocks through Entity A, an opinion letter containing false information was obtained. The letter indicated that the shares were purchased directly from the original shareholders of Entertainment Art in 2013, when in fact the original shareholders sold their stock in 2009. Nonetheless, Entity A's clearing firm accepted the opinion letters and cleared the shares. As a result, the four nominee shareholders were clear to commence trading Biozoom shares beginning on or about May 23, 2013.

60. **PANTHER**, CC1, and CC2 also established brokerage accounts for the nominee shareholders at LS.

61. In or around May 2013, **ABELLAN**, CC1, and CC2 also established brokerage accounts for AFI at BS, Entity A, and ST/SU. In addition, CC1 submitted a signed application to CC2 for an AFI brokerage account at ST/SU in the name of Nominee Director 1.

62. From in or around November 2012 through in or around March 2013, the ten nominee shareholders received shares of Entertainment Art (later shares of Biozoom) as follows:

| Shareholder | Number of Shares |
| --- | --- |
| AHF | 1,402,500 |
| GGB | 1,485,000 |
| LMH | 1,815,000 |
| CDL | 2,062,500 |
| MT | 1,815,000 |
| ARB | 2,310,000 |

| MPF | 2,310,000 |
|-----|-----------|
| DPG | 2,485,000 |
| MG  | 2,145,000 |
| FL  | 2,300,000 |

### The Pump of Biozoom Stock

63.     On or about April 11, 2013, **PANTHER** directed executives at Biozoom to set up a news service to send out press releases on a specific schedule.

64.     From in or around May 2013 through June 2013, **ABELLAN**, CC1, and **PANTHER** caused the issuance and dissemination of articles and stock reports on Biozoom that promoted the stock through means of interstate commerce and otherwise. These articles and reports, however, falsely presented as independent stock analysis.

65.     These articles and stock reports were paid for using entities controlled and funded by **ABELLAN** and others known and unknown to the Grand Jury, through Foresight, Global Financial Insight, and Global Investors Research, yet failed to disclose that Biozoom was being promoted by persons with a controlling interest in the company. The articles and subsequent press releases and stock reports also contained misleading information about Biozoom.

66.     On or about May 9, 2013, **ABELLAN** sent an invoice via email to CC2 in the amount of approximately $374,748 for services provided by International Law Group, a law firm owned by **PANTHER's** father, to Royal. However, International Law Group had not performed any work for Biozoom or any related entities.

67.     In or around late January through February 2013, **ABELLAN** engaged a printer broker located in Scottsdale, Arizona ("Scottsdale Printer") for direct mail and marketing services for Biozoom. **ABELLAN** caused the Scottsdale Printer to issue Biozoom mailers under the guise of Global Financial Insight and Global Investors Research. **ABELLAN** directed the Scottsdale Printer to submit the invoices for the mailers to Foresight.

- 17 -

68.    In or around June 2013, Global Investors Research purchased radio advertising spots on Biozoom for *The Stock Report* to be aired on various IHeartMedia radio programs, to include the *Rush Limbaugh Show* and the Rush Network from on or about June 10, 2013 through on or about June 14, 2013.

69.    In or around June 2013, **ABELLAN**, **PANTHER**, and CC1 caused Global Financial Insight to purchase space in the *Chicago Tribune* and *Los Angeles Times* for a Biozoom advertisement.  The *Chicago Tribune* advertisement was published on or about June 13, 2013, and the *Los Angeles Times* advertisement was published on or about June 23, 2013.

70.    In or around May 2013, **ABELLAN**, **PANTHER**, and CC1 caused Foresight to purchase editorial space in *Forbes* and *Business Week* magazine for Biozoom.  The *Business Week* advertisement was scheduled for publishing in the June 17th-23rd edition, and the *Forbes* article was scheduled for the July 2013 edition.

71.    In or around June 2013, **ABELLAN**, **PANTHER**, and CC1 caused Global Financial Insight to purchase space in the *New York Times* for an article advertising Biozoom's "real Star Trek" medical scanner.  The full-page advertisement was published on the back cover of the Sunday *New York Times* business section on or about June 23, 2013.

72.    As part of the pump of the stock, and coordinated with the issuance of press releases and other promotional material, **ABELLAN**, CC3, and a person known to the Grand Jury, manipulated the trading volume and share price of Biozoom shares.

73.    **ABELLAN** directed CC3 to trade early in Biozoom to ensure that the value of Biozoom shares did not fall below a particular value.  Prior to the commencement of any Biozoom trading, on or before May 15, 2013, CC3 entered a purchase order for more than 2,000 shares of Biozoom.  This order was never executed.  Thereafter, prior to the release of any promotional

materials about Biozoom, CC3 began trading shares of Biozoom. CC3 conducted these early trades in order to create a floor price for Biozoom, as requested by **ABELLAN**.

74. CC3 placed sell orders for hundreds of shares of Biozoom stock which CC3 arranged to be matched with buy orders placed by a person known to the Grand Jury, in order to create the appearance of legitimate buying interest by legitimate investors, when in fact these were coordinated sales made at the request of Biozoom affiliates to generate interest in the shares.

75. Soon after the initiation of the trading of Biozoom stock, in or around May and June of 2013, CC3 created trading volume of Biozoom shares by directing others known and unknown to the Grand Jury, to trade Biozoom shares, and trading shares of Biozoom using his own brokerage account and the accounts of others.

### The "Dump" of Biozoom Stock for Millions of Dollars in Proceeds

76. **ABELLAN** traded Biozoom shares in accounts in the names of the nominee shareholders and AFI at Entity A, BS, ST/SU, LS, and other entities, using an instant messaging platform and an IP proxy server to make it appear that the nominees were trading from Argentina, when in fact, **ABELLAN** was conducting the trades in the names of the nominees from a residence in Spain.

77. From on or about June 14, 2013 through on or about June 21, 2013, **ABELLAN**, CC1, and CC2 caused the AFI account at ST/SU to trade Biozoom shares, making more than 800 transactions per day and increasing the demand for the shares in order to make the investing public believe that general market forces were at work.

78. The distribution of print and media advertisements regarding Biozoom, together with the coordinated manipulative trading by **ABELLAN**, CC3, and a person known to the Grand

Jury, caused the price of Biozoom shares to increase artificially. In addition, the manipulative trading created the appearance of legitimate buying interest by legitimate investors.

79. From on or about the dates set forth in the chart below, **ABELLAN**, **PANTHER**, and CC1 caused the trading of Biozoom shares in accounts held in the names of the nominee shareholders via email and instant message at LS or Entity A and caused the sale of Biozoom shares as follows:

| Nominee Shareholder | Brokerage | Approximate Shares Sold | On or About Dates Sold | Approximate Proceeds |
|---|---|---|---|---|
| GGB | LS | 1,312,053 | 5/16/2013-6/13/2013 | $3,070,251 |
| CDL | LS | 1,328,000 | 6/17/2013-6/18/2013 | $5,020,550 |
| LMH | LS | 1,815,000 | 6/6/2013-6/17/2013 | $5,269,030 |
| AHF | LS/Entity A | 1,402,500 | 5/20/2013-6/5/2013 | $2,068,666 |
| MT | Entity A | 1,592,444 | 6/7/2013-6/11/2013 | $3,116,894 |
| ARB | Entity A | 2,176,726 | 6/10/2013-6/18/2013 | $6,223,310 |
| MPF | LS | 1,994,038 | 6/7/2013-6/19/2013 | $5,456,590 |
| DPG | Entity A | 2,457,645 | 5/28/2013-6/6/2013 | $3,771,761 |

80. In or around June 2013, **ABELLAN**, **PANTHER**, and CC1 caused the wire transfers of millions of dollars, proceeds from the sale of Biozoom shares, from United States brokerage accounts in the name of the nominee shareholders to accounts held at foreign bank accounts in the names of the nominee shareholders. Specifically, on or about June 24, 2013, **ABELLAN**, **PANTHER**, and CC1 caused wire transfers of more than $6 million from an account at Entity A, in the District of Arizona, in the name of nominee shareholder ARB to an account in

the name of nominee ARB at FBME Bank in Cyprus, and a wire transfer of approximately

$4,900,000 from an account in the name of nominee shareholder MPF at Entity A, in the District

of Arizona, to an account in the name of nominee shareholder MPF at Choice Bank in Belize.

81.    In or around June 2013, **ABELLAN**, CC1, and CC2 caused wire transfers of more

than $6,500,000 in proceeds from the sale and trading of Biozoom shares from accounts in the

name of AFI and the nominee shareholders at ST/SU, BS, and FBME Bank in Cyprus, to foreign

offshore bank accounts in the names of the nominee shareholders in Cyprus and Switzerland.

82.    From on or about May 16, 2013 through on or about June 25, 2013, a total of

approximately 87,936,300 shares of Biozoom traded and its stock price increased from

approximately $1.10 per share to more than $4 per share.

83.    In or around June 2013, after reading information about Biozoom on the internet,

Victim A traded shares of Biozoom through a brokerage account at TD Ameritrade and invested

approximately $19,000.

84.    In or around June 2013, after hearing a radio advertisement about Biozoom on *The

Rush Limbaugh Show*, Victim B purchased shares of Biozoom at a branch of investment firm

Charles Schwab in Scottsdale, Arizona.  Victim B was unable to sell his shares in late June 2013

due to the SEC halting trading of the shares.  Victim B lost approximately $13,000.

85.    In or around June 2013, after receiving a Biozoom flyer in the mail at his residence

in Arizona, Victim C traded shares of Biozoom through a brokerage account at Charles Schwab

and invested approximately $3,639.

86.    In or around June 2013, after seeing the Biozoom ticker on CNBC during after-

hours trading, Victim D traded shares of Biozoom through a brokerage account at TD Ameritrade

and lost approximately $83,000.

## COUNT 1
### Conspiracy to Commit Securities Fraud and Wire Fraud
### (18 U.S.C. § 1349)

87.     Paragraphs 1 through 86 of this Indictment are realleged and incorporated herein by reference.

88.     From in or around 2012, through in or around October 2013, the exact dates being unknown, in the District of Arizona, and elsewhere, the defendants,

**FRANCISCO VILLENA ABELLAN,**
**a/k/a "Frank Abellan," "Frank Abel," "Oracle," "Mark," and "Frank Villena,"**
**JAMES B. PANTHER, JR,** and
**a/k/a "James Suqui" and "James Suquilanda," and**
**FAIYAZ DEAN**

together with others known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree to commit certain offenses against the United States, to wit:

(i) securities fraud, that is, to knowingly and intentionally execute a scheme and artifice (a) to defraud any person in connection with any security of Biozoom, an issuer with a class of securities registered under § 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of Biozoom, an issuer with a class of securities registered under § 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), in violation of Title 18, United States Code, Section 1348; and

(ii) wire fraud, that is to knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted by means of wire

communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### PURPOSE OF THE CONSPIRACY

89.     It was a purpose of the conspiracy for the defendants and their coconspirators to unlawfully enrich themselves by (a) making and using false and misleading statements in documents filed with the SEC in 2013 and provided to others to conceal the fact that certain undisclosed principals controlled the issuers and the shares that were listed in the names of nominee shareholders, and that the shares were restricted and could not be freely traded on U.S. markets; (b) engaging in the fraudulent manipulation of stock by artificially inflating the market price and demand; (c) diverting the proceeds of the fraud for the personal use and benefit of the defendants and others; and (d) concealing the defendants' involvement in the fraudulent manipulation of the stock.

### MANNER AND MEANS OF THE CONSPIRACY

90.     Paragraphs 40 through 86 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

**COUNT 2**
**Securities Fraud**
**(18 U.S.C § 1348)**

91.     Paragraphs 1 through 86 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

92.     From in or around 2012, through in or around October 2013, the exact dates being unknown, within the District of Arizona and elsewhere, the defendants,

**FRANCISCO VILLENA ABELLAN,**
**a/k/a "Frank Abellan," "Frank Abel," "Oracle," "Mark," and "Frank Villena,"**
**JAMES B. PANTHER, JR,**
**a/k/a "James Suqui" and "James Suquilanda," and**
**FAIYAZ DEAN,**

aided and abetted by each other and others did knowingly and willfully execute a scheme and artifice (a) to defraud any person in connection with any security of Biozoom, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of Biozoom, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*).

All in violation of Title 18, United States Code, Section 1348 and 2.

**COUNT 3**
**Conspiracy to Commit Money Laundering**
**(18 U.S.C. §1956(h))**

93.     From in or around 2012, through in or around October 2013, the exact dates being unknown, in the District of Arizona, and elsewhere, the defendants,

**FRANCISCO VILLENA ABELLAN,**
**a/k/a "Frank Abellan," "Frank Abel," "Oracle," "Mark," and "Frank Villena,"**
**JAMES B. PANTHER, JR,**

a/k/a "James Suqui" and "James Suquilanda," and
**FAIYAZ DEAN,**

together with others known and unknown to the Grand Jury, did knowingly combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to knowingly engage in monetary transactions affecting interstate and foreign commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1957.

It is further alleged that the specified unlawful activity is fraud in the sale of securities pursuant to Title 18, United States Code, Section 1961(1)(D).

All in violation Title 18, United States Code, Section 1956(h).

## COUNTS 4-8
**Money Laundering**
**(18 U.S.C. § 1957)**

94.     From in or around 2012, through in or around October 2013, the exact dates being unknown, in the District of Arizona, and elsewhere, the defendants,

**FRANCISCO VILLENA ABELLAN,**
**a/k/a "Frank Abellan," "Frank Abel," "Oracle," "Mark," and "Frank Villena,"**
**JAMES B. PANTHER, JR, and**
**a/k/a "James Suqui" and "James Suquilanda,"**
**FAIYAZ DEAN**

aided and abetted by each other and others and together with others known and unknown to the Grand Jury, did knowingly engage in and attempt to engage in monetary transactions affecting interstate and foreign commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, and knowing that the property involved in the financial transactions represented

the proceeds of some form of unlawful activity, as more particularly described in each count below:

| COUNT | APPROX.DATE | FINANCIAL TRANSACTION |
|---|---|---|
| 4 | 6/11/2013 | International wire transfer of approximately $3,770,216 from an account held in the name of nominee shareholder DPG at Entity A, within the District of Arizona, to an account held in the name of nominee shareholder DPG at CBH Compagnie Bancaire Helvetique, SA in Geneva, Switzerland. |
| 5 | 6/11/2013 | Interstate wire transfer of approximately $495,000 from an account held in the name of AFI at Entity A, within the District of Arizona, to an account held in the name of AFI at Bank of New York in New York, New York. |
| 6 | 6/24/2013 | International wire transfer of approximately $4,331,255 from an account held in the name of nominee shareholder ARB at Entity A, within the District of Arizona, to an account held in the name of nominee shareholder ARB at FBME Bank in Cyprus. |
| 7 | 6/24/2013 | International wire transfer of approximately $1,887,919 from an account held in the name of nominee shareholder ARB at Entity A, within the District of Arizona, to an account held in the name of nominee shareholder ARB at FBME Bank in Cyprus. |
| 8 | 6/24/2013 | International wire transfer of approximately $4,900,000 from an account held in the name of nominee shareholder MPF at Entity A, within the District of Arizona, to an account held in the name of nominee shareholder MPF at Choice Bank in Belize. |

It is further alleged that the specified unlawful activity is fraud in the sale of securities pursuant to Title 18, United States Code, Section 1961(1)(D).

All in violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE
### (18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 982(a)(1))

95.    For the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, the United States hereby realleges and incorporates the factual allegations contained in paragraphs 1 through 86.

96.    Upon conviction of the offenses alleged in Counts One and Two, the defendants,

**FRANCISCO VILLENA ABELLAN,**
**a/k/a "Frank Abellan," "Frank Abel," "Oracle," "Mark," and "Frank Villena,"**
**JAMES B. PANTHER, JR,**
**a/k/a "James Suqui" and "James Suquilanda," and**
**FAIYAZ DEAN**

shall forfeit to the United States any and all property, real or personal, which constitutes or is derived from proceeds traceable to the aforementioned offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The property to be forfeited shall include, but is not limited to, the following:

    a.    Money Judgment

        i.    Judgment in favor of the United States of America equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to the violations alleged in Counts One and Two of this Indictment.

97.    If any of the property described above, as a result of any act or omission of the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

e.   has been commingled with other property that cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

**FORFEITURE ALLEGATIONS**
**(Money Laundering)**

98.   For the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461, the United States hereby realleges and incorporates the factual allegations contained in paragraphs 1 through 86.

99.   Upon conviction of the offenses alleged in Counts Three through Eight, the defendants,

**FRANCISCO VILLENA ABELLAN,**
**a/k/a "Frank Abellan," "Frank Abel," "Oracle," "Mark," and "Frank Villena,"**
**JAMES B. PANTHER, JR**
**a/k/a "James Suqui" and "James Suquilanda," and**
**FAIYAZ DEAN**

shall forfeit to the United States any and all property, real or personal, involved in such offenses, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

100.   If any of the property described above, as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property that cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____*S/*_____
FOREPERSON OF THE GRAND JURY
Date:   April 23, 2019

ROBERT ZINK
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice

_____*S/*_____
Tracee Plowell, Assistant Chief
Michelle Pascucci, Trial Attorney