# EXHIBIT 2

| | |
|---|---|
| 1 | ROBERT ZINK |
| 2 | Chief, Fraud Section<br>U.S. Department of Justice, Criminal Division |
| 3 | TRACEE PLOWELL |
| 4 | Senior Litigation Counsel, Fraud Section, Criminal Division<br>Email: Tracee.Plowell@usdoj.gov |

MICHELLE PASCUCCI
Trial Attorney, Fraud Section, Criminal Division
Email: Michelle.Pascucci@usdoj.gov

U.S. Department of Justice
1400 New York Ave., N.W., 3rd Floor
Washington, D.C. 20530
Telephone: 202.616.1668
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-19-00448-PHX-DLR (MHB) |
| Plaintiff, | **PLEA AGREEMENT** |
| vs. | |
| James B. Panther, Jr.,<br>a/k/a "James Suqui" and "James Suquilanda" | |
| Defendant. | |

Plaintiff, United States of America, and the defendant, James B. Panther, Jr., hereby agree to dispose of this matter on the following terms and conditions:

1. **PLEA**

The defendant will plead guilty to the following count(s) of the indictment: count one, conspiracy to commit securities fraud and wire fraud, a class B felony, in violation of 18 U.S.C. § 1349.

2. **MAXIMUM PENALTIES**

    a. A violation of 18 U.S.C. § 1349 is punishable by a maximum term of



imprisonment of twenty-five years, a maximum fine of $250,000, or both, and a term of supervised release of five years.

  b. According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

    (i) make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

    (ii) pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

    (iii) serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

    (iv) pay upon conviction a $100 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013.

  c. The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime of conviction, unless there are stipulations to the contrary that the Court accepts.

**3.** **AGREEMENTS REGARDING SENTENCING**

  a. Restitution. Pursuant to 18 U.S.C. § 3663 and/or 3663A, the defendant specifically agrees to pay full restitution to all victims directly or proximately harmed by the defendant's "relevant conduct," including conduct pertaining to any dismissed counts or uncharged conduct, as defined by United States Sentencing Guidelines (U.S.S.G.) § 1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A. The defendant understands that such restitution will be included in the Court's Order of Judgment and that an unanticipated restitution amount will not serve

as grounds to withdraw the defendant's guilty plea or to withdraw from this plea agreement.

b. Assets and Financial Responsibility. The defendant shall make a full accounting of all assets in which the defendant has any legal or equitable interest. The defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures). The defendant also expressly authorizes the United States Department of Justice, Criminal Division to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Department of Justice Criminal Division, including the Money Laundering and Asset Recovery Section, for any purpose. Finally, if the defendant is sentenced to a term of imprisonment, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

c. Stipulation. If defendant is released on a cash bond, the defendant stipulates that any cash deposit held by the Clerk of Court to secure the defendant's appearance (a) belongs to the defendant and (b) shall be used as payment toward the defendant's monetary penalties pursuant to 18 U.S.C. § 3612(c) and 28 U.S.C. § 2044.

d. Acceptance of Responsibility. If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(a). If the defendant has an offense level of 16 or more, the United States will move the Court for an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

4. **AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

   a. This agreement is between defendant and the Criminal Division, Fraud Section. Other than the offense to which the defendant has entered a plea of guilty, this office will not prosecute the defendant for any offenses committed by the defendant that are known by the government at the time of defendant's plea of guilty.

   b. This agreement does not, in any manner, restrict the actions of the United States in any other district nor bind any other United States Attorney's Office.

5. **COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

   a. If the defendant's guilty plea or plea agreement is rejected, withdrawn, vacated, or reversed at any time, this agreement shall be null and void, the United States shall be free to prosecute the defendant for all crimes of which it then has knowledge and any charges that have been dismissed because of this plea agreement shall automatically be reinstated. In such event, the defendant waives any and all objections, motions, and defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional restrictions in bringing later charges or proceedings. The defendant understands that any statements made at the time of the defendant's change of plea or sentencing may be used against the defendant in any subsequent hearing, trial, or proceeding subject to the limitations of Fed. R. Evid. 410.

6. **WAIVER OF DEFENSES AND APPEAL RIGHTS**

   a. The defendant waives (1) any and all motions, defenses, probable cause determinations, and objections that the defendant could assert to the indictment or information; and (2) any right to file an appeal, any collateral attack, and any other writ or motion that challenges the conviction, an order of restitution or forfeiture, the entry of judgment against the defendant, or any aspect of the defendant's sentence, including the manner in which the sentence is determined, including but not limited to any appeals under 18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and 2255 (habeas petitions), and any right to file a motion for modification of sentence, including under 18 U.S.C. § 3582(c). This waiver shall result in the dismissal of any appeal,

collateral attack, or other motion the defendant might file challenging the conviction, order of restitution or forfeiture, or sentence in this case. This waiver shall not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics Op. 15-01 (2015)).

7. **DISCLOSURE OF INFORMATION**

   a. The United States retains the unrestricted right to provide information and make any and all statements it deems appropriate to the U.S. Probation Office and to the Court in connection with the case.

   b. Any information, statements, documents, and evidence that the defendant provides to the United States pursuant to this agreement may be used against the defendant at any time.

   c. The defendant shall cooperate fully with the U.S. Probation Office. Such cooperation shall include providing complete and truthful responses to questions posed by the U.S. Probation Office including, but not limited to, questions relating to criminal convictions, history of drug abuse, and mental illness; and financial information, including present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution.

8. **FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

   a. Nothing in this agreement shall be construed to protect the defendant from administrative or civil forfeiture proceedings or prohibit the United States from proceeding with and/or initiating an action for civil forfeiture. Pursuant to 18 U.S.C. § 3613, all monetary penalties, including restitution imposed by the Court, shall be due immediately upon judgment, shall be subject to immediate enforcement by the United States, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect the periodic payment schedule). If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the

judgment.

9. **ELEMENTS**

**Conspiracy to Commit Securities Fraud and Wire Fraud**

Beginning in or around 2012 and continuing through in or around October 2013, in the District of Arizona and elsewhere:

1. There was an agreement between two or more persons to commit the crimes of wire fraud, in violation of 18 U.S.C. § 1343, and securities fraud, in violation of 18 U.S.C. § 1348; and

2. The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

10. **FACTUAL BASIS**

a. The defendant admits that the following facts are true and that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

Beginning in or around 2012, in the District of Arizona and elsewhere, the defendant was introduced to a sophisticated group of individuals who were actively engaged in a conspiracy to commit wire fraud led by Francisco Abellan Villena, also known as "Frank Villena," "Frank Abel," "Frank Abellan," "Oracle," and "Mark from Spain" ("Abellan"), Guillermo Ciupiak ("Ciupiak"), Faiyaz Dean ("Dean") and others. Abellan was the architect of complex pump and dump stock promotion manipulation schemes and operated behind the scenes, putting people in place to advance the conspiracy and collecting proceeds at the conclusion of the scheme. Abellan and Ciupiak, with the assistance of a Swiss attorney ("Individual 1"), controlled and/or funded numerous entities, to include Royal Capital Ventures ("Royal"), LeMond Capital ("LeMond"), Allegemeine Finanz & Investment AG ("AFI"), Foresight Media ("Foresight"), BigBang Studios, Global Investors Research ("GIR"), and Global Financial Insight ("GFI"). These entities were ultimately used in furtherance of the scheme to acquire additional corporate entities;

conceal the true ownership of the entities; produce promotional material; fund marketing and other entities; and trade shares.

Along with Individual 1, Abellan and Ciupiak facilitated the creation of secured loan agreements between LeMond and Royal as a means for LeMond to purchase the going-public vehicle for the "pump and dump" scheme, specifically, Entertainment Art, Inc. ("EERT"), and to conceal their association with the entity. Dean negotiated the transaction such that EERT appeared to have a large number of free trading shares when, in reality, the shares were unregistered, restricted and controlled by an affiliate group of shareholders and traders controlled by one individual.

Beginning in or around November 2012, the defendant was in frequent communication with Abellan, Dean, and other participants of the scheme. Defendant knowingly and willfully joined the conspiracy with the intent to engage in acts in furtherance of the scheme. Abellan and Ciupiak arranged for ten Argentine nationals (the "nominee shareholders") to serve as nominee shareholders of EERT. Abellan, Ciupiak, Dean, and the defendant engaged in acts in the names of the nominee shareholders. For example, during March 2013, Dean, who was located in Canada, asked the defendant, via email, to obtain a signature of one of the nominee shareholders. The defendant complied, and, or on or about March 29, 2013, sent a responsive email to Dean, attaching a document containing the JPEG signature of the nominee shareholder, which was then submitted to a U.S. brokerage house via email in an attempt to clear the shares for trading. Abellan, Ciupiak, and others created and controlled email accounts in the name of the nominee shareholders. The defendant facilitated and arranged for the introduction of his coconspirators to the United States brokerage firms. Five accounts were opened in the names of the Argentine nominees at a brokerage firm in New York, New York ("the New York firm"), and EERT shares were deposited into four of the accounts. In connection with the deposit of the EERT shares at the New York firm, the defendant and Dean arranged for the issuance of an opinion letter falsely declaring the shares were not required to bear a restrictive legend and could be sold without registration. At the direction of

Abellan and with the assistance of Ciupiak and Dean, the defendant provided documentation to open accounts at brokerage firms, to include California firm ("the California firm"), and a firm in Scottsdale, Arizona ("the Arizona firm") within the District of Arizona. When the nominee shareholders were unable to clear shares at the California firm, the defendant with the assistance of Dean arranged for the shares to be referred to and ultimately deposited at the Arizona Firm. In order to facilitate the scheme, the defendant arranged for the Arizona firm to make policy exceptions to allow the Argentine nominees to conduct trades via instant messaging (IM).

Abellan, Ciupiak, and Individual 1 also caused accounts to be opened for AFI at the Arizona firm and an online stockbroker. In early 2013, Abellan connected the defendant and Individual 1 so that the defendant could assist Individual 1 in creating subscription agreements to enable AFI to provide bridge financing for another entity controlled by Abellan. The defendant also provided Individual 1 with templates for trustee agreements created by a law firm operated by the defendant's father. The trustee agreements were used to funnel money between entities controlled by Abellan and Ciupiak, to include GFI, and entities controlled by Individual 1 as trustee. After the acquisition of EERT, Abellan, Ciupiak, Dean, and the defendant began searching for a company to take public. They identified Opsolution, a German company developing a mobile scanner that would provide biometric readings from non-invasive skin scans. The Opsolution executives (the "Executives") were seeking investors to support commercial development of the product. At Abellan's direction, Dean initially communicated with the Executives and obtained due diligence material, including a confidential business plan with detailed financial projections, on the product. Dean's initial efforts were unsuccessful. Thereafter, the defendant was directed to approach the Executives, on behalf of his conspirators, to pitch the investment opportunity. The defendant executed a service agreement between EERT/LeMond and Devkom International, an entity controlled by the defendant wherein the defendant would provide consulting services in exchange for a total of $41,300 and an

hourly fee of $275 per hour for work exceeding 180 hours in support of his efforts to negotiate the acquisition of Opsolution for the conspiracy.

In or around early January 2013, in furtherance of the conspiracy, the defendant met with the Executives in Zurich, Switzerland. On behalf of his coconspirators, the defendant offered to help the Executives navigate entry into the U.S. stock market to raise additional funds as a public company. To that end, the defendant negotiated an initial investment of $2 million into Opsolution on behalf of LeMond.

At the defendant's direction, the Executives provided the defendant with a confidential business plan, including detailed financial projections. This was the same plan initially presented to Dean and later included in an investment publication created by members of the conspiracy. The defendant then provided the Executives with a detailed schedule for the issuance of press releases and a list of proposed topics for the releases. The defendant told the Executives that the press releases would help increase the stock price on the public market.

As a result of the reverse merger, EERT became Biozoom, Inc. ("Biozoom") in or around March 2013. Shares of Biozoom constituted securities registered under section 12 of the Securities Exchange Act of 1934 or the securities of an issuer required to file reports under section 15(f) of the Securities Exchange Act of 1934. After the reverse merger, Abellan and the coconspirators manipulated the price of Biozoom shares through the dissemination of misleading and exaggerated promotional materials designed to give the appearance of a deep liquid market thereby inducing victim investors to buy the stock with the eventual goal of the coconspirators selling the artificially-inflated stock at the height of the market for a profit. The factual information contained in the marketing materials was obtained from the initial due diligence material provided to the defendant and Dean by the Executives. The promotional mailing campaign cost more than $4 million and was conducted without the knowledge or authorization of the Executives, the purported owners of Biozoom.

The defendant understands and admits that the purpose of the promotional

campaigns was to convince individuals to invest in shares of Biozoom and that the information in the mailers touting the stocks was designed to appear to be independent stock analysis, when in fact the content was created by Abellan and other coconspirators through GIR, GFI, and Foresight. The defendant understands and admits that these promotional materials contained misleading and exaggerated claims about the Biozoom scanner. Defendant assisted his coconspirators with the promotional campaign, including communicating with a U.S.-based printing company to arrange the wire transfer of funds used to purchase Biozoom mailers, identifying offshore banks which were later used to deposit proceeds from the scheme, providing legal document templates for loan and trust agreements used to transfer funds, and creating invoices, to include an invoice in the amount of $374,748, which falsely stated that the law firm provided legal services in order to receive and conceal the nature of funds, proceeds from the illegal scheme.

From on or around May to June 2013, the defendant was present in Barcelona, Spain and assisted Abellan with trading in the Argentine nominee accounts using IM. While in Barcelona, the defendant monitored Biozoom trading and was in frequent contact with the Arizona brokerage house and others to check on the status of the accounts he referred.

Prior to May 16, 2013, no shares of Biozoom were traded. On May 16, 2013, the "pump" of Biozoom shares began in the form of the coordinated promotional campaign. Over the course of about four weeks from mid-May to late June 2013, almost 88 million shares of Biozoom were traded and the stock price increased from about $1.10 per share to $4 per share. Approximately $34 million dollars in sales were realized from the trading of Biozoom shares. Once the stock price attained significant gains in June 2013, Abellan and Ciupiak "dumped" the Biozoom shares held in the name of the nominee shareholders and sent the proceeds to offshore banks they established in the names of the nominee shareholders. The profits from the sale of Biozoom shares resulted from the purchase of shares by members of the investing public.

On or about June 25, 2013, the SEC suspended trading of Biozoom and ultimately froze $16 million of proceeds from the scheme. After the SEC halted trading in Biozoom,

the defendant attempted to have the Executives sign a back-dated consulting agreement for the defendant relating to his work for Biozoom. The defendant told the Executives that the agreement would allow him to shield their communications with attorney-client privilege. The defendant, however, was not an attorney. The agreement also sought additional compensation. The defendant admits that he, Abellan, Ciupiak, Dean, and others participated in a scheme to obtain Biozoom shares in order to manipulate the price through the dissemination of misleading and exaggerated promotional materials designed to induce victim investors to the coconspirators to sell the stock they held at a profit. The defendant admits that he and his coconspirators used international and interstate wires in furtherance of the scheme, to include, communicating by telephone, email, and instant messaging to U.S. brokerage houses and entities, including the Arizona firm and the Arizona printer; and transferring funds to and/or from the Arizona firm and the Arizona printer from domestic and international financial institutions via wire transfer, in furtherance of the scheme. The defendant further admits that the profit from the sale of the Biozoom shares were proceeds of an illegal scheme, and that the transfer of the funds from the brokerage houses to the foreign bank accounts were financial transactions involving the proceeds of unlawful activity designed to conceal or disguise the true ownership or control of the ill-gotten proceeds.

   b.   The defendant shall swear under oath to the accuracy of this statement and, if the defendant should be called upon to testify about this matter in the future, any intentional material inconsistencies in the defendant's testimony may subject the defendant to additional penalties for perjury or false swearing, which may be enforced by the United States under this agreement.

## APPROVAL AND ACCEPTANCE OF THE DEFENDANT

I have read the entire plea agreement with the assistance of my attorney. I understand each of its provisions and I voluntarily agree to it.

I have discussed the case and my constitutional and other rights with my attorney. I understand that by entering my plea of guilty I shall waive my rights to plead not guilty,

|   |   |
|---|---|
| 1 | to trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to |
| 2 | present evidence in my defense, to remain silent and refuse to be a witness against myself |
| 3 | by asserting my privilege against self-incrimination, all with the assistance of counsel, and |
| 4 | to be presumed innocent until proven guilty beyond a reasonable doubt. |
| 5 |     I agree to enter my guilty plea as indicated above on the terms and conditions set |
| 6 | forth in this agreement. |
| 7 |     I have been advised by my attorney of the nature of the charges to which I am |
| 8 | entering my guilty plea. I have further been advised by my attorney of the nature and range |
| 9 | of the possible sentence and that my ultimate sentence shall be determined by the Court |
| 10 | after consideration of the advisory Sentencing Guidelines. |
| 11 |     My guilty plea is not the result of force, threats, assurances, or promises, other than |
| 12 | the promises contained in this agreement. I voluntarily agree to the provisions of this |
| 13 | agreement and I agree to be bound according to its provisions. |
| 14 |     I understand that if I am granted probation or placed on supervised release by the |
| 15 | Court, the terms and conditions of such probation/supervised release are subject to |
| 16 | modification at any time. I further understand that if I violate any of the conditions of my |
| 17 | probation/supervised release, my probation/supervised release may be revoked and upon |
| 18 | such revocation, notwithstanding any other provision of this agreement, I may be required |
| 19 | to serve a term of imprisonment or my sentence otherwise may be altered. |
| 20 |     This written plea agreement, and any written addenda filed as attachments to this |
| 21 | plea agreement, contain all the terms and conditions of the plea. Any additional |
| 22 | agreements, if any such agreements exist, shall be recorded in a separate document and |
| 23 | may be filed with the Court under seal; accordingly, additional agreements, if any, may not |
| 24 | be in the public record. |
| 25 |     I further agree that promises, including any predictions as to the Sentencing |
| 26 | Guideline range or to any Sentencing Guideline factors that will apply, made by anyone |
| 27 | (including my attorney) that are not contained within this written plea agreement, are null |
| 28 | and void and have no force and effect. |

I am satisfied that my defense attorney has represented me in a competent manner.

I fully understand the terms and conditions of this plea agreement. I am not now using or under the influence of any drug, medication, liquor, or other intoxicant or depressant that would impair my ability to fully understand the terms and conditions of this plea agreement.

05.26.2020
Date

*[signature]*
JAMES B. PANTHER, JR.
Defendant

**APPROVAL OF DEFENSE COUNSEL**

I have discussed this case and the plea agreement with my client in detail and have advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the constitutional and other rights of an accused, the factual basis for and the nature of the offense to which the guilty plea will be entered, possible defenses, and the consequences of the guilty plea including the maximum statutory sentence possible. I have further discussed the concept of the advisory Sentencing Guidelines with the defendant. No assurances, promises, or representations have been given to me or to the defendant by the United States or any of its representatives that are not contained in this written agreement. I concur in the entry of the plea as indicated above and that the terms and conditions set forth in this agreement are in the best interests of my client. I agree to make a bona fide effort to ensure that the guilty plea is entered in accordance with all the requirements of Fed. R. Crim. P. 11.

5/18/20
Date

*[signature]*
Dennis Burke, Esq.
Mark Kokanovitch, Esq.
Attorneys for Defendant